**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____

|  |  |  |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:04cv1365C |
| v. | ) | Judge Susan G. Braden |
| | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

_____

## DECLARATION OF MICHELE M. RILEY, CPA

1.     I am a Managing Director with Invotex and a Certified Public Accountant licensed in the state of Maryland. For the past 16 years I have focused my practice on the application of forensic accounting procedures to client-related matters both inside and outside of the litigation context.

2.     My business address is 1100 Connecticut Avenue, Suite 825, Washington, DC 20036.

3.     I was retained by the Commercial Litigation Branch of the Department of Justice on behalf of the United States to review and comment on the damages claimed by Chevron U.S.A. Inc. (Chevron) in response to the May 8, 2013 Memorandum and Order of the Court.   I reviewed the declarations of Norman D. Stone (Stone Declaration) and Kenneth P. Metcalfe (Metcalfe Declaration), both filed on July 2, 2013, by Chevron in response to the Court's order.

4.     The Department of Justice originally retained Terry L. Musika, CPA, as its damages expert for this matter.  As part of the trial on damages in this matter, held in May and June, 2011, Mr. Musika submitted an initial expert report on May 16, 2011 (the "First Report"), a supplemental report on May 23, 2011 (the "Supplemental Report"), and a declaration on May

31, 2011 ("Musika Declaration").[1] Mr. Musika also testified at trial on June 3, 2011.

5.      Mr. Musika passed away on December 18, 2012.  As a result, the Department of

Justice has retained me, along with the Invotex staff who was involved in the earlier proceedings

(Mr. Musika was a founder of Invotex), to review and comment on Chevron's amended damages

claim, as well as Mr. Musika's rebuttals to Chevron's original damages claim.  I have read the

First Report, the Supplemental Report, the Musika Declaration, and Mr. Musika's trial

testimony, and I am prepared to provide an analysis of damages that is consistent with the

Court's May 8, 2013 order.

6.      In Chevron's above-referenced declarations, Mr. Stone explained that he allocated

Chevron's claimed costs into the four zones within the Elk Hills oil field, and Mr. Metcalfe then

calculated Chevron's damages based on "four categories of damages, as directed by the court,"

using Mr. Stone's allocations and the parameters set forth by the Court in the May 8, 2011 order.

The four categories outlined by the Court are:  (1) costs incurred to participate in the equity

finalization of the Carneros Zone from May 19, 1997, until July 6, 2000 (2) costs incurred to

participate in the equity finalization of the Stevens Zone from July 8, 1996, until June 17, 2010

(3) costs incurred in connection with Chevron's January 7, 2003 FOIA request and January 28,

2004 notice letter to the Assistant Secretary for Fossil Energy (ASFE); and (4) a sanction

equivalent to 42 percent of the legal fees expended by Chevron from February 16, 2007, to

March 5, 2009.  *See* Opinion and Order of May 8, 2013, at 72-80.  My analysis, as well as Mr.

Burzlaff's adjusted allocations, applies to the first two of these four categories, i.e., the costs

incurred by Chevron in connection with equity finalization of the Carneros and Stevens Zones

during the respective time periods delineated by the Court for these zones.

---

[1] The Musika Declaration (JE 1911) and relevant excerpts of trial and deposition testimony cited in this report are attached as an Appendix.

7.      As of the date of Chevron's filing the Metcalfe Declaration, Chevron's claim for damages was $22,621,484. At the deposition of Norman D. Stone, which was taken on October 30, 2013, Mr. Stone provided an exhibit containing corrections to some of Chevron's allocations. These corrections result in a reduction of Chevron's damages claim to $22,588,567.[2] *See* Exhibit 1. As the starting point for my analysis, I have relied upon the calculations from the Metcalfe Declaration (including the native excel version of those calculations) and the amendments made at the Stone deposition.  The objective of my analysis was to evaluate the existence, relevance and accuracy of the support provided by Chevron for the costs it claims to have incurred in connection with the Elk Hills equity finalization process. In a number of instances, discussed in more detail below, I determined Chevron has failed to produce the itemized financial information necessary to support its claim for damages.

8.      My approach in this matter involved two overlapping and related analyses.  First, I prepared an analysis that recalculates the damages amounts presented in the Metcalfe Declaration, based on what appear to be more accurate adjusted allocations provided by Alan Burzlaff, in his declaration. I understand that Mr. Burzlaff participated in the entire equity finalization process and has personal knowledge of the events upon which Mr. Stone relied for his allocations.  My application of Mr. Burzlaff's adjusted allocations results in a $5,711,464 decrease in Chevron's claimed damages.  *See* Exhibit 2.

9.      Second, I reviewed and considered the Court's May 18, 2013 order and Mr. Musika's prior testimony and reports, and the Musika Declaration, and I prepared an analysis

---

[2] I understand that Chevron also sent Department of Justice counsel three letters and an email in the last three months providing further corrections to its damages claim, and that the corrections in these correspondence result in a net increase of $941.29 to Chevron's claim.  The most recent correspondence, dated November 19, 2013, states that Chevron intends to provide further corrections to its damages claim in the near future.  As of December 5, 2013, no further corrections were provided by Chevron.  At the request of counsel, I have not applied the apparently incomplete corrections set forth in Chevron's correspondence to Government counsel.

that applies certain of the opinions expressed by Mr. Musika -- which continue to apply to Chevron's claims and were not addressed in the Court's order -- to Chevron's revised damages claim it submitted in response to the Court's order.  My application of these specific opinions, previously proffered by Mr. Musika and reapplied by me to this new damages scenario, results in a $3,938,176 decrease in Chevron's claimed damages.  *See* Exhibit 2.

10.     Third, I prepared an analysis that combines these two analyses, whereby the adjusted allocations determined by Mr. Burzlaff are combined with the application, in this new damages scenario, of certain of Mr. Musika's prior opinions.  My combined application of Mr. Burzlaff's adjusted allocations and certain of the opinions previously proffered by Mr. Musika provides a total adjustment of $8,417,671 decrease in Chevron's claimed damages.  *See* Exhibit 2.[3]

I.     <u>Review of Mr. Stone's Allocations And Application Of Mr. Burzlaff's Adjustments</u>

11.     I have reviewed the Metcalfe and Stone Declarations.  Mr. Metcalfe relies upon Mr. Stone's allocations to determine the costs Chevron incurred in the equity finalization process for the relevant zones during the relevant time periods.  The Stone Declaration states that Mr. Stone's allocation estimates are "reasonably accurate estimates of the amounts allocable to these zones."  Stone Decl. at 4.  In determining these allocations, Mr. Stone reviewed "thousands of cost items, many of which were more than fifteen years old."  *Id*.  To assist him in performing this work, Mr. Stone relied upon a timeline previously prepared by Mr. Burzlaff, which was a joint trial exhibit for the previous trials held in this matter.  *See* Chronology (JE 17).  Mr. Stone testified he was "very grateful Mr. Burzlaff put [the timeline] together" because he used it for multiple invoices.  *See* Stone Depo Tr. at 21-22.  In situations where there was no invoice for the

---

[3]  In this third analysis, which combines the first two, I checked for any double counting resulting from the combination of the first two analyses.  The results of my analysis revealed that no double counting issues exist.

amount claimed by Chevron, Mr. Stone made allocations based on the activities taking place in the process during the appropriate time frame.[4]

12.     Mr. Stone necessarily relied, in large part, upon his memory and recollections to do much of the work of allocating the expenses to different zones. I accept this as a reality of the situation.  However, in explaining the methodology he used to make the allocations, Mr. Stone was often unable to recall the specifics of the allocations he had done in June of 2013 (Mr. Stone signed his declaration on June 26, 2013).[5]

13.     Relatedly, I understand that Mr. Stone's allocation of costs within the CVX Internal Technical Consultant[6] cost category was performed based on the timing of the costs. This is inconsistent with the testimony of Ganesh Thakur, Vice President of Chevron's Energy Technology Company, who stated, during his deposition in this matter in 2011, that each time entry made by the consultants could be traced to a zone based on the "GO-113" work orders created for each task.  Thakur Depo. Tr. at 14, 59-60.  I understand that Mr. Burzlaff relied upon the "GO-113" work orders to adjust the allocations for this category, consistent with Mr. Thakur's prior testimony.

14.     Mr. Stone did at times admit that his memory could result in an inaccurate allocation. For example, an invoice that he initially allocated 100 percent to the Stevens Zone

---

[4]  *See* Stone Depo Tr. at 152 ("So based on time frame of 5/97, I honestly don't think it can be anything but Stevens."); *id.* at 154 ("…without knowing that we had more information [to use in making the allocation], on the face it would be time frame."); *see also id.* at 150 ("It's 12/96. It's got to be Stevens. And so they allocated it based on that.") (Mr. Rosenberg speaking).

[5]  "I simply do not remember doing this. It's not familiar at all to me at all, at least in this form." (Stone Depo. Tr. at 62:5-7); "Again, as with the others, this doesn't jump out at me as one that I recall doing. So I don't have the benefit of knowing exactly what we did and why we did it at the time that we did it." (*id.* at 87: 10-13); "Well, again, I don't recognize this in terms of memory of why we allocated the way we did." (*id.* at 145:25-146:1); "Based on this information in front of me, I don't know [the reason for the allocation] and I have no recollection of going through each and every one of these allocations." (*id.* at 182:10-12).

[6]  I note that Chevron's claimed costs categorized as CVX Internal Technical Consultants refer to Chevron's Energy Technology Company, previously referred to as Chevron's Petroleum Technology Company.  Thakur Depo Tr. at 34.

was questioned by the Department of Justice, and he ultimately concluded that the invoice should have been allocated to the Dry Gas Zone, because the cost related to the digitization of "a bunch of Dry Gas maps" that Mr. Stone initially had "no recollection of" at the time he executed his declaration.  Stone Depo. Tr. at 127-29.

16. I appreciate that Mr. Stone, in large part, had to work from memory, and I understand that the results of his work do in many instances provide a fair approximation for certain costs incurred in the relevant zones.  However, there are limits to what memory can provide in terms of support for the allocations, as demonstrated by the issues discussed above.  As a forensic accountant, I endeavor to verify the accuracy and reliability of the financial figures which I am presented, by reviewing and analyzing documentation and relevant testimony from individuals with pertinent knowledge relating to the financial figures.  Here, regarding the adjusted allocations provided by Mr. Burzlaff for certain of Chevron's costs, it appeared to me that Mr. Burzlaff's adjusted allocations were more reliable and accurate than Mr. Stone's, principally for the reasons Mr. Burzlaff himself states in his declaration.

16. Regarding the allocation of Company Payroll & Benefits, the Stone Declaration states that the allocations for many employees change over time because the employees worked on different zones at different times.  Stone Decl. at 5.  My understanding is that this was also true of Mr. Stone, because he had responsibility for the overall equity finalization process for Chevron, and therefore had to work on a number of different zones.  However, Mr. Stone allocated 100 percent of his own salary, as well as 100 percent of Mr. Mark Holtzclaw's salary, to the Stevens Zone, despite the fact there is overwhelming evidence, which is addressed in Mr. Burzlaff's declaration, that Mr. Stone and Mr. Holtzclaw worked on all four zones.  Mr. Stone's rationale for doing this is that "from Chevron's point of view and my point of view, we were

essential to the Stevens to have it completed. And our time should be assigned 100 percent to the Stevens." Stone Depo. Tr. at 265; *id*. at 260 (Mr. Stone stated it was "impossible to envision that equity for Stevens could have been done or completed over the years without the two of us dedicated to the Stevens work for the time period that we're looking at or the life of equity finalization.") This rationale does not alter the fact that Mr. Stone and Mr. Holtzclaw both performed substantial work on all four zones. Thus, a portion of both of their salaries should be allocated to other zones.

17.    Accordingly, Mr. Burzlaff has prepared adjusted salary allocations for Mr. Stone and Mr. Holtzclaw, and he has also made adjustments for Mark Wilson, Fernando Cardenosa and Kevin Maneffa, based on similar findings. These adjustments cause Chevron's claim for Company Payroll & Benefits to decrease from $7,986,729 to $4,427,659, a reduction of $3,559,070. *See* Exhibit 3. Further, Chevron employs a methodology, presented by Mr. Metcalfe in his declaration, whereby the calculation of the allocation of damages for the "Other" category,[7] a claim of $2,272,599, relies upon the Company Payroll & Benefits allocations. In principle, I do not disagree with employing this methodology for calculating the Other category. *See* Metcalfe Decl. at 8 ("In my experience and based on my understanding of these cost types, I believe this allocation method is reasonable and is consistent with Chevron's own practices."). When Mr. Burzlaff's adjusted allocations of the Company Payroll & Benefits costs are applied to the Other damages category, that category is reduced by $886,794, to $1,385,805. *See* Exhibit 3. This corresponding reduction in the Other category demonstrates the importance of applying accurate and reliable allocations in the Company Payroll & Benefits category, as the allocation of payroll and benefits carries through to the Other category.

---

[7]  Mr. Metcalfe describes the "Other" category as Employee Business Expenses; Office Space; Computer Services & Equipment; Office Services & Equipment; Other Equipment, Services, And Rentals; and Communications. *See* Metcalfe Decl. at 8.

18.     Regarding the External Non-Legal Professional & Labor cost category, Mr. Burzlaff has adjusted Mr. Stone's initial allocation of invoices from the vendor Techbase International (Techbase).  Like Mr. Stone's and Mr. Holtzclaw's salaries, Mr. Stone allocated 100 percent of the Techbase costs to the Stevens Zone, even though the Techbase software was used on all four zones (as Mr. Burzlaff explains in his declaration).  Consistent with Mr. Burzlaff's adjustments for the Techbase invoices, I have changed the allocations for this vendor. The application of Mr. Burzlaff's adjusted allocations causes a decrease in this cost category from $2,963,952 to $2,617,049, a reduction of $346,903.  *See* Exhibit 3.

19.     Regarding the CVX Internal Technical Consultants category, as discussed above, Mr. Stone's allocations for this category are based solely upon timing and do not correspond with the "GO-113" work orders. Mr. Thakur referenced those "GO-113" work orders during his deposition when he explained how billing from the internal technical consultants was tracked in the ordinary course of business.  By reviewing the "GO-113" work orders and other documentation Mr. Burzlaff references in his declaration, Mr. Burzlaff has identified problematic issues with Mr. Stone's allocations for this category and he has provided adjusted allocations.  I have applied Mr. Burzlaff's adjusted allocations to this category, and it results in damages of $2,958,261 for this category, a reduction of $789,451. *See* Exhibit 3.

20.     Regarding the Miscellaneous Expenses category, Chevron and Mr. Metcalfe allocated these costs by applying the average of the allocations for all of the other cost categories, combined (excluding Legal Costs).  Given Mr. Burzlaff's adjustments discussed above, there is a corresponding reduction in this category. The adjustments cause a $2,825 decrease in Chevron's claimed damages in the Miscellaneous Expenses category (from $57,859 to $55,034).  *See* Exhibit 3.

21.     Regarding the Legal Costs category, Mr. Burzlaff determined that Chevron had incorrectly allocated fees from the Fried Frank law firm. Based on his review of invoices and other related documents, Mr. Burzlaff has proposed an alternate allocation of these fees.  I have applied this allocation and the result is a decrease in Chevron's claimed damages of $126,420 to $5,433,296. *See* Exhibit 3.

22.     The adjustments provided by Mr. Burzlaff reduce Chevron's overall damages claim by $5,711,463 (from $22,588,567 to $16,877,103). *See* Exhibit 3.

23.     As a result of applying Mr. Burzlaff's adjustments to Chevron's allocations, I have calculated the costs allocated to each Elk Hills zone (excluding Legal Costs) as follows:

| | | |
|---|---|---|
| Stevens | $11,485,001 | (48.7%) |
| SOZ | $11,633,258 | (49.3%) |
| Carneros | $289,314 | (1.2%) |
| DGZ | $179,942 | (0.8%) |
| Total | $23,587,514 | (100%) |

24.     While these new allocations still lean heavily to the Stevens zone, they are closer to the cost ratios Mr. Burzlaff presented in his declaration, which are based on the Department of Energy's and Netherland Sewell and Associates, Inc.'s actual costs for each zone, as compared to the allocations made by Mr. Stone for Chevron many years after the events took place.

25.     Finally, Mr. Metcalfe made a comparison of his allocations of costs to the equity value of each Elk Hills zone. Mr. Metcalfe stated that "The results of this comparison provide a level of independent confirmation that the relative costs incurred by Chevron … are reasonable." Metcalfe Decl. at 11. However, I agree with Mr. Burzlaff that that the relative equity value of each zone is not necessarily a reliable metric for confirming the relative costs incurred in connection with the equity finalization process for each zone.  Mr. Metcalfe confirms this,

stating that "[a]lthough the Carneros Zone had less total value than the Dry Gas Zone, …

Chevron spent more on the Carneros Zone than the Dry Gas Zone." Metcalfe Decl. at 11 n.17.

## II.   **Application and Reiteration Of Certain Of Mr. Musika's Opinions**

26.     Mr. Musika completed both a "Systems Analysis" and a "Transaction Analysis"

regarding Chevron's original damages claim. These analyses uncovered certain deficiencies in

Chevron's claimed damages.  Given that Chevron's current claim is derived from its claim

presented at the trial in 2011, it is my opinion, based on my review and consideration of the

analyses presented by Mr. Musika and the record in this matter, that the deficiencies Mr. Musika

identified still exist within Chevron's current damages claim, because Chevron has not produced

the itemized financial information necessary to support its claim.

27.     Mr. Musika discussed the System Analysis in the declaration he submitted as part

of the damages trial held in 2011.  *See* Declaration of Terry L. Musika, CPA, dated May 31,

2011, pp. 3- 6 (JE 1911).  As a result of the Systems Analysis, Mr. Musika concluded that

"Chevron's ordinary course system and controls did not provide a reliable approach or

standalone basis to conclude that Chevron's claimed costs were incurred in connection with the

Elk Hills Equity Finalization Process."  *Id.* at 6.  He clarified as follows:

> [I]t is important to emphasize that my conclusion does not question
> the incurrence of a Chevron expense.  I would agree that the
> ordinary course accounting system and controls would provide a
> level of comfort concerning whether Chevron had incurred an
> expense.  The key issue involving Chevron's damage claim is
> whether the Chevron expense was incurred in connection with the
> Elk Hills Equity Finalization Process. *Id*. at 6

The issue was further explored at trial, and Mr. Musika testified that while Chevron's claimed

costs did exist in their ordinary course accounting system, the costs had to be adjusted, re-classed

and corrected for errors in order to be assigned to Elk Hills.  *See* June 3, 2011 Trial Tr. at 1111-

14.  This continues to be an important issue, because Chevron's accounting system did not

specifically track Elk Hills Equity Finalization costs and its accounting data needed significant interpretation and modification for the purposes of this litigation and to respond to the Court's Memorandum Opinion and Order.  Given that the accounting system did not specifically track Elk Hills Equity Finalization costs, it stands to reason that the accounting system also did not track costs to the specific zones within Elk Hills.  *See* Stone Decl. at 2 ("During the equity finalization process, Chevron generally did not record or track its equity finalization costs by zone.").  Chevron's allocations to zones are based primarily upon Mr. Stone's recollection, with assistance from the recollections of other personnel and review of documents.

28.     Based on the results of the Systems Analysis, Mr. Musika conducted a Transaction Analysis to "further investigate and analyze Chevron's damage claim on a detailed transaction basis," and Mr. Musika also discussed the System Analysis in the declaration he submitted as part of the damages trial.  *See* Musika Decl. at 6-14 (JE 1911).  The results of this analysis were that Chevron had claimed "$8,219,202 of transactions with insufficient support to demonstrate that the claimed transaction was incurred in connection with the Elk Hills Equity Finalization Process."  *Id*. at 7.  Mr. Musika's analysis was broken into five categories, with a sixth category designated to correct for the potential of double counting.  The five categories were:

  i.     Unsupported transactions acknowledged by Chevron and Mr. Metcalfe,

  ii.    Deficiencies in Chevron's claimed support,

  iii.   Improper inclusion of fixed costs unrelated to equity finalization in the CVX Internal Technical Consultants category,

  iv.    Improper inclusion of accrued benefit costs unrelated to equity finalization, and

  v.     Improper inclusion of costs related to sale.

Categories one, three, four and five remain relevant to Chevron's updated damages claim, as Chevron has derived its updated claim from the claim it presented at the damages trial held in 2011.[8]  Accordingly, the analysis below applies the methodologies discussed above to Chevron's updated damages claim.  The application of these methodologies results in a decrease to Chevron's updated damages claim of $3,938,176.  I provide in Exhibits 4 and 4.2 a detailed identification of the four categories of adjustment that constitute this aggregate adjustment.

29.     As an overarching starting point, I must emphasize that the objective of the transaction test is not to determine whether an expense actually was incurred by Chevron.  The objective is to determine the extent to which Chevron has provided support that the expenses it claims as damages were incurred by Chevron in connection with the Elk Hills equity finalization process for the Stevens or Carneros zone.  Simple name recognition of a vendor by a Chevron employee is not sufficient support.  I understand that there was significant activity in and around the Elk Hills equity finalization process, involving Chevron, the San Joaquin Business Unit, or some other activity within Elk Hills other than the equity finalization process.  Further, I understand, based on testimony of Chevron employees connected to the Elk Hills equity finalization process, that many of the vendors that performed work in connection with equity finalization also performed other services for Chevron not associated with the equity finalization process.  As Chevron witnesses have indicated on numerous occasions, it is not unusual that they cannot recall certain details concerning an activity that occurred many years ago.  Accordingly, the basis of the following adjustments is the extent to which Chevron has provided adequate support that the expense that was incurred by Chevron was incurred in connection with the

---

[8] I have eliminated the second category of adjustments as Mr. Stone and Mr. Burzlaff have specifically reviewed invoices for their allocations to the Elk Hills zones. Additionally, I have not included the $24 million offset which was opined to by Mr. Musika, as the Court has already addressed the offset analysis and did not accept it.  *See* Memorandum Opinion and Order, p.77.

specified zone within the Elk Hills equity finalization process.

30.     The first adjustment, as shown on Exhibits 4.2 and 4.5, is for $1,205,456 in transactions that Chevron and Mr. Metcalfe have already acknowledged are unsupported.  In Chevron's original damages claim, both Chevron and Mr. Metcalfe produced a detailed listing of transactions in support of the total claim. The detailed transaction listing contained various fields of information for each transaction, including identified cost center, cost element, and cost category.  The detailed transaction listing also contained a field labeled "amount supported." Accordingly, when the transaction had no support shown in the "amount supported" field, it was counted in this adjustment, because Chevron has not provided the itemized financial information necessary to determine whether the transaction was applicable to the relevant zones.  In his workpaper binders that were provided at the time of the damages trial, Mr. Metcalfe included a workpaper titled "Summary Percent Of Total Claimed Incurred Costs Supported," in which he calculated and reported that the "Percent Of Total Claimed Incurred Costs Supported" was 82% of the total claimed costs.[9]

31.     The $1,205,456 adjustment I have calculated represents only 5.3 percent of Chevron's current damages claim ($1,205,456 ÷ $22,588,567 = 5.3%).  Additionally, as Mr. Musika described at trial, this adjustment was developed by identifying cost categories for which one would expect to have third-party supporting documentation, such as an invoice or business expense receipt.  June 3, 2011 Trial Tr. at 1121-22.  Accordingly, the adjustment of $1,205,456 is based on the amounts identified *by Chevron* as unsupported, and it only includes cost categories for which one would expect that there be third-party supporting documentation.  As with my other calculations, I did not include cost categories such as Company Payroll & Benefits

---

[9]  Mr. Metcalfe's Workpaper Binder "N" – General Accounting Information & Other Supporting Documents, at p.N-2 (JE 1871).

that would be supported by internal documentation.

32.     The next two analyses address the extent to which two cost categories, CVX Internal Technical Consultants and Company Payroll & Benefits, include expenses comprised of internal charges that largely represent the allocation of Chevron corporate costs to internal Chevron projects or programs (understandably, neither of these costs categories are supported by outside invoices).  Mr. Musika's investigation in this area focused specifically on Chevron management's decision regarding the allocation of corporate costs to the Elk Hills equity finalization process and my subsequent analysis focused only on the portion of those cost categories that were allocated to the Stevens and Carneros Zones during the relevant time periods, as discussed in the Stone Declaration and the Metcalfe Declaration.

33.     The second category of adjustments began with an analysis of Chevron's corporate cost allocations and a review of the rates charged by CVX Internal Technical Consultants to internal Chevron projects.  The CVX Internal Technical Consultant category name was created to reflect work done by Chevron's internal consulting organization, which has also been known as the Chevron Petroleum Technology Company ("CPTC") or the Energy Technology Group ("ETC").  May 31, 2011 Trial Tr. at 316-317.  Mr. Musika determined that Chevron had produced a description of the policies and procedures for the ETC for only one year, 2005.  *See* Chevron ETC Labor Rates, June 6, 2005 (CVXD 5238 – CVXD5247). Accordingly, Mr. Musika assumed that Chevron followed the same policies and procedures with respect to the development and charging of costs related to the CVX Internal Technical Consultants category in all the relevant years.  Based on the 2005 ETC Labor Rates document and testimony provided by Dr. Thakur at the damages trial, the goal of the ETC rates was to capture a full cost recovery of the costs of the ETC. May 31, 2011 Trial Tr. 299-300.  The key

cost components included in the standard rates developed by the ETC to be charged to other

Chevron programs included payroll costs, office rent, computers and software,

telecommunications and network connectivity, material and supplies, general travel costs, the

president, planning, human resources, and finance. *See* Chevron ETC Labor Rates, June 6, 2005

(CVXD5238 – CVXD5247); *see also* June 3, 2011 Trial Tr. at 1124-1126.  Accordingly, the

costs included in this full cost recovery model included fixed costs that would have been

incurred by Chevron even if the Elk Hills equity finalization process did not occur.  *See* Musika

Decl. at 11 (JE 1911).   Further, the rates were standard fixed rates that were based on dividing

the total ETC anticipated costs for the year by the total number of ETC employees, times 1,560

hours.[10]  Therefore, if an ETC employee worked more than 1,560 hours in a year, ETC would

recoup even more than their total costs. *See* Musika Decl. at 11-12 (JE 1911).  Finally, Mr.

Thakur testified that Chevron's cost to hire ETC employees did not increase as a result of the Elk

Hills equity finalization process, that Chevron would not have had to fire employees if Elk Hills

had used other outside consultants, and that, generally, there was a backlog of work for those

employees.  Thakur Depo Tr. of May 3, 2011, at 60-62.

      34.     To calculate this adjustment, Mr. Musika compared the highest rate of an ETC

employee charging time to the Elk Hills equity finalization process to the calculated effective

hourly rate charged by Mr. Stone, the most senior employee assigned directly to the Elk Hills

equity finalization process.  He then compared Mr. Stone's inherent rate with the ETC employee

and found that Mr. Stone's rate of $91 per hour represented 56.9 percent of the ETC rate.

Musika Decl. at 12.  Accordingly, Mr. Musika concluded that the inverse of this percentage, or

---

[10] 1,560 hours are calculated as 40 hours per week multiplied by 52 weeks in a year then deducting 20-25% for
allowances such as vacations and holidays. Mr. Musika conservatively used a 25% allowance thereby decreasing the
hours for determining a labor rate and increasing the final hourly rate. *See* Chevron ETC Labor Rates, June 6, 2005
(CVXD5238 – CVXD5247 at CVXD5244).

43.1 percent, represents the allocation of ETC costs over and above the employees' salary and benefit costs. Put another way, this 43.1 percent represents the fixed costs of ETC that would have existed even without the Elk Hills equity finalization process. Thus, I multiplied Chevron's updated damages for the CVX Internal Technical Consultants category by 43.1 percent, resulting in an adjustment to Chevron's updated damages claim of $1,615,264. *See* Exhibits 4.2 and 4.6.

35.     This analysis assumes that the ETC employees would have used every hour that they charged to the Elk Hills equity finalization process on an alternative project, which is a reasonable assumption given Mr. Thakur's statements regarding backlogs of work for these consultants. Thakur Depo Tr. of May 3, 2011 at 60-62. However, I do conservatively allow the full cost of the employees and their benefits.

36.     The third adjustment to Chevron's claimed costs focuses on the Company Payroll & Benefits category. Based on analysis of the costs included in this category, Mr. Musika determined that Chevron included the salary costs for certain individuals whom Chevron claimed to have worked specifically on the Elk Hills equity finalization process, and that Chevron also included a charge for employee benefits for these employees. The benefits charge is based on a percentage of direct salaries that is intended to represent the costs associated with employee benefits. However, the percent that was applied to the employees charged to the Elk Hills equity finalization process is based upon the cost ratio of employee benefits to direct salaries for a larger segment of Chevron employees, beyond the Elk Hills equity finalization process employees. For the San Joaquin Business Unit, this calculation was done by Chevron at the "Chevron USA" legal entity level. June 1, 2011 Trial Tr. at 403-04. Mr. Musika performed no further investigation or adjustment of Chevron's direct *salary* costs associated with the individual Chevron employees who worked on the Elk Hills equity finalization process.

However, there was further investigation into the employee *benefits* charge, as discussed below.

37.     Based on further investigation of the costs included in the employee benefit rate used to calculate Chevron's damages relating to the Elk Hills equity finalization process, Mr. Musika determined that the benefit rate included certain accrued and unpaid costs that did not relate to the employees involved with Elk Hills equity finalization. June 1, 2011 Trial Tr. at 1128-1131.   While certain of the benefits  such as FICA and medical insurance would generally apply to all employees, there are four specific benefits Chevron included in its calculation of the benefits rate that do not apply to all Chevron employees.  These four benefits are the stock plan, the savings plus plan, OPEB Cash, and OPEB non-cash.  Musika Decl. at 13 (JE 1911).  Further, in deposition testimony, neither Mr. Stone nor Kimberly Anne Melton, Chevron's Finance Team Leader, could explain these four benefits.  Stone Depo Tr. of May 11, 2011, at 216-217; Melton Depo Tr. of May 12, 2011 at 214-216.  At trial, Ms. Melton explained that OPEB was "Other Post Employment Benefits," but she did not define the other categories.  June 1, 2011 Trial Tr. at 404-406.  Based on the fact that Chevron has provided minimal evidence to show that the claimed employees participated in these specific employee benefit programs,[11] and given that the Chevron witnesses did not explain why these costs are applicable to the specific zones of the Elk Hills equity finalization process, and Chevron has not provided itemized financial information that would support the allocation of these benefits to the relevant zones, I have made an adjustment of $1,102,362 to Chevron's claimed damages, as illustrated on Exhibits 4.2 and 4.7**,** to remove the charge for these benefits. This adjustment is based on the percentage that these unknown and unsupported benefits represent of the total benefits Chevron includes as part of its

---

[11]   While Ms. Melton explained at trial that the most Chevron employees were vested for ESIP (employee stock option plan) and pensions during the period that Chevron has claimed costs, Ms. Melton did not state that any of the four benefits at issue here are applicable to all Elk Hills employees or were related to equity finalization.  June 1, 2011 Trial Tr. 406.

updated damages claim.

38.     The fourth adjustment is for costs that Chevron has agreed relate to the sale of Elk Hill properties.  Mr. Stone stated in a previous declaration that Chevron's original damage claim included approximately $1.4 million of transactions that are apparently related to "sale issues other than equity finalization."  JE 1718 at 6.  I have reviewed Chevron's updated damages claim and have found that $15,094 of the costs related to sale issues are still being claimed by Chevron, and I have therefore removed these costs from their damages.  *See* Exhibits 4.2 and 4.8.

39.     Finally, I performed an analysis to ensure that a transaction was not deducted from Chevron's claims more than once as a result of these four adjustments.  Accordingly, I reviewed all of the adjustment categories discussed above to identify the transactions that appeared in more than one adjustment category.  I found that it was never the case that a transaction was deducted more than one time. Based on this approach, the adjustment amounts presented on Exhibit 4.2 can be considered on an individual stand-alone basis.

40.     In total, the four adjustments I made as part of the Transaction Analysis results in a $3,938,176 reduction in Chevron's updated damages claim for the costs it incurred in relation to the Stevens and Carneros zones during the relevant time periods.  Under this analysis, Chevron's total claim for damages is $18,650,391 -- not taking into account Mr. Burzlaff's allocations.  *See* Exhibit 4.  I provide analysis which combines Mr. Burzlaff's adjustments with my four Transaction Analysis adjustments below.

III.    **Combination Of Adjusted Damages Claim**

41.     In a final damages scenario, I have calculated Chevron's damages by combining both the allocation adjustments from Mr. Burzlaff and the results of the four adjustments from my Transaction Analysis.  In combining these two categories of adjustments, I have again

completed an analysis to ensure that no transaction was being deducted more than one time. The analysis leads to the same conclusion as above, where no transactions were deducted more than once. The outcome of the combined analysis can be seen in Exhibit 5 and results in total damages claimed by Chevron of $14,170,896. This represents a reduction of $8,417,671 in Chevron's damages claim. Should the Court decide to only apply deductions to certain cost categories, or choose only to apply certain of Mr. Burzlaff's allocations or my adjustments to Chevron's claimed costs, a combination of Exhibits 2, 4.2 and 5.2 provides a basis for that analysis.

I declare under penalty of perjury that the content herein is true and correct. Executed on December 6, 2013.

Michele M. Riley

Exhibit 1

## Chevron's Corrections to Damages Claims

| | | Stevens | Carneros | FOIA | Sanctions | Total |
|---|---|---|---|---|---|---|
| Chevron's Claim Per Metcalfe Declaration 1/ | | $ 21,153,483 | $ 475,755 | $ 80,744 | $ 911,502 | $ 22,621,484 |
| Corrections to Legal Costs 2/ | | | | | | |
| Line 73 | Fried Frank | | (3,463) | | | (3,463) |
| Line 116 | Akin Gump | (6,752) | | (429) | | (7,181) |
| Line 117 | Akin Gump | (17,862) | | 4,122 | | (13,740) |
| Line 184 | Jones Day | 1,975 | | | (830) | 1,146 |
| Subtotal | | (22,639) | (3,463) | 3,693 | (830) | (23,238) |
| | | | | | | |
| Corrections to External Non-Legal Prof & Labor Costs 2/ | | | | | | |
| Line 40 | Arrow Engineering | (8,582) | | | | (8,582) |
| Line 134 | Multiple Vendors | (1,037) | | | | (1,037) |
| Subtotal | | (9,619) | - | - | - | (9,619) |
| | | | | | | |
| Resulting Corrections to Miscellaneous 3/ | | (61) | - | - | - | $ (61) |
| | | | | | | |
| Chevron's Corrected Damages Claim | | $ 21,121,164 | $ 472,292 | $ 84,437 | $ 910,672 | $ 22,588,567 |

Sources:
1/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim-2.
2/   Exhibit 22 to the deposition of Norman D. Stone dated October 30, 2013.
3/   Miscellaneous Costs are allocated "based on the total of other cost types assigned to a given zone by month" (Metcalfe Declaration p. 8) therefore, correcting the allocations herein results in new allocations for miscellaneous costs.

Prepared by Invotex

Exhibit 2

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 21 of 196
Chevron U.S.A. Inc. v. The United States

**Summary of Adjustments to Chevron's Damages Claim**

| Cost Type | Chevron's Corrected Damages Claim 1/ | Mr. Burzlaff's Allocations 2/ | Adjusted Claim Based on: Transaction Analysis 3/ | Combined Analysis 4/ |
|---|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 4,564,606 | $ 4,438,186 | $ 4,532,982 | $ 4,407,884 |
| Legal Costs - FOIA and Sanctions | 995,110 | 995,110 | 995,110 | 995,110 |
| Company Payroll & Benefits | 7,986,729 | 4,427,659 | 6,884,367 | 3,845,683 |
| External Non-Legal Prof & Labor | 2,963,952 | 2,617,049 | 2,739,233 | 2,392,331 |
| CVX Internal Technical Consultants | 3,747,712 | 2,958,261 | 2,132,448 | 1,683,250 |
| Other | 2,272,599 | 1,385,805 | 1,308,391 | 791,603 |
| Miscellaneous Expenses | 57,859 | 55,034 | 57,859 | 55,034 |
| **Chevron's Adjusted Damages Claim** | **$ 22,588,567** | **$ 16,877,103** | **$ 18,650,391** | **$ 14,170,896** |
| Reduction to Chevron's Corrected Damages Claim | | $ (5,711,464) | $ (3,938,176) | $ (8,417,671) |

**Sources/Notes:**

1/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 3. Chevron's claim has been updated based on Exhibit 22 to the deposition of Mr. Stone dated October 30, 2013. See Exhibit 1.

2/ See Exhibit 3.0.

3/ See Exhibit 4.0.

4/ See Exhibit 5.0.

Prepared by Invotex

Exhibit 3

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 22 of 196
Chevron U.S.A. Inc. v. The United States

# Chevron's Adjusted Damages Claim Using Mr. Burzlaff's Adjusted Allocations

| Cost Type | Chevron's Corrected Damages Claim 1/ | Chevron's Adjusted Damages Claim 2/ | Reduction to Chevron's Corrected Damages Claim |
|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 4,564,606 | $ 4,438,186 | $ (126,420) |
| Legal Costs - FOIA and Sanctions | 995,110 | 995,110 | - |
| Company Payroll & Benefits | 7,986,729 | 4,427,659 | (3,559,071) |
| External Non-Legal Prof & Labor | 2,963,952 | 2,617,049 | (346,902) |
| CVX Internal Technical Consultants | 3,747,712 | 2,958,261 | (789,451) |
| Other | 2,272,599 | 1,385,805 | (886,794) |
| Miscellaneous Expenses | 57,859 | 55,034 | (2,825) |
| Total | $ 22,588,567 | $ 16,877,103 | $ (5,711,463) |

**Sources**:
1/  See Exhibit 2.
2/  See Exhibit 3.1.

Prepared by Invotex

Exhibit 3.1

# Chevron's Adjusted Damages Claim Using Mr. Burzlaff's Adjusted Allocations - By Zone

|  | Stevens Zone | Carneros Zone | Total |  |
|---|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 3,994,601 | $ 443,585 | $ 4,438,186 | 1/ |
| Legal Costs - FOIA and Sanctions | - | - | 995,110 | 2/ |
| Company Payroll & Benefits | 4,403,820 | 23,838 | 4,427,659 | 3/ |
| External Non-Legal Prof & Labor | 2,581,697 | 35,352 | 2,617,049 | 4/ |
| CVX Internal Technical Consultants | 2,958,261 | - | 2,958,261 | 5/ |
| Other | 1,379,455 | 6,350 | 1,385,805 | 6/ |
| Miscellaneous Expenses | 54,847 | 186 | 55,034 | 7/ |
| Adjusted Damages | $ 15,372,682 | $ 509,312 | $ 16,877,103 |  |

**Sources:**

1/   See Exhibit 3.2
2/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 13 and Exhibit 22 to Mr. Stone's Deposition dated October 30, 2013.
3/   See Exhibit 3.3.
4/   See Exhibit 3.4.
5/   See Exhibit 3.5.
6/   See Exhibit 3.6.
7/   See Exhibit 3.7.

Prepared by Invotex

Document 399-2   Filed 12/06/13   Page 24 of 196
Chevron U.S.A. Inc. v. The United States

Exhibit 3.2

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Legal Costs**

| Claimed Date | Activity Date | Vendor | Bates No. 2/ | Total Amount | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Stevens | Carneros | Dry Gas | Shallow Oil | Net Zero | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Net Zero | Other |
| Dec-96 | Oct-96 | Fried Frank | CVXO 5895 | $ 30,982 | $ 23,237 | $ - | $ - | $ - | $ - | $ 7,746 | $ 9,295 | $ 7,746 | $ 6,196 | $ - | $ - | $ 7,746 |
| Jan-97 | Nov-96 | Fried Frank | CVXO 5897 | 79,116 | 31,646 | 31,646 | - | - | - | 15,823 | 23,735 | 19,779 | 19,779 | - | - | 15,823 |
| Jun-97 | Apr-97 | Fried Frank | CVXO 9311 | 106,398 | 106,398 | - | - | - | - | - | 42,559 | - | - | 63,839 | - | - |
| Jul-97 | May-97 | Fried Frank | CVXO 9912 | 65,675 | 65,675 | - | - | - | - | - | 26,270 | - | - | 39,405 | - | - |
| Total | | | | $ 282,171 | $ 226,956 | $ 31,646 | $ - | $ - | $ - | $ 23,569 | $ 101,859 | $ 27,525 | $ 25,975 | $ 103,244 | $ - | $ 23,569 |
| Adjusted - In Date Range | | | | $ 226,956 | $ 226,956 | $ 31,646 | $ - | $ - | $ - | $ 23,569 | $ 101,859 | $ 25,975 | $ 25,975 | $ 103,244 | $ - | $ 23,569 |
| Difference | | | | | | | | | | | $ (125,097) | $ - | $ - | $ 25,975 | $ 103,244 | $ - |

| | Stevens | Carneros | Total |
|---|---|---|---|
| Chevron's Corrected Claim 3/ | 4,121,021 | 443,585 | 4,564,606 |
| Mr. Burzlaff's Adjustment | (125,097) | - | (125,097) |
| Other Adjustment 4/ | (1,323) | | (1,323) |
| Adjusted Claim | 3,994,601 | 443,585 | 4,438,186 |

**Sources:**
1/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 25 to 28.
2/ Declaration of Alan A. Burzlaff, dated December 6, 2013.
3/ See Exhibits 4.3 and 4.4.
4/ Adjustment due to Mr. Metcalfe's use of average monthly allocations when no direct allocation was provided.

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 25 of 196
Chevron U.S.A. Inc. v. The United States

Exhibit 3.3

## Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits



| Employee | Chevron's Damages Claim | | | Adjusted Claim | | | Reduction to Chevron's Damages Claim | | |
|---|---|---|---|---|---|---|---|---|---|
| | Stevens | Carneros | | Stevens | Carneros | | Stevens | Carneros | Total |
| Other Indirect Labor 6/ | 1,580,949 | - | | 793,139 | 3,331 | | (787,810) | 3,331 | (784,479) |
| Total | $ 6,513,238 | $ - | | $ 2,930,329 | $ 23,838 | | $ (3,582,909) | $ 23,838 | (3,559,071) |

|  | Stevens | Carneros | Total |
|---|---|---|---|
| Chevron's Corrected Claim for Company Payroll & Benefits 7/ | 7,986,729 | - | 7,986,729 |
| Adjustment | (3,582,909) | 23,838 | (3,559,071) |
| Adjusted Company Payroll & Benefits | $ 4,403,820 | $ 23,838 | $ 4,427,658 |

**Sources:**

1/  See Exhibit 3.3.1.
2/  See Exhibit 3.3.2.
3/  See Exhibit 3.3.3.
4/  See Exhibit 3.3.4.
5/  See Exhibit 3.3.5.
6/  See Exhibit 3.3.6.
7/  See Exhibits 4.3 and 4.4.

Prepared by Invotex

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 26 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.1

Page 1 of 4

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - Norman Stone**



Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.1

Page 2 of 4



Prepared by Invotex

Exhibit 3.3.1

Page 3 of 4

Prepared by Invotex






Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 29 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.1

**Sources:**
1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 95 to 98.
2/  Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.
3/  Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted
    Mr. Metcalfe's apportionment methodology.

Prepared by Invotex

Page 4 of 4

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.2

Page 1 of 4

Prepared by Invotex

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - Mark Holtzclaw**



Exhibit 3.3.2

Chevron U.S.A. Inc. v. The United States

Prepared by Invotex



Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 32 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.2

Page 3 of 4

Prepared by Invotex




Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.2



**Sources:**

1/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 79 to 82.

2/   Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.

3/   Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr. Metcalfe's apportionment methodology.

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.3

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - Mark Wilson**



**Sources:**
1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 103 to 106.
2/  Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.
3/  Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr. Metcalfe's apportionment methodology.

Prepared by Invotex

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.4

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - F. Cardenosa**



Original Allocations 1/, 3/

Adjusted Allocations 2/, 3/

Year | Month | Total Amount | Stevens | Carneros | Dry Gas | Shallow Oil | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Other

Prepared by Invotex

Sources:
1/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 75 to 78.
2/   Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.
3/   Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr.
     Metcalfe's apportionment methodology.

Exhibit 3.3.5

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - Kevin Maneffa**



**Sources:**
1/  Mr. Metcalfe's Chevron Interim Ruling – Damages Binder, Interim – 83 to 86.
2/  Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.
3/  Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr.
    Metcalfe's apportionment methodology.

Prepared by Invotex

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Company Payroll & Benefits - Other Indirect Labor**

| Year | Month | Total Amount | Original Allocations 1/, 3/ | | | | | Adjusted Allocations 2/, 3/ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Stevens | Carneros | Dry Gas | Shallow Oil | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Other |
| 1996 | 7 | - | - | - | - | - | - | - | - | - | - | - |
| 1996 | 8 | - | - | - | - | - | - | - | - | - | - | - |
| 1996 | 9 | - | - | - | - | - | - | - | - | - | - | - |
| 1996 | 10 | - | - | - | - | - | - | - | - | - | - | - |
| 1996 | 11 | - | - | - | - | - | - | - | - | - | - | - |
| 1996 | 12 | - | - | - | - | - | - | - | - | - | - | - |
| 1997 | 1 | 44,670 | 25,218 | - | - | - | 19,452 | 25,218 | - | - | - | 19,452 |
| 1997 | 2 | 39,350 | 21,469 | - | - | - | 17,881 | 20,805 | - | 265 | - | 17,881 |
| 1997 | 3 | 36,674 | 21,352 | - | - | - | 15,322 | 20,692 | - | 264 | - | 15,322 |
| 1997 | 4 | 35,586 | 20,391 | - | - | - | 15,195 | 19,504 | - | - | - | 16,082 |
| 1997 | 5 | 38,815 | 23,249 | - | - | - | 15,566 | 22,220 | - | - | - | 16,595 |
| 1997 | 6 | 46,623 | 28,128 | - | - | - | 18,494 | 26,954 | - | - | - | 19,669 |
| 1997 | 7 | 34,884 | 27,692 | - | - | - | 7,191 | 27,023 | - | - | - | 7,860 |
| 1997 | 8 | 15,220 | 9,361 | - | - | - | 5,859 | 8,572 | - | - | 321 | 6,327 |
| 1997 | 9 | 16,223 | 9,652 | - | - | - | 6,571 | 8,881 | - | - | 307 | 7,035 |
| 1997 | 10 | 15,698 | 9,239 | - | - | - | 6,459 | 8,201 | - | - | 578 | 6,919 |
| 1997 | 11 | 16,369 | 9,738 | - | - | - | 6,632 | 8,685 | - | - | 586 | 7,098 |
| 1997 | 12 | 16,743 | 11,325 | - | - | - | 5,418 | 10,531 | - | - | 340 | 5,872 |
| 1998 | 1 | 14,682 | 14,682 | - | - | - | - | 13,163 | - | - | 458 | 1,062 |
| 1998 | 2 | 16,664 | 16,664 | - | - | - | - | 15,304 | - | - | 549 | 812 |
| 1998 | 3 | 16,255 | 16,255 | - | - | - | - | 12,821 | - | - | 2,335 | 1,099 |
| 1998 | 4 | 14,224 | 14,224 | - | - | - | - | 11,292 | - | - | 2,034 | 898 |
| 1998 | 5 | 18,506 | 18,506 | - | - | - | - | 14,541 | - | - | 2,796 | 1,168 |
| 1998 | 6 | 16,919 | 11,564 | - | - | 5,354 | - | 6,167 | - | - | 9,684 | 1,068 |
| 1998 | 7 | 18,151 | 12,063 | - | - | 6,088 | - | 6,341 | - | - | 10,952 | 858 |
| 1998 | 8 | 16,783 | 11,263 | - | - | 5,520 | - | 5,691 | - | - | 9,991 | 1,101 |
| 1998 | 9 | 14,830 | 9,380 | - | - | 5,449 | - | 5,196 | - | - | 8,546 | 1,087 |
| 1998 | 10 | 15,643 | 9,895 | - | - | 5,748 | - | 5,432 | - | - | 9,063 | 1,147 |
| 1998 | 11 | 14,932 | 9,445 | - | - | 5,487 | - | 5,190 | - | - | 8,647 | 1,095 |
| 1998 | 12 | 12,627 | 8,690 | - | - | 3,937 | - | 3,825 | - | - | 7,742 | 1,060 |
| 1999 | 1 | 10,772 | 7,413 | - | - | 3,359 | - | 4,019 | - | - | 5,848 | 905 |
| 1999 | 2 | 11,956 | 8,072 | - | - | 3,884 | - | 4,112 | 329 | - | 7,119 | 396 |
| 1999 | 3 | 11,290 | 7,059 | - | - | 4,231 | - | 3,381 | 282 | - | 7,626 | - |
| 1999 | 4 | 10,721 | 6,704 | - | - | 4,018 | - | 3,211 | 268 | - | 7,242 | - |
| 1999 | 5 | 11,870 | 7,422 | - | - | 4,448 | - | 3,555 | 297 | - | 8,018 | - |
| 1999 | 6 | 11,209 | 7,008 | - | - | 4,201 | - | 3,357 | 280 | - | 7,571 | - |
| 1999 | 7 | 10,834 | 6,774 | - | - | 4,060 | - | 3,245 | 271 | - | 7,318 | - |
| 1999 | 8 | 11,078 | 6,927 | - | - | 4,151 | - | 3,318 | 277 | - | 7,483 | - |
| 1999 | 9 | 11,047 | 6,907 | - | - | 4,140 | - | 3,563 | 313 | - | 7,171 | - |
| 1999 | 10 | 11,675 | 7,300 | - | - | 4,375 | - | 3,766 | 330 | - | 7,579 | - |
| 1999 | 11 | 11,227 | 7,020 | - | - | 4,207 | - | 6,169 | 683 | - | 4,375 | - |
| 1999 | 12 | 10,513 | 6,573 | - | - | 3,940 | - | 6,573 | - | - | 3,940 | - |
| 2000 | 1 | - | - | - | - | - | - | - | - | - | - | - |
| 2000 | 2 | - | - | - | - | - | - | - | - | - | - | - |

Exhibit 3.3.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 38 of 196

Chevron U.S.A. Inc. v. The United States

| Year | Month | Total Amount | Original Allocations 1/ 3/ | | | | | Adjusted Allocations 2/ 3/ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Stevens | Carneros | Dry Gas | Shallow Oil | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Other |
| 2000 | 3 | - | - | - | - | - | - | - | - | - | - | - |
| 2000 | 4 | - | - | - | - | - | - | - | - | - | - | - |
| 2000 | 5 | 17,609 | 10,972 | - | - | 6,637 | - | 2,458 | - | - | 15,151 | - |
| 2000 | 6 | 16,774 | 10,452 | - | - | 6,323 | - | 5,826 | - | - | 10,948 | - |
| 2000 | 7 | 14,288 | 8,903 | - | - | 5,386 | - | 4,265 | - | - | 10,023 | - |
| 2000 | 8 | 15,854 | 9,878 | - | - | 5,976 | - | 8,126 | - | - | 7,728 | - |
| 2000 | 9 | 13,897 | 9,664 | - | - | 4,233 | - | 7,515 | - | - | 6,383 | - |
| 2000 | 10 | 14,301 | 9,945 | - | - | 4,356 | - | 1,924 | - | - | 12,377 | - |
| 2000 | 11 | 7,503 | 4,718 | - | - | 2,786 | - | 1,999 | - | - | 5,504 | - |
| 2000 | 12 | 4,329 | 3,170 | - | - | 1,159 | - | 1,900 | - | - | 2,428 | - |
| 2001 | 1 | 5,874 | 4,937 | - | - | 937 | - | 312 | - | - | 5,562 | - |
| 2001 | 2 | 5,536 | 5,407 | - | - | 129 | - | 43 | - | - | 5,493 | - |
| 2001 | 3 | 3,610 | 3,610 | - | - | - | - | - | - | - | 3,610 | - |
| 2001 | 4 | 3,447 | 2,598 | - | - | - | 849 | - | - | - | 2,598 | 849 |
| 2001 | 5 | 4,521 | 4,521 | - | - | - | - | 393 | - | - | 4,521 | - |
| 2001 | 6 | 4,699 | 4,699 | - | - | - | - | 393 | - | - | 4,306 | - |
| 2001 | 7 | 4,055 | 4,055 | - | - | - | - | 210 | - | - | 3,846 | - |
| 2001 | 8 | 4,500 | 4,500 | - | - | - | - | - | - | - | 4,500 | - |
| 2001 | 9 | 4,257 | 4,257 | - | - | - | - | - | - | - | 4,257 | - |
| 2001 | 10 | 4,521 | 4,521 | - | - | - | - | - | - | - | 4,521 | - |
| 2001 | 11 | 4,340 | 4,340 | - | - | - | - | 1,063 | - | - | 3,277 | - |
| 2001 | 12 | 2,895 | 2,895 | - | - | - | - | 728 | - | - | 2,167 | - |
| 2002 | 1 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 2 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 3 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 4 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 5 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 6 | - | - | - | - | - | - | - | - | - | - | - |
| 2002 | 7 | 55,802 | 55,802 | - | - | - | - | - | - | - | 55,802 | - |
| 2002 | 8 | 7,471 | 7,471 | - | - | - | - | - | - | - | 7,471 | - |
| 2002 | 9 | 7,619 | 7,619 | - | - | - | - | - | - | - | 7,619 | - |
| 2002 | 10 | 8,923 | 8,923 | - | - | - | - | - | - | - | 8,923 | - |
| 2002 | 11 | 7,693 | 7,693 | - | - | - | - | - | - | - | 7,693 | - |
| 2002 | 12 | 8,225 | 6,397 | - | - | 1,828 | - | 609 | - | - | 7,616 | - |
| 2003 | 1 | 13,470 | 10,477 | - | - | 2,993 | - | 998 | - | - | 12,472 | - |
| 2003 | 2 | 14,080 | 10,951 | - | - | 3,129 | - | 1,043 | - | - | 13,037 | - |
| 2003 | 3 | 26,945 | 20,305 | - | - | 6,640 | - | 2,213 | - | - | 24,732 | - |
| 2003 | 4 | 18,516 | 14,431 | - | - | 4,085 | - | 1,362 | - | - | 17,155 | - |
| 2003 | 5 | 17,887 | 13,941 | - | - | 3,947 | - | 1,316 | - | - | 16,572 | - |
| 2003 | 6 | 11,508 | 11,508 | - | - | - | - | - | - | - | 11,508 | - |
| 2003 | 7 | 11,299 | 11,299 | - | - | - | - | - | - | - | 11,299 | - |
| 2003 | 8 | 12,833 | 12,833 | - | - | - | - | - | - | - | 12,833 | - |
| 2003 | 9 | 9,935 | 9,935 | - | - | - | - | - | - | - | 9,935 | - |
| 2003 | 10 | 12,699 | 12,699 | - | - | - | - | - | - | - | 12,699 | - |
| 2003 | 11 | 10,864 | 10,864 | - | - | - | - | - | - | - | 10,864 | - |

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.6

| Year | Month | Total Amount | Original Allocations 1/ 3/ | | | | | Adjusted Allocations 2/ 3/ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Stevens | Carneros | Dry Gas | Shallow Oil | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Other |
| 2003 | 12 | 6,446 | 6,446 | - | - | - | - | - | - | - | 6,446 | - |
| 2004 | 1 | 12,157 | 12,157 | - | - | - | - | 6,571 | - | - | 5,585 | - |
| 2004 | 2 | 13,069 | 13,069 | - | - | - | - | 4,784 | - | - | 8,286 | - |
| 2004 | 3 | 9,199 | 9,199 | - | - | - | - | 1,210 | - | - | 7,989 | - |
| 2004 | 4 | 11,973 | 11,973 | - | - | - | - | 2,863 | - | - | 9,110 | - |
| 2004 | 5 | 12,542 | 12,542 | - | - | - | - | 2,117 | - | - | 10,426 | - |
| 2004 | 6 | 10,639 | 10,639 | - | - | - | - | 473 | - | - | 10,166 | - |
| 2004 | 7 | 10,195 | 10,195 | - | - | - | - | 587 | - | - | 9,609 | - |
| 2004 | 8 | 10,726 | 10,726 | - | - | - | - | 715 | - | - | 10,011 | - |
| 2004 | 9 | 10,350 | 10,350 | - | - | - | - | 3,370 | - | - | 6,980 | - |
| 2004 | 10 | 10,369 | 10,369 | - | - | - | - | 8,724 | - | - | 1,645 | - |
| 2004 | 11 | 9,216 | 9,216 | - | - | - | - | 1,736 | - | - | 7,480 | - |
| 2004 | 12 | 4,014 | 4,014 | - | - | - | - | 223 | - | - | 3,791 | - |
| 2005 | 1 | - | - | - | - | - | - | - | - | - | - | - |
| 2005 | 2 | - | - | - | - | - | - | - | - | - | - | - |
| 2005 | 3 | 13,201 | 13,201 | - | - | - | - | 4,305 | - | - | 8,897 | - |
| 2005 | 4 | 12,163 | 12,163 | - | - | - | - | 921 | - | - | 11,241 | - |
| 2005 | 5 | 11,205 | 11,205 | - | - | - | - | 2,417 | - | - | 8,788 | - |
| 2005 | 6 | 12,163 | 12,163 | - | - | - | - | 2,040 | - | - | 10,123 | - |
| 2005 | 7 | 11,698 | 11,698 | - | - | - | - | 1,178 | - | - | 10,520 | - |
| 2005 | 8 | 10,965 | 10,965 | - | - | - | - | 258 | - | - | 10,707 | - |
| 2005 | 9 | 11,745 | 11,745 | - | - | - | - | 1,855 | - | - | 9,891 | - |
| 2005 | 10 | 11,739 | 11,739 | - | - | - | - | 2,381 | - | - | 9,358 | - |
| 2005 | 11 | 10,959 | 10,959 | - | - | - | - | - | - | - | 10,959 | - |
| 2005 | 12 | 5,847 | 5,847 | - | - | - | - | 1,137 | - | - | 4,710 | - |
| 2006 | 1 | - | - | - | - | - | - | - | - | - | - | - |
| 2006 | 2 | - | - | - | - | - | - | - | - | - | - | - |
| 2006 | 3 | - | - | - | - | - | - | - | - | - | - | - |
| 2006 | 4 | 12,573 | 12,573 | - | - | - | - | - | - | - | 12,573 | - |
| 2006 | 5 | - | - | - | - | - | - | - | - | - | - | - |
| 2006 | 6 | 12,396 | 12,396 | - | - | - | - | 2,723 | - | - | 9,673 | - |
| 2006 | 7 | 11,749 | 11,749 | - | - | - | - | 3,418 | - | - | 8,331 | - |
| 2006 | 8 | 11,754 | 11,754 | - | - | - | - | 8,676 | - | - | 3,079 | - |
| 2006 | 9 | 11,535 | 11,535 | - | - | - | - | 2,514 | - | - | 9,021 | - |
| 2006 | 10 | 12,026 | 12,026 | - | - | - | - | - | - | - | 12,026 | - |
| 2006 | 11 | 6,477 | 6,477 | - | - | - | - | - | - | - | 6,477 | - |
| 2006 | 12 | 3,907 | 3,907 | - | - | - | - | 199 | - | - | 3,707 | - |
| 2007 | 1 | 10,482 | 10,482 | - | - | - | - | - | - | - | 10,482 | - |
| 2007 | 2 | 10,948 | 10,948 | - | - | - | - | 3,832 | - | - | 7,116 | - |
| 2007 | 3 | 9,770 | 9,770 | - | - | - | - | 1,809 | - | - | 7,961 | - |
| 2007 | 4 | 11,125 | 11,125 | - | - | - | - | 318 | - | - | 10,808 | - |
| 2007 | 5 | 11,192 | 11,192 | - | - | - | - | 605 | - | - | 10,587 | - |
| 2007 | 6 | 11,979 | 11,979 | - | - | - | - | 4,948 | - | - | 7,031 | - |
| 2007 | 7 | 10,807 | 10,807 | - | - | - | - | 3,138 | - | - | 7,670 | - |
| 2007 | 8 | 11,479 | 11,479 | - | - | - | - | 3,189 | - | - | 8,290 | - |

Prepared by Invotex

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 40 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.3.6

| Year | Month | Total Amount | Original Allocations 1/ 3/ | | | | | Adjusted Allocations 2/ 3/ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Stevens | Carneros | Dry Gas | Shallow Oil | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Other |
| 2007 | 9 | 10,969 | 10,969 | - | - | - | - | 2,598 | - | - | 8,371 | - |
| 2007 | 10 | 8,112 | 8,112 | - | - | - | - | 5,408 | - | - | 2,704 | - |
| 2007 | 11 | 6,322 | 6,322 | - | - | - | - | 1,383 | - | - | 4,939 | - |
| 2007 | 12 | 5,765 | 5,765 | - | - | - | - | 3,493 | - | - | 2,273 | - |
| 2008 | 1 | - | - | - | - | - | - | - | - | - | - | - |
| 2008 | 2 | 11,220 | 11,220 | - | - | - | - | 10,849 | - | - | 371 | - |
| 2008 | 3 | 6,633 | 6,633 | - | - | - | - | 5,631 | - | - | 1,003 | - |
| 2008 | 4 | 10,175 | 10,175 | - | - | - | - | 9,444 | - | - | 731 | - |
| 2008 | 5 | 9,862 | 9,862 | - | - | - | - | 8,453 | - | - | 1,409 | - |
| 2008 | 6 | 10,600 | 10,600 | - | - | - | - | 10,011 | - | - | 589 | - |
| 2008 | 7 | 9,614 | 9,614 | - | - | - | - | 9,391 | - | - | 224 | - |
| 2008 | 8 | 10,847 | 10,847 | - | - | - | - | 10,157 | - | - | 690 | - |
| 2008 | 9 | 6,230 | 6,230 | - | - | - | - | 5,892 | - | - | 338 | - |
| 2008 | 10 | 10,407 | 10,407 | - | - | - | - | 9,407 | - | - | 1,001 | - |
| 2008 | 11 | 4,182 | 4,182 | - | - | - | - | 3,705 | - | - | 477 | - |
| 2008 | 12 | 3,983 | 3,983 | - | - | - | - | 1,945 | - | - | 2,038 | - |
| 2009 | 1 | 12,723 | 12,723 | - | - | - | - | 8,055 | - | - | 4,668 | - |
| 2009 | 2 | 17,122 | 17,122 | - | - | - | - | 16,005 | - | - | 1,117 | - |
| 2009 | 3 | 14,726 | 14,726 | - | - | - | - | 13,750 | - | - | 976 | - |
| 2009 | 4 | 14,143 | 14,143 | - | - | - | - | 10,214 | - | - | 3,929 | - |
| 2009 | 5 | 13,453 | 13,453 | - | - | - | - | 12,841 | - | - | 611 | - |
| 2009 | 6 | 14,252 | 14,252 | - | - | - | - | 13,559 | - | - | 693 | - |
| 2009 | 7 | 12,289 | 12,289 | - | - | - | - | 10,784 | - | - | 1,505 | - |
| 2009 | 8 | 16,704 | 16,704 | - | - | - | - | 14,581 | - | - | 2,123 | - |
| 2009 | 9 | 14,113 | 14,113 | - | - | - | - | 13,525 | - | - | 588 | - |
| 2009 | 10 | 14,672 | 14,672 | - | - | - | - | 14,442 | - | - | 230 | - |
| 2009 | 11 | 9,790 | 9,790 | - | - | - | - | 9,436 | - | - | 354 | - |
| 2009 | 12 | 5,640 | 5,640 | - | - | - | - | 5,191 | - | - | 450 | - |
| 2010 | 1 | 13,585 | 13,585 | - | - | - | - | 9,863 | - | - | 3,722 | - |
| 2010 | 2 | 15,708 | 15,708 | - | - | - | - | 11,237 | - | - | 4,472 | - |
| 2010 | 3 | 11,080 | 11,080 | - | - | - | - | 8,026 | - | - | 3,053 | - |
| 2010 | 4 | 15,188 | 15,188 | - | - | - | - | 13,121 | - | - | 2,067 | - |
| 2010 | 5 | 14,653 | 14,653 | - | - | - | - | 13,891 | - | - | 763 | - |
| 2010 | 6 | 15,188 | 7,594 | - | - | - | - | 6,798 | - | - | 1,591 | - |
| Total | | $ 1,876,570 | $ 1,580,949 | $ - | $ - | $ 147,138 | $ 140,890 | $ 793,139 | $ 3,331 | $ 529 | $ 911,260 | $ 160,719 |
| Difference | | | | | | | | $ (787,810) | $ 3,331 | $ 529 | $ 764,122 | $ 19,829 |

Sources:

1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 95 to 98.

2/  Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.

3/  Allocations reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted
Mr. Metcalfe's apportionment methodology.

Exhibit 3.4

**Mr. Burdiff's Adjustments to Chevron's Damages Claim for External Non-Legal Prof & Labor**

| Year | Month | Activity Date | Vendor | Rates No. | Total Amount | Orig. Steveris | Orig. Cameros | Orig. Dry Gas | Orig. Shallow Oil | Orig. Net to Zero | Orig. Other | Adj. Steveris | Adj. Cameros | Adj. Dry Gas | Adj. Shallow Oil | Adj. Net to Zero | Adj. Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 10 | 8/27/1997-8/30/1997 | Techbase International | KR6GXX-004406 | 1,300 | 1,300 | | | | | | 1,214 | | | 86 | | |
| 1997 | 11 | 10/22/1997-10/24/1997 | Techbase International | KR6GXX-004437 | 1,612 | 1,612 | | | | | | 1,510 | | | 102 | | |
| 1997 | 11 | 11/3/1997 | Techbase International | KR6GXX-004444 | 11,850 | 11,850 | | | | | | 11,100 | | | 749 | | |
| 1997 | 12 | 11/12/1997-11/14/1997 | Techbase International | KR6GXX-004453 -004454 | 3,888 | 3,888 | | | | | | 3,832 | | | 56 | | |
| 1998 | 1 | 1/13/1998 | Techbase International | KR6GXX-004475 | 4,110 | 4,110 | | | | | | 3,972 | | | 138 | | |
| 1998 | 1 | 1/12/1998-1/14/1998 | Techbase International | KR6GXX-004470-004471 | 2,534 | 2,534 | | | | | | 2,449 | | | 85 | | |
| 1998 | 1 | 1/22/1998 | Techbase International | KR6GXX-004477 | 7,674 | 7,674 | | | | | | 7,416 | | | 258 | | |
| 1998 | 2 | 2/9/1998-2/13/1998 | Techbase International | KR6GXX-004479-004480 | 3,370 | 3,370 | | | | | | 3,254 | | | 117 | | |
| 1998 | 2 | 2/19/1998-2/20/1998 | Techbase International | KR6GXX-004021 | 638 | 638 | | | | | | 615 | | | 22 | | |
| 1998 | 2 | 2/23/1998-2/28/1998 | Techbase International | KR6GXX-004486 | 7,098 | 7,098 | | | | | | 6,852 | | | 246 | | |
| 1998 | 3 | 3/1/1998-3/7/1998 | Techbase International | KR6GXX-004483 | 5,396 | 5,396 | | | | | | 5,209 | | | 187 | | |
| 1998 | 3 | 3/8/1998-3/14/1998 | Techbase International | KR6GXX-004025 | 3,237 | 3,237 | | | | | | 2,738 | | | 499 | | |
| 1998 | 3 | 3/15/1998-3/21/1998 | Techbase International | KR6GXX-004023 | 2,049 | 2,049 | | | | | | 1,733 | | | 316 | | |
| 1998 | 3 | 3/22/1998-3/24/1998 | Techbase International | KR6GXX-004027 | 6,304 | 6,304 | | | | | | 5,333 | | | 971 | | |
| 1998 | 4 | 4/12/1998-4/18/1998 | Techbase International | KR6GXX-004520 | 6,041 | 6,041 | | | | | | 5,110 | | | 931 | | |
| 1998 | 4 | 4/19/1998-4/25/1998 | Techbase International | KR6GXX-004532 | 3,642 | 3,642 | | | | | | 3,086 | | | 556 | | |
| 1998 | 5 | 4/26/1998-5/2/1998 | Techbase International | KR6GXX-004357 | 2,083 | 2,083 | | | | | | 1,765 | | | 318 | | |
| 1998 | 5 | 5/3/1998 | Techbase International | KR6GXX-004550 | 7,023 | 7,023 | | | | | | 5,951 | | | 1,072 | | |
| 1998 | 5 | 5/3/1998-5/9/1998 | Techbase International | KR6GXX-004530 | 4,399 | 4,399 | | | | | | 3,690 | | | 709 | | |
| 1998 | 5 | 5/3/1998-5/9/1998 | Techbase International | KR6GXX-004535 | 3,717 | 3,717 | | | | | | 3,118 | | | 599 | | |
| 1998 | 6 | Jun 14-20 1998 | Techbase International | KR6GXX-004528 | 1,920 | 1,920 | | | | | | 1,610 | | | 310 | | |
| 1998 | 6 | May Jun 31 1998 | Techbase International | KR6GXX-004541 -004542 | 1,360 | 1,360 | | | | | | 1,141 | | | 219 | | |
| 1998 | 6 | 5/17/1998-5/23/1998 | Techbase International | KR6GXX-004540 | 4,860 | 4,860 | | | | | | 1,891 | | | 2,969 | | |
| 1998 | 6 | 5/24/1998-5/30/1998 | Techbase International | KR6GXX-004545 -004546 | 744 | 744 | | | | | | 289 | | | 454 | | |
| 1998 | 6 | Jun 21-27 1998 | Techbase International | KR6GXX-004540 | 8,237 | 8,237 | | | | | | 3,205 | | | 5,032 | | |
| 1998 | 6 | Jun 1-13 1998 | Techbase International | KR6GXX-004553 -004554 | 6,881 | 6,881 | | | | | | 2,677 | | | 4,204 | | |
| 1998 | 7 | 7/12/1998-7/18/1998 | Techbase International | KR6GXX-004551 | 4,858 | 4,858 | | | | | | 1,781 | | | 3,076 | | |
| 1998 | 7 | July 19 - 25, 1998 | Techbase International | KR6GXX-004552 | 2,669 | 2,669 | | | | | | 957 | | | 1,652 | | |
| 1998 | 8 | Aug 27 - 29, 1998 | Techbase International | KR6GXX-004557 | 7,735 | 7,735 | | | | | | 2,836 | | | 4,899 | | |
| 1998 | 8 | 7/26/1998-7/31/1998 | Techbase International | KR6GXX-004568 -004569 | 5,810 | 5,810 | | | | | | 2,130 | | | 3,680 | | |
| 1998 | 9 | 9/14/1998-9/20/1998 | Techbase International | KR6GXX-004573 | 3,740 | 3,740 | | | | | | 1,357 | | | 2,383 | | |
| 1998 | 10 | 9/27/1998-9/30/1998 | Techbase International | KR6GXX-004577 | 5,181 | 5,181 | | | | | | 1,880 | | | 3,301 | | |
| 1998 | 10 | 8/27/1998-8/29/1998 | Techbase International | KR6GXX-004582 -004583 | 1,615 | 1,615 | | | | | | 611 | | | 1,004 | | |
| 1998 | 10 | 9/21/1998-9/30/1998 | Techbase International | KR6GXX-004579 -004580 | 7,565 | 7,565 | | | | | | 2,860 | | | 4,704 | | |
| 1998 | 10 | 10/4/1998-10/10/1998 | Techbase International | KR6GXX-004610 -004611 | 7,470 | 7,470 | | | | | | 2,824 | | | 4,645 | | |
| 1998 | 10 | | Techbase International | | 3,542 | 3,542 | | | | | | 1,327 | | | 2,215 | | |
| 1998 | 10 | 10/11/1998-10/17/1998 | Techbase International | KR6GXX-004608 | 3,542 | | | | | 3,542 | | | | | | | 3,542 |
| 1998 | 10 | 10/18/1998-10/24/1998 | Techbase International | KR6GXX-004606 | 2,274 | 2,274 | | | | | | 852 | | | 1,422 | | |
| 1998 | 10 | 10/18/1998-10/24/1998 | Techbase International | KR6GXX-004643 | 1,477 | 1,477 | | | | | | 553 | | | 923 | | |
| 1998 | 10 | | Techbase International | | 978 | 978 | | | | | | 366 | | | 611 | | |
| 1998 | 10 | 11/8/1998-11/24/1998 | Techbase International | KR6GXX-004406 | (3,542) | | | | | (3,542) | | | | | | | (3,542) |
| 1998 | 11 | 11/15/1998-11/21/1998 | Techbase International | KR6GXX-004615 | 2,104 | 2,104 | | | | | | 789 | | | 1,315 | | |
| 1998 | 11 | 10/25/1998-10/31/1998 | Techbase International | KR6GXX-004619 -004620 | 1,636 | 1,636 | | | | | | 614 | | | 1,023 | | |
| 1998 | 11 | | Techbase International | | 9,707 | 9,707 | | | | | | 3,641 | | | 6,066 | | |
| 1998 | 11 | 11/1/1998-11/7/1998 | Techbase International | KR6GXX-004667 | 7,560 | | | | | 7,560 | | | | | | | 7,560 |
| 1998 | 12 | 12/13/1998-12/19/1998 | Techbase International | KR6GXX-004648 | 7,560 | 7,560 | | | | | | 2,835 | | | 4,725 | | |
| 1998 | 12 | 12/6/1998-12/12/1998 | Techbase International | KR6GXX-004651 -004648 | 2,338 | 2,338 | | | | | | 1,844 | | | 493 | | |
| 1998 | 12 | 11/22/1998-12/5/1998 | Techbase International | KR6GXX-004647 -004648 | 6,899 | 6,899 | | | | | | 5,443 | | | 1,456 | | |
| 1999 | 1 | | Techbase International | KR6GXX-004801 | 6,872 | 6,872 | | | | | | 5,471 | | | 1,451 | | |
| 1999 | 1 | Dec 20, 1998 - Jan 2, 1999 | Techbase International | KR6GXX-004802 | (7,560) | | | | | (7,560) | | | | | | | (7,560) |
| 1999 | 1 | 12/15/1997-12/20/1997 | Techbase International | KR6GXX-004634 -004637 | 4,527 | 4,527 | | | | | | 1,844 | | | 2,683 | | |
| 1999 | 1 | Jan 3- 9 1999 | Techbase International | KR6GXX-004629 -004640 | 3,927 | | | | | 3,027 | | | | | | | 3,927 |
| 1999 | 1 | Jan 3- 9 1999 | Techbase International | KR6GXX-004629 -004640 | 3,500 | | | | | 3,500 | | | | | | | 3,500 |
| 1999 | 2 | 2/7/1999-2/13/1999 | Techbase International | KR6GXX-004639 -004640 | 3,754 | 3,754 | | | | | | 1,529 | | | 2,225 | | |
| 1999 | 2 | 1/17/1999-1/23/1999 | Techbase International | KR6GXX-004645 | (3,927) | | | | | (3,927) | | | | | | | (3,927) |
| 1999 | 2 | 2/4/1999-2/20/1999 | Techbase International | KR6GXX-004656 | 8,976 | 8,976 | | | | | | 3,656 | | | 5,310 | | |
| 1999 | 3 | Jan 31- Feb. 6, 1999 | Techbase International | KR6GXX-004650 | 1,466 | 1,466 | | | | | | 522 | 42 | | 903 | | |
| 1999 | 3 | 3/7/1999-3/13/1999 | Techbase International | KR6GXX-004647 -004648 | 914 | 914 | | | | | | 325 | 26 | | 563 | | |
| 1999 | 4 | 2/28/1999-3/6/1999 | Techbase International | KR6GXX-004801 | 7,327 | 7,327 | | | | | | 2,606 | 209 | | 4,512 | | |
| 1999 | 4 | 3/7/1999-3/13/1999 | Techbase International | KR6GXX-004802 | 6,968 | 6,968 | | | | | | 2,478 | 161 | | 4,291 | | |
| 1999 | 4 | 3/7/1999-3/13/1999 | Techbase International | KR6GXX-004083 | 5,656 | 5,656 | | | | | | 2,012 | 70 | | 3,483 | | |
| 1999 | 4 | 3/21/1999-3/27/1999 | Techbase International | KR6GXX-004480 | 2,813 | 2,813 | | | | | | 842 | 24 | | 1,900 | | |
| 1999 | 5 | 5/17/1999-3/16/1999 | Techbase International | KR6GXX-004278 | 956 | 956 | | | | | | 286 | | | 646 | | |
| 1999 | 5 | 4/11/1999-4/17/1999 | Techbase International | KR6GXX-004076 | 5,020 | 5,020 | | | | | | 126 | | | 3,391 | | |
| 1999 | 5 | 4/18/1999-4/25/1999 | Techbase International | KR6GXX-004074 | 8,708 | 8,708 | | | | | | 2,608 | 218 | | 5,882 | | |
| 1999 | 5 | 4/26/1999-5/2/1999 | Techbase International | | 5,990 | 5,990 | | | | | | 1,794 | 150 | | 4,046 | | |
| 1999 | 5 | 4/4/1999-4/10/1999 | Techbase International | | 9,222 | 9,222 | | | | | | 2,762 | 231 | | 6,229 | | |
| | | | Techbase International | | 9,170 | 9,170 | | | | | | 2,746 | 229 | | 6,194 | | |
| | | | Techbase International | | 8,100 | 8,100 | | | | | | 2,426 | 203 | | 5,471 | | |
| | | | Techbase International | | 7,900 | 7,900 | | | | | | 2,366 | 198 | | 5,337 | | |
| | | | Techbase International | | 2,295 | 2,295 | | | | | | 687 | 57 | | 1,550 | | |
| | | | Techbase International | | 1,615 | 1,615 | | | | | | 484 | 40 | | 1,091 | | |
| | | | Techbase International | | 1,169 | 1,169 | | | | | | 350 | 29 | | 789 | | |

Prepared by Invotex

Exhibit 3.4

| Year | Month | Activity Date | Vendor | Rates No. | Total Amount | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Steeves | Camaros | Dry Gas | Shallow Oil | Net to Zero | Other | Steeves | Camaros | Dry Gas | Shallow Oil | Net to Zero | Other |
| 1999 | 6 | 5/30/1999 6/5/1999 | Techbase International | KRGCVX-004099 | 5,231 | 5,231 | | | | | | 1,567 | 131 | 3,533 | | | |
| 1999 | 6 | 6/6/1999 6/12/1999 | Techbase International | KRGCVX-004096 | 5,158 | 5,158 | | | | | | 1,545 | 129 | 3,484 | | | |
| 1999 | 6 | 5/24/1999 5/31/1999 | Techbase International | KRGCVX-004093 | 4,221 | 4,221 | | | | | | 1,364 | 106 | 2,651 | | | |
| 1999 | 6 | 5/17/1999 5/23/1999 | Techbase International | KRGCVX-004091 | 1,891 | 1,891 | | | | | | 566 | 47 | 1,278 | | | |
| 1999 | 8 | 8/1/1999 8/7/1999 | Techbase International | KRGCVX-004116 | 7,036 | 7,036 | | | | | | 2,107 | 176 | 4,753 | | | |
| 1999 | 8 | 7/18/1999 7/24/1999 | Techbase International | KRGCVX-004113 | 6,511 | 6,511 | | | | | | 1,950 | 163 | 4,398 | | | |
| 1999 | 8 | 7/11/1999 7/17/1999 | Techbase International | KRGCVX-004110 | 6,173 | 6,173 | | | | | | 1,848 | 154 | 4,170 | | | |
| 1999 | 8 | 7/25/1999 7/31/1999 | Techbase International | KRGCVX-004107 | 6,157 | 6,157 | | | | | | 1,844 | 154 | 4,159 | | | |
| 1999 | 8 | 7/4/1999 7/10/1999 | Techbase International | KRGCVX-004104 | 4,700 | 4,700 | | | | | | 1,408 | 118 | 3,174 | | | |
| 1999 | 8 | 8/8/1999 8/14/1999 | Techbase International | KRGCVX-004102 | 1,806 | 1,806 | | | | | | 541 | 45 | 1,220 | | | |
| 1999 | 8 | 8/15/1999 8/21/1999 | Techbase International | KRGCVX-004124 | 8,517 | 8,517 | | | | | | 2,747 | 241 | 5,529 | | | |
| 1999 | 9 | 9/13/1999 9/19/1999 | Techbase International | KRGCVX-004121 | 8,455 | 8,455 | | | | | | 2,727 | 239 | 5,489 | | | |
| 1999 | 9 | 9/7/1999 | Techbase International | KRGCVX-004119 | 829 | 829 | | | | | | 267 | 23 | 538 | | | |
| 1999 | 10 | 8/22/1999 8/28/1999 | Techbase International | KRGCVX-004130 | 8,614 | 8,614 | | | | | | 2,778 | 244 | 5,592 | | | |
| 1999 | 10 | 9/20/1999 9/26/1999 | Techbase International | KRGCVX-004127 | 5,461 | 5,461 | | | | | | 1,761 | 155 | 3,545 | | | |
| 1999 | 11 | 10/24/1999 10/30/1999 | Techbase International | KRGCVX-004116 | 8,359 | 8,359 | | | | | | 4,594 | 508 | 3,257 | | | |
| 1999 | 11 | 10/31/1999 11/6/1999 | Techbase International | KRGCVX-004133 | 6,866 | 6,866 | | | | | | 3,773 | 418 | 2,675 | | | |
| 1999 | 12 | 12/12/1999 12/18/1999 | Techbase International | KRGCVX-004145 | 8,566 | 8,566 | | | | | | 6,260 | | 2,288 | | | |
| 1999 | 12 | 10/31/1999 11/6/1999 | Techbase International | KRGCVX-004142 | 8,069 | 8,069 | | | | | | 5,905 | | 2,165 | | | |
| 1999 | 12 | 10/31/1999 12/6/1999 | Techbase International | KRGCVX-004139 | 360 | 360 | | | | | | 263 | | 97 | | | |
| 2000 | 1 | 1/10/2000 1/16/2000 | Techbase International | KRGCVX-004148 | 6,892 | 6,892 | | | | | | 1,436 | 1,078 | 4,379 | | | |
| 2000 | 1 | 2/21/2000 2/27/2000 | Techbase International | KRGCVX-004165 | 11,136 | 11,136 | | | | | | 1,426 | 141 | 9,569 | | | |
| 2000 | 1 | 1/31/2000 2/6/2000 | Techbase International | KRGCVX-004162 | 10,237 | 10,237 | | | | | | 1,311 | 130 | 8,796 | | | |
| 2000 | 2 | 1/17/2000 12/12/2000 | Techbase International | KRGCVX-004155-004166 | 7,447 | | | | | 7,447 | | | | | | 7,447 | |
| 2000 | 2 | 2/21/2000 2/13/2000 | Techbase International | KRGCVX-004158 | 7,447 | 7,447 | | | | | | 954 | 94 | 6,399 | | | |
| 2000 | 2 | 2/21/2000 2/13/2000 | Techbase International | KRGCVX-004155 | 5,373 | 5,373 | | | | | | 688 | 68 | 4,617 | | | |
| 2000 | 2 | 2/14/2000 2/20/2000 | Techbase International | KRGCVX-004155-004166 | (7,447) | | | | | (7,447) | | | | | | (7,447) | |
| 2000 | 2 | 2/14/2000 2/20/2000 | Techbase International | KRGCVX-004153 | 2,647 | 2,647 | | | | | | 339 | 34 | 2,274 | | | |
| 2000 | 3 | 1/24/2000 1/30/2000 | Techbase International | KRGCVX-004151 | 1,928 | 1,928 | | | | | | 247 | 24 | 1,656 | | | |
| 2000 | 3 | 3/20/2000 3/26/2000 | Techbase International | KRGCVX-004178 | 12,093 | 12,093 | | | | | | 1,759 | | 10,333 | | | |
| 2000 | 3 | 2/29/2000 3/5/2000 | Techbase International | KRGCVX-004174 | 4,480 | 4,480 | | | | | | 652 | | 3,828 | | | |
| 2000 | 3 | 3/13/2000 3/19/2000 | Techbase International | KRGCVX-004171 | 2,647 | 2,647 | | | | | | 385 | | 2,262 | | | |
| 2000 | 3 | 3/6/2000 3/12/2000 | Techbase International | KRGCVX-004168 | 1,371 | 1,371 | | | | | | 199 | | 1,172 | | | |
| 2000 | 4 | 3/27/2000 4/2/2000 | Techbase International | KRGCVX-004186 | 9,486 | 9,486 | | | | | | 1,255 | | 8,230 | | | |
| 2000 | 4 | 4/10/2000 4/16/2000 | Techbase International | KRGCVX-004184 | 5,950 | 5,950 | | | | | | 774 | | 5,076 | | | |
| 2000 | 4 | 4/3/2000 4/9/2000 | Techbase International | KRGCVX-004182 | 3,113 | 3,113 | | | | | | 412 | | 2,701 | | | |
| 2000 | 5 | 5/1/2000 5/7/2000 | Techbase International | KRGCVX-004206 | 7,397 | 7,397 | | | | | | 1,032 | | 6,364 | | | |
| 2000 | 5 | 5/8/2000 | Techbase International | KRGCVX-004204 | 5,079 | 5,079 | | | | | | 709 | | 4,370 | | | |
| 2000 | 5 | 4/24/2000 4/30/2000 | Techbase International | KRGCVX-004216 | 4,938 | 4,938 | | | | | | 686 | | 4,251 | | | |
| 2000 | 5 | 4/17/2000 4/23/2000 | Techbase International | KRGCVX-004193 | 4,155 | 4,155 | | | | | | 579 | | 3,572 | | | |
| 2000 | 5 | 5/8/2000 5/21/2000 | Techbase International | KRGCVX-004191 | 1,827 | 1,827 | | | | | | 255 | | 1,572 | | | |
| 2000 | 5 | | Techbase International | CVX0 1187 | 2,756 | 2,756 | | | | | | 957 | | 1,799 | | | |
| 2000 | 6 | | Techbase International | KRGCVX-004209 | 1,509 | 1,509 | | | | | | 524 | | 985 | | | |
| 2000 | 6 | 6/5/2000 6/18/2000 | Techbase International | KRGCVX-004216 | 8,960 | 8,960 | | | | | | 2,675 | | 6,286 | | | |
| 2000 | 7 | 7/3/2000 7/9/2000 | Techbase International | KRGCVX-004214 | 3,533 | 3,533 | | | | | | 1,055 | | 2,479 | | | |
| 2000 | 7 | 6/19/2000 6/25/2000 | Techbase International | KRGCVX-004211 | 3,385 | 3,385 | | | | | | 987 | | 2,318 | | | |
| 2000 | 7 | 6/26/2000 7/2/2000 | Techbase International | KRGCVX-004232 | 6,878 | 6,878 | | | | | | 3,525 | | 3,353 | | | |
| 2000 | 7 | 7/24/2000 7/30/2000 | Techbase International | KRGCVX-004229 | 6,607 | 6,607 | | | | | | 3,386 | | 3,221 | | | |
| 2000 | 8 | 8/7/2000 8/13/2000 | Techbase International | KRGCVX-004226 | 6,605 | 6,605 | | | | | | 3,385 | | 3,220 | | | |
| 2000 | 8 | 7/31/2000 8/6/2000 | Techbase International | KRGCVX-004223 | 3,677 | 3,677 | | | | | | 1,885 | | 1,793 | | | |
| 2000 | 8 | 8/14/2000 8/20/2000 | Techbase International | KRGCVX-004221 | 3,140 | 3,140 | | | | | | 1,609 | | 1,531 | | | |
| 2000 | 9 | 7/17/2000 7/23/2000 | Techbase International | KRGCVX-004219 | 2,516 | 2,516 | | | | | | 1,290 | | 1,227 | | | |
| 2000 | 9 | 8/21/2000 8/27/2000 | Techbase International | KRGCVX-004238 | 9,266 | 9,266 | | | | | | 5,011 | | 4,256 | | | |
| 2000 | 9 | 8/28/2000 9/10/2000 | Techbase International | KRGCVX-004235 | 7,431 | 7,431 | | | | | | 4,018 | | 3,413 | | | |
| 2000 | 10 | 9/11/2000 9/17/2000 | Techbase International | KRGCVX-004244 | 3,072 | 3,072 | | | | | | 413 | | 2,658 | | | |
| 2001 | | 3/7/2001 | Techbase International | KRGCVX-004796 | 5,079 | 5,079 | | | | | | | | 5,079 | | | |
| 2003 | | | Techbase International | | 5,079 | 5,079 | | | | | | 374 | | 4,705 | | | |
| 2004 | | 4/1/2004 | Techbase International | KRGCVX-004247 | 5,079 | 5,079 | | | | | | 857 | | 4,222 | | | |
| Total | | | | | 615,920 | 612,220 | | | | 3,900 | | 258,287 | 6,830 | 346,002 | | 3,500 | |
| Difference | | | | | | | | | | | | (353,733) | | (353,733) | | | |

**Sources:**
1/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 368 to 376.
2/ Adjusted allocations based on Company Payroll & Benefits described in the Declaration of Alan A. Burzlaff, dated December 6, 2013. See also Exhibit 3.3.
3/ See Exhibits 4.3 and 4.4.

| | Steeves | Camaros | Dry Gas | Total |
|---|---|---|---|---|
| Chevron's Corrected Claim for External Non-Legal Prof & Labor 3/ | 2,955,430 | 28,522 | 6,830 | 2,963,952 |
| Adjustment (Techbase) | (353,733) | | | (346,902) |
| Adjusted External Non-Legal Prof & Labor | 2,583,697 | 35,352 | 6,830 | 2,617,050 |

Prepared by Invotex

Exhibit 3.5

## Mr. Burzlaff's Adjustments to Chevron's Damages Claim for CVX Internal Technical Consultants

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 43 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 1996 | 7 | $ 62,664 | $ - | $ 62,664 | $ - |
| 1996 | 8 | 180,145 | - | 180,145 | - |
| 1996 | 9 | 154,514 | - | 154,514 | - |
| 1996 | 10 | 267,214 | - | 267,214 | - |
| 1996 | 11 | 127,974 | - | 127,974 | - |
| 1996 | 12 | 154,631 | - | 154,631 | - |
| 1997 | 1 | 179,497 | - | 179,497 | - |
| 1997 | 2 | 167,517 | - | 167,517 | - |
| 1997 | 3 | 169,466 | - | 169,466 | - |
| 1997 | 4 | 160,451 | - | 160,451 | - |
| 1997 | 5 | 145,908 | - | 145,908 | - |
| 1997 | 6 | 145,299 | - | 145,299 | - |
| 1997 | 7 | 71,134 | - | 71,134 | - |
| 1997 | 8 | 60,160 | - | 30,080 | - |
| 1997 | 9 | 68,370 | - | 34,185 | - |
| 1997 | 10 | 121,456 | - | 60,728 | - |
| 1997 | 11 | 80,339 | - | 80,339 | - |
| 1997 | 12 | 151,730 | - | 151,730 | - |
| 1998 | 1 | 27 | - | 27 | - |
| 1998 | 2 | 205,258 | - | 205,258 | - |
| 1998 | 3 | 199,460 | - | 199,460 | - |
| 1998 | 4 | 137,690 | - | 13,769 | - |
| 1998 | 5 | 107,652 | - | 10,765 | - |
| 1998 | 6 | 110,732 | - | 11,073 | - |
| 1998 | 7 | 41,685 | - | 8,337 | - |
| 1998 | 8 | 43,645 | - | 8,729 | - |
| 1998 | 9 | 44,416 | - | 8,883 | - |
| 1998 | 10 | 44,742 | - | 8,948 | - |
| 1998 | 11 | 41,246 | - | 8,249 | - |
| 1998 | 12 | 55,648 | - | 11,130 | - |

Prepared by Invotex

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 1999 | 1 | 18,906 | - | 7,562 | - |
| 1999 | 2 | 25,178 | - | 10,071 | - |
| 1999 | 3 | 28,380 | - | 11,352 | - |
| 1999 | 4 | 17,194 | - | 6,878 | - |
| 1999 | 5 | 13,092 | - | 5,237 | - |
| 1999 | 6 | 27,090 | - | 10,836 | - |
| 1999 | 7 | 11,327 | - | 4,531 | - |
| 1999 | 8 | 15,821 | - | 6,329 | - |
| 1999 | 9 | 16,460 | - | 6,584 | - |
| 1999 | 10 | 13,462 | - | 5,385 | - |
| 1999 | 11 | 11,041 | - | 4,417 | - |
| 1999 | 12 | 13,528 | - | 5,411 | - |
| 2000 | 1 | 4,832 | - | 4,832 | - |
| 2000 | 2 | 4,624 | - | 4,624 | - |
| 2000 | 3 | 3,056 | - | 3,056 | - |
| 2000 | 4 | 1,288 | - | 1,288 | - |
| 2000 | 5 | - | - | - | - |
| 2000 | 6 | - | - | - | - |
| 2000 | 7 | 608 | - | 608 | - |
| 2000 | 8 | 432 | - | 432 | - |
| 2000 | 9 | - | - | - | - |
| 2000 | 10 | - | - | - | - |
| 2000 | 11 | - | - | - | - |
| 2000 | 12 | - | - | - | - |
| 2001 | 1 | - | - | - | - |
| 2001 | 2 | - | - | - | - |
| 2001 | 3 | - | - | - | - |
| 2001 | 4 | - | - | - | - |
| 2001 | 5 | - | - | - | - |
| 2001 | 6 | - | - | - | - |
| 2001 | 7 | - | - | - | - |
| 2001 | 8 | - | - | - | - |

Prepared by Invotex

Exhibit 3.5

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 45 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|-----------|----------|-----------|----------|
|      |       | Stevens | Carneros | Stevens | Carneros |
| 2001 | 9  | - | - | - | - |
| 2001 | 10 | - | - | - | - |
| 2001 | 11 | - | - | - | - |
| 2001 | 12 | - | - | - | - |
| 2002 | 1  | - | - | - | - |
| 2002 | 2  | - | - | - | - |
| 2002 | 3  | 2,178 | - | 2,178 | - |
| 2002 | 4  | 198 | - | 198 | - |
| 2002 | 5  | 116 | - | 116 | - |
| 2002 | 6  | - | - | - | - |
| 2002 | 7  | - | - | - | - |
| 2002 | 8  | - | - | - | - |
| 2002 | 9  | 264 | - | 264 | - |
| 2002 | 10 | 4,697 | - | 4,697 | - |
| 2002 | 11 | 3,621 | - | 3,621 | - |
| 2002 | 12 | 649 | - | 649 | - |
| 2003 | 1  | 2,640 | - | 2,640 | - |
| 2003 | 2  | 5,824 | - | 5,824 | - |
| 2003 | 3  | 1,620 | - | 1,620 | - |
| 2003 | 4  | (1,310) | - | (1,310) | - |
| 2003 | 5  | - | - | - | - |
| 2003 | 6  | - | - | - | - |
| 2003 | 7  | - | - | - | - |
| 2003 | 8  | - | - | - | - |
| 2003 | 9  | - | - | - | - |
| 2003 | 10 | - | - | - | - |
| 2003 | 11 | - | - | - | - |
| 2003 | 12 | - | - | - | - |
| 2004 | 1  | - | - | - | - |
| 2004 | 2  | - | - | - | - |
| 2004 | 3  | - | - | - | - |
| 2004 | 4  | - | - | - | - |

Exhibit 3.5

Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
| --- | --- | --- | --- | --- | --- |
| | | Stevens | Carneros | Stevens | Carneros |
| 2004 | 5 | - | - | - | - |
| 2004 | 6 | - | - | - | - |
| 2004 | 7 | - | - | - | - |
| 2004 | 8 | - | - | - | - |
| 2004 | 9 | - | - | - | - |
| 2004 | 10 | - | - | - | - |
| 2004 | 11 | - | - | - | - |
| 2004 | 12 | - | - | - | - |
| 2005 | 1 | - | - | - | - |
| 2005 | 2 | - | - | - | - |
| 2005 | 3 | - | - | - | - |
| 2005 | 4 | - | - | - | - |
| 2005 | 5 | - | - | - | - |
| 2005 | 6 | - | - | - | - |
| 2005 | 7 | - | - | - | - |
| 2005 | 8 | - | - | - | - |
| 2005 | 9 | - | - | - | - |
| 2005 | 10 | - | - | - | - |
| 2005 | 11 | - | - | - | - |
| 2005 | 12 | - | - | - | - |
| 2006 | 1 | - | - | - | - |
| 2006 | 2 | - | - | - | - |
| 2006 | 3 | - | - | - | - |
| 2006 | 4 | - | - | - | - |
| 2006 | 5 | - | - | - | - |
| 2006 | 6 | - | - | - | - |
| 2006 | 7 | - | - | - | - |
| 2006 | 8 | - | - | - | - |
| 2006 | 9 | - | - | - | - |
| 2006 | 10 | - | - | - | - |
| 2006 | 11 | - | - | - | - |
| 2006 | 12 | - | - | - | - |

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|----------|---------|---------|---------|
| | | Stevens | Carneros | Stevens | Carneros |
| 2007 | 1 | - | - | - | - |
| 2007 | 2 | - | - | - | - |
| 2007 | 3 | - | 230 | 230 | - |
| 2007 | 4 | - | - | - | - |
| 2007 | 5 | - | - | - | - |
| 2007 | 6 | - | - | - | - |
| 2007 | 7 | - | - | - | - |
| 2007 | 8 | - | - | - | - |
| 2007 | 9 | - | - | - | - |
| 2007 | 10 | - | - | - | - |
| 2007 | 11 | - | - | - | - |
| 2007 | 12 | - | - | - | - |
| 2008 | 1 | - | - | - | - |
| 2008 | 2 | - | - | - | - |
| 2008 | 3 | - | - | - | - |
| 2008 | 4 | - | - | - | - |
| 2008 | 5 | - | - | - | - |
| 2008 | 6 | - | - | - | - |
| 2008 | 7 | - | - | - | - |
| 2008 | 8 | - | - | - | - |
| 2008 | 9 | - | - | - | - |
| 2008 | 10 | - | - | - | - |
| 2008 | 11 | - | - | - | - |
| 2008 | 12 | - | - | - | - |
| 2009 | 1 | - | - | - | - |
| 2009 | 2 | - | - | - | - |
| 2009 | 3 | - | - | - | - |
| 2009 | 4 | - | - | - | - |
| 2009 | 5 | - | - | - | - |
| 2009 | 6 | - | - | - | - |
| 2009 | 7 | - | - | - | - |
| 2009 | 8 | - | - | - | - |

Prepared by Invotex

Exhibit 3.5

Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 2009 | 9 | - | - | - | - |
| 2009 | 10 | - | - | - | - |
| 2009 | 11 | - | - | - | - |
| 2009 | 12 | - | - | - | - |
| 2010 | 1 | - | - | - | - |
| 2010 | 2 | - | - | - | - |
| 2010 | 3 | - | - | - | - |
| 2010 | 4 | - | - | - | - |
| 2010 | 5 | - | - | - | - |
| 2010 | 6 | - | - | - | - |
| Total | | $ 3,747,712 | $ - | $ 2,958,261 | $ - |
| Difference | | | | $ (789,451) | $ - |

**Sources**:

1/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 458 to 462.

2/   Adjusted allocations based on the Declaration of Alan A. Burzlaff, dated December 6, 2013.

Prepared by Invotex

Page 6 of 6

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5.1

**Mr. Burzlaff's Adjustments to Chevron's Damages Claim for CVX Internal Technical Consultants**

| Year | Month | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other |
| 1996 | 7 | 75.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 8 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 9 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 10 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 11 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 12 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 1 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 2 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 3 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 4 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 5 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 6 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 7 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 8 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 9 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 10 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1997 | 11 | 96.83% | 0.00% | 0.00% | 0.00% | 3.17% | 0.00% | 96.83% | 0.00% | 0.00% | 0.00% | 3.17% | 0.00% |
| 1997 | 12 | 101.76% | 0.00% | 0.00% | 0.00% | -1.76% | 0.00% | 101.76% | 0.00% | 0.00% | 0.00% | -1.76% | 0.00% |
| 1998 | 1 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 2 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 3 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 4 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 5 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 6 | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1998 | 7 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% |
| 1998 | 8 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% |
| 1998 | 9 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% |
| 1998 | 10 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1998 | 11 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1998 | 12 | 50.00% | 0.00% | 0.00% | 50.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 1 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 2 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 3 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 4 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 5 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 6 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 7 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 8 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 9 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 10 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 11 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 1999 | 12 | 25.00% | 0.00% | 0.00% | 75.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 1 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 2 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 3 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 4 | 9.42% | 0.00% | 0.00% | 84.74% | 5.85% | 0.00% | 9.42% | 0.00% | 0.00% | 84.74% | 5.85% | 0.00% |
| 2000 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 50 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5.1

| Year | Month | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other |
| 2000 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2000 | 7 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 8 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2000 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2000 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% |
| 2000 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2000 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2001 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 3 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 4 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 5 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2002 | 9 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 10 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 11 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2002 | 12 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2003 | 1 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2003 | 2 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2003 | 3 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2003 | 4 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2003 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2003 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 51 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5.1

| Year | Month | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other |
| 2004 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2004 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2005 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2006 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 3 | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% | 10.00% | 0.00% | 0.00% | 90.00% | 0.00% | 0.00% |
| 2007 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% |
| 2007 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2007 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 52 of 196

Chevron U.S.A. Inc. v. The United States

Exhibit 3.5.1

| Year | Month | Original Allocations 1/ | | | | | | Adjusted Allocations 2/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other | Stevens | Carneros | Dry Gas | Shallow Oil | Net to Zero | Other |
| 2008 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2008 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 7 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 8 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 9 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 10 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 11 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2009 | 12 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 2 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 3 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 4 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 5 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2010 | 6 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**Sources:**
1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 468 to 473.
2/  Adjusted allocations per Declaration of Alan A. Burzlaff, dated December 6, 2013.

Prepared by Invotex

Exhibit 3.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 53 of 196
Chevron U.S.A. Inc. v. The United States

## Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Other

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|------------|----------|------------|----------|
|      |       | Stevens | Carneros | Stevens | Carneros |
| 1996 | 7 | $ 39,522 | - | $ 36,306 | $ - |
| 1996 | 8 | 40,713 | - | 36,488 | - |
| 1996 | 9 | 18,908 | - | 16,334 | - |
| 1996 | 10 | 37,427 | - | 32,851 | - |
| 1996 | 11 | 31,272 | - | 29,279 | - |
| 1996 | 12 | 23,531 | - | 22,789 | - |
| 1997 | 1 | 22,088 | - | 22,088 | - |
| 1997 | 2 | 28,045 | - | 27,178 | - |
| 1997 | 3 | 39,817 | - | 38,587 | - |
| 1997 | 4 | 37,125 | - | 35,510 | - |
| 1997 | 5 | 44,902 | - | 42,913 | - |
| 1997 | 6 | 43,695 | - | 41,871 | - |
| 1997 | 7 | 73,927 | - | 72,141 | - |
| 1997 | 8 | 52,406 | - | 47,988 | - |
| 1997 | 9 | 35,242 | - | 32,427 | - |
| 1997 | 10 | 141,870 | - | 135,467 | - |
| 1997 | 11 | 18,550 | - | 16,545 | - |
| 1997 | 12 | 19,161 | - | 18,530 | - |
| 1998 | 1 | 26,656 | - | 23,897 | - |
| 1998 | 2 | 18,750 | - | 17,219 | - |
| 1998 | 3 | 21,354 | - | 19,760 | - |
| 1998 | 4 | 61,625 | - | 55,788 | - |
| 1998 | 5 | 28,027 | - | 22,023 | - |
| 1998 | 6 | 22,775 | - | 12,145 | - |
| 1998 | 7 | 15,300 | - | 8,837 | - |
| 1998 | 8 | 32,708 | - | 20,666 | - |
| 1998 | 9 | 15,075 | - | 8,351 | - |
| 1998 | 10 | 22,204 | - | 15,155 | - |
| 1998 | 11 | 8,691 | - | 4,776 | - |
| 1998 | 12 | 32,972 | - | 28,226 | - |
| 1999 | 1 | 35,838 | - | 29,184 | - |

Exhibit 3.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 54 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 1999 | 2 | 7,795 | - | 3,971 | 318 |
| 1999 | 3 | 7,849 | - | 3,760 | 314 |
| 1999 | 4 | 9,643 | - | 4,619 | 386 |
| 1999 | 5 | 11,814 | - | 5,659 | 473 |
| 1999 | 6 | 10,609 | - | 5,082 | 424 |
| 1999 | 7 | 10,766 | - | 5,157 | 431 |
| 1999 | 8 | 9,102 | - | 4,360 | 364 |
| 1999 | 9 | 9,798 | - | 5,054 | 444 |
| 1999 | 10 | 8,719 | - | 4,498 | 395 |
| 1999 | 11 | 8,721 | - | 7,665 | 848 |
| 1999 | 12 | 11,376 | - | 11,376 | - |
| 2000 | 1 | 7,213 | - | 2,403 | 1,804 |
| 2000 | 2 | 7,409 | - | 1,518 | 150 |
| 2000 | 3 | 9,499 | - | 6,510 | - |
| 2000 | 4 | 19,264 | - | 4,091 | - |
| 2000 | 5 | 14,107 | - | 3,160 | - |
| 2000 | 6 | 11,997 | - | 6,687 | - |
| 2000 | 7 | 12,954 | - | 6,206 | - |
| 2000 | 8 | 4,561 | - | 3,752 | - |
| 2000 | 9 | 10,837 | - | 8,427 | - |
| 2000 | 10 | 12,087 | - | 2,338 | - |
| 2000 | 11 | 11,050 | - | 4,683 | - |
| 2000 | 12 | 8,366 | - | 5,015 | - |
| 2001 | 1 | 10,055 | - | 636 | - |
| 2001 | 2 | 15,185 | - | 121 | - |
| 2001 | 3 | 13,827 | - | - | - |
| 2001 | 4 | 10,116 | - | - | - |
| 2001 | 5 | 14,404 | - | - | - |
| 2001 | 6 | 13,786 | - | 1,153 | - |
| 2001 | 7 | 6,501 | - | 336 | - |
| 2001 | 8 | 74,635 | - | 45,860 | - |
| 2001 | 9 | (1,393) | - | - | - |

Prepared by Invotex

Exhibit 3.6

Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|-------|----------|---------|----------|
|      |       | Stevens | Carneros | Stevens | Carneros |
| 2001 | 10 | 12,867 | - | - | - |
| 2001 | 11 | 14,941 | - | 3,659 | - |
| 2001 | 12 | 12,187 | - | 3,065 | - |
| 2002 | 1  | 7,235 | - | - | - |
| 2002 | 2  | 5,582 | - | - | - |
| 2002 | 3  | 4,211 | - | - | - |
| 2002 | 4  | 8,329 | - | - | - |
| 2002 | 5  | 5,063 | - | - | - |
| 2002 | 6  | 2,243 | - | - | - |
| 2002 | 7  | 10,291 | - | - | - |
| 2002 | 8  | 9,393 | - | - | - |
| 2002 | 9  | 10,737 | - | - | - |
| 2002 | 10 | 11,774 | - | - | - |
| 2002 | 11 | 17,098 | - | - | - |
| 2002 | 12 | 14,989 | - | 1,427 | - |
| 2003 | 1  | 8,376 | - | 798 | - |
| 2003 | 2  | 7,501 | - | 714 | - |
| 2003 | 3  | 7,722 | - | 842 | - |
| 2003 | 4  | 8,160 | - | 770 | - |
| 2003 | 5  | 8,334 | - | 786 | - |
| 2003 | 6  | 15,895 | - | - | - |
| 2003 | 7  | 7,828 | - | - | - |
| 2003 | 8  | 9,576 | - | - | - |
| 2003 | 9  | 16,944 | - | - | - |
| 2003 | 10 | 10,864 | - | - | - |
| 2003 | 11 | 9,198 | - | - | - |
| 2003 | 12 | 9,984 | - | - | - |
| 2004 | 1  | 7,619 | - | 4,118 | - |
| 2004 | 2  | 8,566 | - | 3,135 | - |
| 2004 | 3  | 6,077 | - | 800 | - |
| 2004 | 4  | 8,989 | - | 2,150 | - |
| 2004 | 5  | 9,800 | - | 1,654 | - |

Exhibit 3.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 56 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 2004 | 6 | 7,124 | - | 317 | - |
| 2004 | 7 | 6,714 | - | 386 | - |
| 2004 | 8 | 7,057 | - | 470 | - |
| 2004 | 9 | 9,608 | - | 3,128 | - |
| 2004 | 10 | 2,634 | - | 2,216 | - |
| 2004 | 11 | 6,269 | - | 1,181 | - |
| 2004 | 12 | 6,901 | - | 383 | - |
| 2005 | 1 | 7,415 | - | 761 | - |
| 2005 | 2 | 5,752 | - | 2,700 | - |
| 2005 | 3 | 14,035 | - | 4,576 | - |
| 2005 | 4 | 5,234 | - | 397 | - |
| 2005 | 5 | 6,345 | - | 1,369 | - |
| 2005 | 6 | 19,231 | - | 10,310 | - |
| 2005 | 7 | 9,736 | - | 980 | - |
| 2005 | 8 | 6,822 | - | 161 | - |
| 2005 | 9 | 8,489 | - | 1,340 | - |
| 2005 | 10 | 7,718 | - | 1,565 | - |
| 2005 | 11 | 10,158 | - | - | - |
| 2005 | 12 | 5,829 | - | 1,133 | - |
| 2006 | 1 | 6,904 | - | - | - |
| 2006 | 2 | 5,375 | - | 179 | - |
| 2006 | 3 | 6,619 | - | 308 | - |
| 2006 | 4 | 5,421 | - | - | - |
| 2006 | 5 | 12,623 | - | 5,865 | - |
| 2006 | 6 | 5,509 | - | 1,210 | - |
| 2006 | 7 | 8,555 | - | 2,489 | - |
| 2006 | 8 | 8,405 | - | 6,204 | - |
| 2006 | 9 | 4,502 | - | 981 | - |
| 2006 | 10 | 3,311 | - | - | - |
| 2006 | 11 | 7,868 | - | - | - |
| 2006 | 12 | 7,898 | - | 403 | - |
| 2007 | 1 | 4,382 | - | - | - |

Prepared by Invotex

Exhibit 3.6

Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 2007 | 2 | 4,819 | - | 1,687 | - |
| 2007 | 3 | 4,035 | - | 747 | - |
| 2007 | 4 | 7,651 | - | 219 | - |
| 2007 | 5 | 8,996 | - | 486 | - |
| 2007 | 6 | 19,737 | - | 8,152 | - |
| 2007 | 7 | 5,104 | - | 1,482 | - |
| 2007 | 8 | 3,389 | - | 941 | - |
| 2007 | 9 | 6,349 | - | 1,504 | - |
| 2007 | 10 | 7,691 | - | 5,127 | - |
| 2007 | 11 | 9,082 | - | 1,987 | - |
| 2007 | 12 | 3,166 | - | 1,918 | - |
| 2008 | 1 | 3,187 | - | 2,371 | - |
| 2008 | 2 | 2,741 | - | 2,650 | - |
| 2008 | 3 | 2,342 | - | 1,988 | - |
| 2008 | 4 | 4,546 | - | 4,220 | - |
| 2008 | 5 | 2,734 | - | 2,343 | - |
| 2008 | 6 | 3,205 | - | 3,027 | - |
| 2008 | 7 | 8,447 | - | 8,375 | - |
| 2008 | 8 | 3,049 | - | 2,855 | - |
| 2008 | 9 | 1,553 | - | 1,468 | - |
| 2008 | 10 | 7,278 | - | 6,579 | - |
| 2008 | 11 | 2,318 | - | 2,053 | - |
| 2008 | 12 | 2,644 | - | 1,291 | - |
| 2009 | 1 | 3,044 | - | 1,927 | - |
| 2009 | 2 | 5,354 | - | 5,005 | - |
| 2009 | 3 | 9,030 | - | 8,432 | - |
| 2009 | 4 | 3,207 | - | 2,316 | - |
| 2009 | 5 | 9,279 | - | 8,857 | - |
| 2009 | 6 | 6,814 | - | 6,482 | - |
| 2009 | 7 | 7,283 | - | 6,391 | - |
| 2009 | 8 | 10,034 | - | 8,759 | - |
| 2009 | 9 | 7,294 | - | 6,990 | - |

Prepared by Invotex

Chevron U.S.A. Inc. v. The United States

Exhibit 3.6

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 2009 | 10 | 3,671 | - | 3,613 | - |
| 2009 | 11 | 23,360 | - | 22,516 | - |
| 2009 | 12 | 5,620 | - | 5,172 | - |
| 2010 | 1 | 3,504 | - | 2,544 | - |
| 2010 | 2 | 2,903 | - | 2,076 | - |
| 2010 | 3 | 2,767 | - | 2,004 | - |
| 2010 | 4 | 3,849 | - | 3,325 | - |
| 2010 | 5 | 7,260 | - | 6,882 | - |
| 2010 | 6 | 2,619 | - | 2,345 | - |
| 2010 | 7 | - | - | - | - |
| Total | | $ 2,272,599 | $ - | $ 1,379,455 | $ 6,350 |
| Difference | | | | $ (893,144) | $ 6,350 |

Sources:

1/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 484 to 488.

2/ Reflects the adjustments to Company Payroll & Benefits as described in Declaration of Alan A. Burzlaff, dated December 6, 2013. See also Exhibit 3.3.

Prepared by Invotex

Exhibit 3.7

# Mr. Burzlaff's Adjustments to Chevron's Damages Claim for Miscellaneous Costs

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 1996 | 7 | $ 26,970 | $ - | $ 25,393 | $ - |
| 1996 | 8 | 2,803 | - | 2,715 | - |
| 1996 | 9 | 6,191 | - | 5,961 | - |
| 1996 | 10 | 3,078 | - | 2,972 | - |
| 1996 | 11 | 629 | - | 613 | - |
| 1996 | 12 | 2,857 | - | 2,723 | - |
| 1997 | 1 | 484 | - | 473 | - |
| 1997 | 2 | 1,014 | - | 1,005 | - |
| 1997 | 3 | 1,417 | - | 1,406 | - |
| 1997 | 4 | 760 | - | 750 | - |
| 1997 | 5 | 6,416 | 169 | 6,338 | 169 |
| 1997 | 6 | 241 | - | 210 | - |
| 1997 | 7 | 57 | - | 50 | - |
| 1997 | 8 | 521 | - | 467 | - |
| 1997 | 9 | 59 | - | 50 | - |
| 1997 | 10 | - | - | - | - |
| 1997 | 11 | - | - | - | - |
| 1997 | 12 | - | - | - | - |
| 1998 | 1 | - | - | - | - |
| 1998 | 2 | - | - | - | - |
| 1998 | 3 | - | - | - | - |
| 1998 | 4 | - | - | - | - |
| 1998 | 5 | - | - | - | - |
| 1998 | 6 | - | - | - | - |
| 1998 | 7 | - | - | - | - |
| 1998 | 8 | - | - | - | - |
| 1998 | 9 | - | - | - | - |
| 1998 | 10 | 2,400 | - | 2,400 | - |
| 1998 | 11 | - | - | - | - |
| 1998 | 12 | - | - | - | - |

Prepared by Invotex

Exhibit 3.7

Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|--------|---------|--------|---------|
| | | Stevens | Carneros | Stevens | Carneros |
| 1999 | 1 | - | - | - | - |
| 1999 | 2 | - | - | - | - |
| 1999 | 3 | - | - | - | - |
| 1999 | 4 | - | - | - | - |
| 1999 | 5 | - | - | - | - |
| 1999 | 6 | - | - | - | - |
| 1999 | 7 | - | - | - | - |
| 1999 | 8 | - | - | - | - |
| 1999 | 9 | - | - | - | - |
| 1999 | 10 | - | - | - | - |
| 1999 | 11 | 19 | 11 | 15 | 12 |
| 1999 | 12 | - | - | - | - |
| 2000 | 1 | - | - | - | - |
| 2000 | 2 | - | - | - | - |
| 2000 | 3 | - | - | - | - |
| 2000 | 4 | 41 | 5 | 16 | 5 |
| 2000 | 5 | - | - | - | - |
| 2000 | 6 | - | - | - | - |
| 2000 | 7 | - | - | - | - |
| 2000 | 8 | - | - | - | - |
| 2000 | 9 | - | - | - | - |
| 2000 | 10 | - | - | - | - |
| 2000 | 11 | - | - | - | - |
| 2000 | 12 | - | - | - | - |
| 2001 | 1 | - | - | - | - |
| 2001 | 2 | - | - | - | - |
| 2001 | 3 | - | - | - | - |
| 2001 | 4 | - | - | - | - |
| 2001 | 5 | - | - | - | - |
| 2001 | 6 | - | - | - | - |
| 2001 | 7 | - | - | - | - |

Prepared by Invotex

Exhibit 3.7

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 61 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|-------------------------|---------|-------------------------|---------|
|      |       | Stevens | Carneros | Stevens | Carneros |
| 2001 | 8  | - | - | - | - |
| 2001 | 9  | - | - | - | - |
| 2001 | 10 | - | - | - | - |
| 2001 | 11 | - | - | - | - |
| 2001 | 12 | - | - | - | - |
| 2002 | 1  | - | - | - | - |
| 2002 | 2  | - | - | - | - |
| 2002 | 3  | - | - | - | - |
| 2002 | 4  | - | - | - | - |
| 2002 | 5  | - | - | - | - |
| 2002 | 6  | - | - | - | - |
| 2002 | 7  | - | - | - | - |
| 2002 | 8  | - | - | - | - |
| 2002 | 9  | - | - | - | - |
| 2002 | 10 | - | - | - | - |
| 2002 | 11 | - | - | - | - |
| 2002 | 12 | - | - | - | - |
| 2003 | 1  | - | - | - | - |
| 2003 | 2  | - | - | - | - |
| 2003 | 3  | - | - | - | - |
| 2003 | 4  | - | - | - | - |
| 2003 | 5  | - | - | - | - |
| 2003 | 6  | - | - | - | - |
| 2003 | 7  | - | - | - | - |
| 2003 | 8  | - | - | - | - |
| 2003 | 9  | - | - | - | - |
| 2003 | 10 | - | - | - | - |
| 2003 | 11 | - | - | - | - |
| 2003 | 12 | - | - | - | - |
| 2004 | 1  | - | - | - | - |
| 2004 | 2  | - | - | - | - |

Prepared by Invotex

Exhibit 3.7

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
| | | Stevens | Carneros | Stevens | Carneros |
| --- | --- | --- | --- | --- | --- |
| 2004 | 3 | - | - | - | - |
| 2004 | 4 | - | - | - | - |
| 2004 | 5 | - | - | - | - |
| 2004 | 6 | - | - | - | - |
| 2004 | 7 | - | - | - | - |
| 2004 | 8 | - | - | - | - |
| 2004 | 9 | - | - | - | - |
| 2004 | 10 | - | - | - | - |
| 2004 | 11 | - | - | - | - |
| 2004 | 12 | 1,260 | - | 910 | - |
| 2005 | 1 | - | - | - | - |
| 2005 | 2 | - | - | - | - |
| 2005 | 3 | 118 | - | 54 | - |
| 2005 | 4 | - | - | - | - |
| 2005 | 5 | - | - | - | - |
| 2005 | 6 | - | - | - | - |
| 2005 | 7 | - | - | - | - |
| 2005 | 8 | - | - | - | - |
| 2005 | 9 | - | - | - | - |
| 2005 | 10 | - | - | - | - |
| 2005 | 11 | - | - | - | - |
| 2005 | 12 | - | - | - | - |
| 2006 | 1 | - | - | - | - |
| 2006 | 2 | - | - | - | - |
| 2006 | 3 | - | - | - | - |
| 2006 | 4 | - | - | - | - |
| 2006 | 5 | - | - | - | - |
| 2006 | 6 | - | - | - | - |
| 2006 | 7 | - | - | - | - |
| 2006 | 8 | - | - | - | - |
| 2006 | 9 | - | - | - | - |

Exhibit 3.7

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 63 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|------|-------|---------|---------|---------|---------|
| | | Stevens | Carneros | Stevens | Carneros |
| 2006 | 10 | - | - | - | - |
| 2006 | 11 | - | - | - | - |
| 2006 | 12 | - | - | - | - |
| 2007 | 1 | - | - | - | - |
| 2007 | 2 | - | - | - | - |
| 2007 | 3 | - | - | - | - |
| 2007 | 4 | - | - | - | - |
| 2007 | 5 | - | - | - | - |
| 2007 | 6 | - | - | - | - |
| 2007 | 7 | - | - | - | - |
| 2007 | 8 | - | - | - | - |
| 2007 | 9 | - | - | - | - |
| 2007 | 10 | - | - | - | - |
| 2007 | 11 | - | - | - | - |
| 2007 | 12 | - | - | - | - |
| 2008 | 1 | 17 | - | 13 | - |
| 2008 | 2 | - | - | - | - |
| 2008 | 3 | - | - | - | - |
| 2008 | 4 | - | - | - | - |
| 2008 | 5 | - | - | - | - |
| 2008 | 6 | - | - | - | - |
| 2008 | 7 | - | - | - | - |
| 2008 | 8 | 31 | - | 29 | - |
| 2008 | 9 | 83 | - | 82 | - |
| 2008 | 10 | 32 | - | 31 | - |
| 2008 | 11 | - | - | - | - |
| 2008 | 12 | - | - | - | - |
| 2009 | 1 | 14 | - | 9 | - |
| 2009 | 2 | - | - | - | - |
| 2009 | 3 | - | - | - | - |
| 2009 | 4 | - | - | - | - |

Prepared by Invotex

Exhibit 3.7

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 64 of 196
Chevron U.S.A. Inc. v. The United States

| Year | Month | Original Allocations 1/ | | Adjusted Allocations 2/ | |
|---|---|---|---|---|---|
| | | Stevens | Carneros | Stevens | Carneros |
| 2009 | 5 | - | - | - | - |
| 2009 | 6 | - | - | - | - |
| 2009 | 7 | - | - | - | - |
| 2009 | 8 | - | - | - | - |
| 2009 | 9 | - | - | - | - |
| 2009 | 10 | 163 | - | 160 | - |
| 2009 | 11 | - | - | - | - |
| 2009 | 12 | - | - | - | - |
| 2010 | 1 | - | - | - | - |
| 2010 | 2 | - | - | - | - |
| 2010 | 3 | - | - | - | - |
| 2010 | 4 | - | - | - | - |
| 2010 | 5 | - | - | - | - |
| 2010 | 6 | - | - | - | - |
| 2010 | 7 | - | - | - | - |
| Total | | $ 57,674 | $ 185 | $ 54,847 | $ 186 |
| Difference | | | | $ (2,826) | $ 1 |

**Notes/Sources:**

1/   Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 661-662.

2/   Reflects the adjustments to multiple cost categories based on Declaration of Alan A. Burzlaff, dated December 6, 2013 and as seen in Exhibits 3.3 through 3.6.

Prepared by Invotex

Exhibit 4

**Chevron's Damages Claim Adjusted for Transaction Analysis**

Chevron U.S.A. Inc. v. The United States

| Cost Type | Chevron's Corrected Damages Claim 1/ | Chevron's Adjusted Damages Claim 2/ | Reduction to Chevron's Corrected Damages Claim |
|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 4,564,606 | $ 4,532,982 | $ (31,624) |
| Legal Costs - FOIA and Sanctions | 995,110 | 995,110 | - |
| Company Payroll & Benefits | 7,986,729 | 6,884,367 | (1,102,362) |
| External Non-Legal Prof & Labor | 2,963,952 | 2,739,233 | (224,718) |
| CVX Internal Technical Consultants | 3,747,712 | 2,132,448 | (1,615,264) |
| Other | 2,272,599 | 1,308,391 | (964,208) |
| Miscellaneous Expenses | 57,859 | 57,859 | - |
| Total | $ 22,588,567 | $ 18,650,391 | $ (3,938,176) |

Notes/Sources:
1/   See Exhibit 2.
2/   See Exhibit 4.1.

Prepared by Invotex

Exhibit 4.1

Chevron U.S.A. Inc. v. The United States

## Chevron's Damages Claim Adjusted for Transaction Analysis - By Zone

| | Stevens Zone 1/ | Carneros Zone 2/ | Adjusted Claim 3/ |
|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 4,089,397 | $ 443,585 | $ 4,532,982 |
| Legal Costs - FOIA and Sanctions | - | - | 995,110 |
| Company Payroll & Benefits | 6,884,367 | - | 6,884,367 |
| External Non-Legal Prof & Labor | 2,710,711 | 28,523 | 2,739,233 |
| CVX Internal Technical Consultants | 2,132,448 | - | 2,132,448 |
| Other | 1,308,391 | - | 1,308,391 |
| Miscellaneous Expenses | 57,674 | 185 | 57,859 |
| Adjusted Damages Claim | $ 17,182,988 | $ 472,293 | $ 18,650,391 |

**Sources:**
1/   See Exhibit 4.3.
2/   See Exhibit 4.4.
3/   See Exhibit 4.2.

Prepared by Invotex

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 67 of 196
Chevron U.S.A Inc. v. The United States

**Chevron's Damages Claim Adjusted for Transaction Analysis**

| Cost Category | Chevron's Corrected Damage Claim 3/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization | Improper Inclusion of Costs Related to Sale | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| 1/ Legal Costs - Stevens and Carneros | $ 4,564,606 | $ 27,551 | $ - | $ - | $ 4,073 | $ 4,532,982 |
| 2/ Legal Costs - FOIA and Sanctions | 995,110 | - | - | - | - | 995,110 |
| 1/ Company Payroll & Benefits | 7,986,729 | - | - | 1,102,362 | - | 6,884,367 |
| 1/ External Non-Legal Prof & Labor | 2,963,952 | 213,767 | - | - | 10,951 | 2,739,233 |
| 1/ CVX Internal Technical Consultants | 3,747,712 | - | 1,615,264 | - | - | 2,132,448 |
| 1/ Other | 2,272,599 | 964,138 | - | - | 70 | 1,308,391 |
| 1/ Miscellaneous Expenses | 57,859 | - | - | - | - | 57,859 |
| **Total** | $ 22,588,567 | $ 1,205,456 | $ 1,615,264 | $ 1,102,362 | $ 15,094 | $ 18,650,391 |

Sources:

1/ Calculated as the sum of Exhibit 4.3 and 4.4.

2/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 18. FOIA and Sanctions are not included in zone-specific analysis.

3/ See Exhibit 2.

Prepared by Invotex

**Chevron's Damages Claim Adjusted for Transaction Analysis - Stevens Zone**

| Cost Category | Chevron's Corrected Damage Claim 1/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert 2/ | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants 3/ | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization 4/ | Improper Inclusion of Costs Related to Sale 5/ | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| Legal Costs | $ 4,121,021 | $ 27,551 | $ - | $ - | $ 4,073 | $ 4,089,397 |
| Company Payroll & Benefits | 7,986,729 | - | - | 1,102,362 | - | 6,884,367 |
| External Non-Legal Prof & Labor | 2,935,430 | 213,767 | - | - | 10,951 | 2,710,711 |
| CVX Internal Technical Consultants | 3,747,712 | - | 1,615,264 | - | - | 2,132,448 |
| Other | 2,272,599 | 964,138 | - | - | 70 | 1,308,391 |
| Miscellaneous Expenses | 57,674 | - | - | - | - | 57,674 |
| **Total** | $ 21,121,164 | $ 1,205,457 | $ 1,615,264 | $ 1,102,362 | $ 15,094 | $ 17,182,988 |

Sources:
1/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 18, 60, 354, 462, 488, 662 as corrected by Exhibit 22 to Deposition of Mr. Stone dated October 30, 2013.
2/ See Exhibit 4.5.
3/ See Exhibit 4.6.
4/ See Exhibit 4.7.
5/ See Exhibit 4.8.

Prepared by Invotex

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 69 of 196
Chevron U.S.A Inc. v. The United States

**Chevron's Damages Claim Adjusted for Transaction Analysis - Carneros Zone**

| Cost Category | Chevron's Corrected Damage Claim 1/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert 2/ | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants 3/ | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization 4/ | Improper Inclusion of Costs Related to Sale 5/ | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| Legal Costs | $ 443,585 | $ - | $ - | $ - | $ - | $ 443,585 |
| Company Payroll & Benefits | - | - | - | - | - | - |
| External Non-Legal Prof & Labor | 28,522 | (1) | - | - | - | 28,523 |
| CVX Internal Technical Consultants | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Miscellaneous Expenses | 185 | - | - | - | - | 185 |
| **Total** | $ 472,292 | $ (1) | $ - | $ - | $ - | $ 472,293 |

**Sources:**

1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 18, 60, 354, 462, 488, 662 as corrected by Exhibit 22 to Deposition of Mr. Stone dated October 30, 2013.
2/  See Exhibit 4.5.
3/  See Exhibit 4.6.
4/  See Exhibit 4.7.
5/  See Exhibit 4.8.

Prepared by Invotex

Exhibit 4.5

Chevron U.S.A. Inc. v. The United States

## Summary of Unsupported Transactions Identified by Chevron 1/

| | Stevens Zone | | Adjustments for Carneros Zone | | Total | |
|---|---|---|---|---|---|---|
| **Legal Costs** | | | | | | |
| Total 2/ | $ | 4,121,021 | $ | 443,585 | $ | 4,564,606 |
| Supported 3/ | | 4,093,470 | | 443,585 | | 4,537,055 |
| **Not Supported** | $ | 27,551 | $ | - | $ | 27,551 |
| | | | | | | |
| **External Non-Legal Prof & Labor** | | | | | | |
| Total 2/ | $ | 2,935,430 | $ | 28,522 | $ | 2,963,952 |
| Supported 3/ | | 2,721,662 | | 28,523 | | 2,750,185 |
| **Not Supported** | $ | 213,767 | $ | (1) | $ | 213,767 |
| | | | | | | |
| **Other** | | | | | | |
| Total 2/ | $ | 1,627,683 | $ | - | $ | 1,627,683 |
| Supported 3/ | | 663,545 | | - | | 663,545 |
| **Not Supported** | $ | 964,138 | $ | - | $ | 964,138 |
| | | | | | | |
| **Total** | | | | | | |
| Total | $ | 8,684,134 | $ | 472,107 | $ | 9,156,241 |
| Supported | | 7,478,677 | | 472,108 | | 7,950,785 |
| **Not Supported** | $ | 1,205,457 | $ | (1) | $ | 1,205,456 |

Prepared by Invotex

**Sources/Notes:**

1/ Adjustments reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr. Metcalfe's apportionment methodology.

2/ Exhibits 4.2 to 4.4. Other does not include Chevron's claim for Office Space.

3/ Source documents identified on Interim pages 26-28, 368-376 and 494-516; and Native 0003b.xls.

Exhibit 4.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 71 of 196
Chevron U.S.A. Inc. v. The United States

## Adjustment to Claimed Costs for CVX Internal Technical Consultants

| | Stevens Zone | | Carneros Zone | |
|---|---|---|---|---|
| Total CVX Internal Technical Consultant Costs | 3,747,712 | 1/ | - | 1/ |
| Adjustment of Labor Rate for Removal of Resources Costs | 43.1% | 2/ | 43.1% | 2/ |
| **Adjustment to Claimed Costs** | $ 1,615,264 | | $ - | |

**Sources:**
1/  See Exhibit 4.
2/  Musika Declaration, paragraph 18.

Prepared by Invotex

Document 399-2   Filed 12/06/13   Page 72 of 196

Exhibit 4.7

**Adjustment for Chevron's Claimed Payroll Burden Costs**

| | 1996 - 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inappropriate Burden Expense Elements** | | | | | | | | | | | | | |
| Stock Plan / Pension Plan / Pension & Annuity Plan | n/a | $ 27,540,050 1/ | $ 8,433,830 2/ | $ 63,363,501 1/ | $ 42,721,798 3/ | $ 46,761,415 5/ | $ 41,654,315 6/ | $ 39,784,406 7/ | $ 24,276,662 7/ | $ 109,528,831 9/ | $ 99,824,703 10/ | $ 23,294,337 11/ | $ 525,183,849 |
| Saving Plan Plan (ESIP) | n/a | 3,586,465 | 15,517,666 2/ | 25,210,965 2/ | 25,515,347 3/ | 26,173,002 5/ | 31,240,824 6/ | 36,260,445 7/ | 44,166,677 7/ | 49,184,947 9/ | 49,530,025 10/ | 19,168,924 11/ | 325,546,227 |
| OPEB Cash | n/a | 15,611,088 | 21,566,182 2/ | 34,625,326 2/ | 29,690,447 3/ | 29,933,222 5/ | 33,081,074 6/ | 31,789,264 7/ | 23,698,600 7/ | 23,030,416 9/ | 23,912,130 10/ | 9,705,492 11/ | 280,743,241 |
| OPEB Non-Cash | n/a | 6,175,543 1/ | 9,878,600 2/ | 5,636,681 2/ | 3,669,606 3/ | | | | | | | | 25,369,430 |
| Total Inappropriate Burden Expense | n/a | 52,913,146 | 55,516,218 | 128,836,473 | 101,597,198 | 102,867,639 | 107,976,213 | 107,834,115 | 92,141,939 | 181,744,194 | 173,239,859 | 52,168,754 | 1,160,835,747 |
| | | | | | | | | | | | | | |
| Total Burden Expense | n/a | 84,947,399 1/ | 122,802,396 2/ | 188,616,575 2/ | 161,965,963 4/ | 161,925,897 4/ | 173,718,801 4/ | 177,871,059 4/ | 183,467,775 4/ | 281,448,300 9/ | 275,593,667 10/ | 87,326,499 11/ | 1,899,682,331 |
| Ratio of Inappropriate to Total Burden | n/a | 62.3% | 48.5% | 68.3% | 62.7% | 63.5% | 62.2% | 60.6% | 50.2% | 64.6% | 62.9% | 59.7% | 61.1% |
| | | | | | | | | | | | | | |
| **Adjustment for Steven's Zone** | | | | | | | | | | | | | |
| Payroll Burden - In-Date Range 12/ | 1,041,509 | 49,639 | 91,879 | 159,812 | 120,540 | 126,862 | 120,968 | 115,387 | 102,024 | 153,784 | 84,027 | n/a | 2,166,430 |
| Allocation to Stevens Zone 13/ | 67.3% | 96.5% | 97.6% | 88.1% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | n/a | |
| Stevens Zone Portion of Payroll Burden | 700,725 | 47,917 | 89,654 | 140,782 | 120,540 | 126,862 | 120,968 | 115,387 | 102,024 | 153,784 | 84,027 | n/a | 1,802,669 |
| | | | | | | | | | | | | | |
| Payroll Burden - Stevens Zone | 700,725 | 47,917 | 89,654 | 140,782 | 120,540 | 126,862 | 120,968 | 115,387 | 102,024 | 153,784 | 84,027 | n/a | 1,802,669 |
| Adjustment to Payroll Burden | 61.1% | 62.3% | 48.5% | 68.3% | 62.7% | 63.5% | 62.2% | 60.6% | 50.2% | 64.6% | 62.9% | n/a | |
| Account Cost Adjustment for Payroll Burden - Stevens Zone | $ 428,191 | $ 29,847 | $ 43,451 | $ 96,183 | $ 75,612 | $ 80,592 | $ 75,188 | $ 69,951 | $ 51,209 | $ 99,305 | $ 52,820 | n/a | $ 1,100,262 |

**Sources**

1/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-33.
2/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-34.
3/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-35.
4/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-36.
5/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-37.
6/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-38.
7/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-39.
8/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-40.
9/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-41.
10/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-42.
11/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-43.
12/ Cost Element 6601/6200 per Native0003b limited to the appropriate date range.
13/ Calculated as a percentage of total payroll allocated to Stevens or Carneros after Mr. Burtall's adjustments.

Exhibit 4.8

Adjustment for Costs Related to Sale

| Cost Center | Cost Category | Cost Element | Cost element name | Period | Total Year | Amount | Vendor Description | Bates ID | Excluded by Mr. Metcalfe 2/ Blue Ridge | Excluded by Mr. Metcalfe 2/ Other | Allocated by Mr. Metcalfe 2/ Streens Zone | Cameros Zone | Dry Gas Zone | Shallow Oil Zone | Net to Zone | Other | Total Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chevron Native0030b 1/ | | | | | | | | | | | | | | |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | | 1996 | 48,789.63 | FRED FRANK | CV0D0001 | | $ 15,082.61 | | | | | | 48,789.63 | 48,789.63 |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 1 | 1996 | 3,246.48 | FRED FRANK | CV0D0014 | | 3,246.48 | | | | | | | 22,164.53 |
| 6411161 | External Non-Legal Prof & Labor | 75470100 LEGAL SERVICE & FEES | | 1 | 1996 | 28,636.92 | BARENTS GROUP L L C | CV0D0012 | | 28,636.92 | | | | | | 914.00 | 22,164.53 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | | 2 | 1996 | 18,465.52 | CASSIDY & ASSOCIATES | CV0D0011 | | 18,465.52 | | | | | | 52.00 | 52.00 |
| 6411161 | External Non-Legal Prof & Labor | 75470100 LEGAL SERVICE & FEES | | 2 | 1996 | 8,742.74 | CASSIDY & ASSOCIATES | CV0D0018 | | 8,742.74 | | | | | | 19,691.97 | 19,691.97 |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 2 | 1996 | 672.77 | CASSIDY & ASSOCIATES | CV0D0017 | | 672.77 | | | | | | | |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 2 | 1996 | 629.80 | CASSIDY & ASSOCIATES | CV0D0009 | | 629.80 | | | | | | | |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 2 | 1996 | 5,754.59 | FRED FRANK | CV0D0019 | | 5,754.59 | | | | | | | |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 3 | 1996 | 17,947.59 | CASSIDY & ASSOCIATES | CV0D0024 | | 17,947.59 | | | | | | 6.00 | 19.00 3/ |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 3 | 1996 | 603.21 | CASSIDY & ASSOCIATES | CV0D0023 | | 603.21 | | | | | | 12,381.76 | 12,381.76 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | | 3 | 1996 | 3,160.36 | CASSIDY & ASSOCIATES | CV0D0029 | | 3,160.36 | | | | | | 18,846.46 | 18,846.46 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | | 3 | 1996 | 173.76 | CASSIDY & ASSOCIATES | CV0D0028 | | 173.76 | | | | | | 580.00 | 580.00 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | | 4 | 1996 | 512.00 | FRED FRANK | CV0D0026 | | 512.00 | | | | | 440.00 | 440.00 | |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 5 | 1996 | 16,422.25 | CARMEN GROUP INC | CV0D0031 | | 16,422.25 | | | | | | 46,934.92 | 46,934.92 |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 5 | 1996 | 6,000.00 | CARMEN GROUP INC | CV0D0025 | | 6,000.00 | | | | | | 30,328.75 | 30,328.75 |
| 6411161 | Legal Costs | 75590200 OTHR PROF SERV & FEE | | 6 | 1996 | 1,326.63 | FRED FRANK | CV0D0030 | | 1,326.63 | | | | | | 9.00 | 52.00 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | | 6 | 1996 | 9,157.56 | CARMEN GROUP INC | CV0D0035 | | 9,157.56 | | | | | | 19,691.97 | 19,691.97 |

*[Section: Excluded Due to Date Range]*

| 6411161 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 7 | 1996 | 48,789.63 | WZI | CV0D0038 | | 48,789.63 | | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 7 | 1996 | 22,164.53 | WZI | CV0D0074 | | 22,164.53 | | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | BARENTS GROUP L L C | 8 | 1996 | 914.00 | BARENTS GROUP L L C | CV0D0085 | | 914.00 | 43.00 | | | | | | |
| 6411132 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | ZALCO LABORATORIES INC | 8 | 1996 | 52.00 | ZALCO LABORATORIES INC | CV0D0006 | | | 52.00 | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 70000100 CONTRACT LBR SURFACE | WZI | 9 | 1996 | 19,691.97 | WZI | CV0D0091 | | 218.96 | | | | | | | |
| 6411132 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | J B EXCITIONG | 9 | 1996 | 218.96 | J B EXCITIONG | CV0D0099 | | 218.96 | 9.00 | 4.00 | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | ZALCO LABORATORIES INC | 10 | 1996 | 26.00 | ZALCO LABORATORIES INC | CV0D0007 | | 26.00 | | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | CARMEN GROUP INC | 10 | 1996 | 12,381.76 | CARMEN GROUP INC | CV0D0152 | | 12,381.76 | | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 70000100 CONTRACT LBR SURFACE | WZI | 10 | 1996 | 18,846.46 | WZI | CV0D0271 | | 18,846.46 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 70000100 CONTRACT LBR SURFACE | ONLINE CONNECTING POINT/PACIFIC ONLI | 11 | 1997 | 580.00 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV0D0227 | | 580.00 | 580.00 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 70000100 CONTRACT LBR SURFACE | ONLINE CONNECTING POINT/PACIFIC ONLI | 6 | 1997 | 440.00 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV0D0361 | | 440.00 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 6 | 1997 | 46,934.92 | WZI | CV0D0364,0374 | | 46,934.92 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 7 | 1997 | 30,328.75 | WZI | CV0D0318 | | 30,328.75 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 8 | 1997 | 650.00 | WZI | CV0D0430 | | | 650.00 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 8 | 1997 | 35,697.50 | WZI | CV0D0430 | | 35,697.50 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 8 | 1997 | 4,936.25 | WZI | CV0D0427 | | | 4,936.25 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 8 | 1997 | 2,264.38 | WZI | CV0D0424 | | | 2,264.38 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 8 | 1997 | 18.78 | WZI | CV0D0383 | | 18.78 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 9 | 1997 | 21,297.50 | WZI | CV0D0387 | | 21,297.50 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 9 | 1997 | 8,779.47 | WZI | CV0D0383 | | 8,779.47 | | | | | | | |
| UC15100 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 9 | 1997 | 78.60 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV0D0391 | | | 78.60 | | | | | | |
| UC15100 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 9 | 1997 | 6,936.91 | CARMEN GROUP INC | CV0D0410 | | 6,936.91 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 10 | 1997 | 78.57 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV0D0499 | | | 78.57 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 10 | 1997 | 12.71 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV0D0383 | | | 12.71 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 9 | 1997 | 56,239.23 | CARMEN GROUP INC | CV0D0412 | | 56,239.23 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 10 | 1997 | 37,553.75 | CARMEN GROUP INC | CV0D0206 | | 37,553.75 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 11 | 1997 | 22,496.25 | WZI | CV0D0487 | | 22,496.25 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 11 | 1997 | 8,422.50 | WZI | CV0D0483 | | 8,422.50 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | LYNCH & ASSOCIATES | 11 | 1997 | 2,500.00 | LYNCH & ASSOCIATES | CV0D0422 | | 2,500.00 | 2,500.00 | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 12 | 1997 | 23,479.73 | WZI | CV0D0587 | | 23,479.73 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 12 | 1997 | 9,245.45 | WZI | CV0D0530 | | 9,245.45 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 12 | 1997 | 21,548.50 | WZI | CV0D0527 | | 21,548.50 | | | | | | | |
| UC15101 | External Non-Legal Prof & Labor | 75590200 OTHR PROF SERV & FEE | WZI | 12 | 1997 | 5,580.02 | WZI | | | 5,580.02 | 10,951.29 | 4.00 | | 4.00 | 440.00 | 457,343.83 | 466,739.12 |

*[Section: Legal Costs]*

| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 8 | 1996 | 16,472.99 | CARMEN GROUP INC | CV0D0069 | 85,191.25 | | | | | | | 16,472.99 | 16,472.99 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 8 | 1996 | 12,660.42 | CARMEN GROUP INC | CV0D0088 | | | | | | | | 12,660.42 | 12,660.42 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 8 | 1996 | 640.50 | CARMEN GROUP INC | CV0D0087 | | | | | | | | 640.50 | 640.50 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | KLEIN WEGIS DENATALE HALL | 9 | 1996 | 315.39 | KLEIN WEGIS DENATALE HALL | CV0D0067 | | | | | | | | 315.39 | 315.39 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | NOSSAMAN GUTHNER KNOX & | 9 | 1996 | 4,987.21 | NOSSAMAN GUTHNER KNOX & | CV0D0062 | | | | | | | 3,740.21 | 1,247.00 | 4,987.21 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | NOSSAMAN GUTHNER KNOX & | 9 | 1996 | 443.75 | NOSSAMAN GUTHNER KNOX & | CV0D0035 | | | | | | | 332.75 | 111.00 | 443.75 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 9 | 1996 | 12,018.45 | CARMEN GROUP INC | CV0D0218 | 66,300.00 | | | | | | | 12,018.45 | 12,018.45 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | WZI | 9 | 1996 | 2,293.75 | WZI | CV0D0220 | | | | | | | | 2,293.75 | 2,293.75 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | BLUE RIDGE DESIGN & TECHNICAL | 10 | 1996 | 60,300.00 | BLUE RIDGE DESIGN & TECHNICAL | CV0D0154 | | | | | | | | | |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 10 | 1996 | 85,191.25 | CARMEN GROUP INC | CV0D0143 | 45,000.00 | | | | | | | 25,147.07 | 25,147.07 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 11 | 1996 | 25,147.07 | CARMEN GROUP INC | CV0D0246 | | | | | | | | 932.50 | 932.50 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 12 | 1996 | 932.50 | CARMEN GROUP INC | CV0D0250 | 33,100.00 | | | | | | | 9,813.70 | 9,813.70 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | KLEIN WEGIS DENATALE HALL | 11 | 1996 | 9,813.70 | KLEIN WEGIS DENATALE HALL | CV0D0099 | | | | | | | | 16,031.26 | 16,031.26 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | KLEIN WEGIS DENATALE HALL | 12 | 1996 | 16,031.26 | KLEIN WEGIS DENATALE HALL | CV0D0797 | 28,200.00 | | | | | | | 3,300.00 | 3,300.00 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | WZI | 12 | 1996 | 3,300.00 | WZI | CV0D0216 | | | | | | | | 6,304.79 | 6,304.79 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 12 | 1996 | 6,304.79 | CARMEN GROUP INC | CV0D0277 | | | | | | | | 63.75 | 63.75 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | KLEIN WEGIS DENATALE HALL | 12 | 1996 | 63.75 | KLEIN WEGIS DENATALE HALL | CV0D0217 | | | | | | | | 406.88 | 406.88 |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 12 | 1996 | 406.88 | CARMEN GROUP INC | CV0D0268 | | | | | | | | | |
| 6411161 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 2 | 1997 | 2,293.75 | CARMEN GROUP INC | CV0D0110 | | | | | | | | 19,551.88 | 19,551.88 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | BLUE RIDGE DESIGN & TECHNICAL | 1 | 1997 | 33,100.00 | BLUE RIDGE DESIGN & TECHNICAL | CV0D0302 | | | | | | | | 11,767.76 | 11,767.76 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 1 | 1997 | 19,551.88 | BARENTS GROUP L L C | CV0D0098 | | | | | | | | 369.75 | 369.75 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 2 | 1997 | 11,767.76 | CARMEN GROUP INC | CV0D0246 | | | | | | | | | |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 4 | 1997 | 9,234.10 | CARMEN GROUP INC | CV0D0779 | | | | | | | | 31,997.16 | 31,997.16 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | BLUE RIDGE DESIGN & TECHNICAL | 5 | 1997 | 28,200.00 | BLUE RIDGE DESIGN & TECHNICAL | CV0D0316 | | | | | | | | 9,234.10 | 9,234.10 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | CARMEN GROUP INC | 3 | 1997 | 369.75 | CARMEN GROUP INC | CV0D0098 | | | | | | | | | |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | WZI | 4 | 1997 | 369.75 | VENDOR N/A | CV0D0320 | | | | | | | | 7,960.23 | 7,960.23 |
| UC15101 | Legal Costs | 75470100 LEGAL SERVICE & FEES | BLUE RIDGE DESIGN & TECHNICAL | 6 | 1997 | 25,827.00 | BLUE RIDGE DESIGN & TECHNICAL | CV0D0339 | 25,827.00 | | | | | | | | |

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 74 of 196

Exhibit 4.8

| Cost Center | Cost Category | Cost Element | Cost element name | Period | Fiscal Year | Amount | Vendor Description | Bates ID | Blue Ridge (Excluded by Mr. Metcalfe) | Other (Excluded by Mr. Metcalfe) | Stevens Zone (Allocated by Mr. Metcalfe) | Camerina Zone | Dry Gas Zone | Shallow Oil Zone | Other | Net to Zero | Total Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 6 | 1997 | 9,492.29 | CARMEN GROUP INC | CVXO 0334 | | | | | | | 9,492.29 | | 9,492.29 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 7 | 1997 | 42,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0382 | 42,500.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 7 | 1997 | 6,157.88 | CARMEN GROUP INC | CVXO 0380 | | | | | | | 6,157.88 | | 6,157.88 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 9 | 1997 | 35,350.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0474 | 35,350.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 9 | 1997 | 9,859.10 | CARMEN GROUP INC | CVXO 0472 | | | | | | | 9,859.10 | | 9,859.10 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 10 | 1997 | 26,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0502 | 26,500.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 10 | 1997 | 7,770.68 | CARMEN GROUP INC | CVXO 0494 | | | | | | | 7,770.68 | | 7,770.68 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 23,750.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0518 | 23,750.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 22,040.00 | CARMEN GROUP INC | CVXO 0516 | | | | | | | 22,040.00 | | 22,040.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 700.00 | LYNCH ASSOCIATES | CVXO 0501 | | | | | | | 700.00 | | 700.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 12 | 1997 | 32,660.00 | CARMEN GROUP INC | CVXO 0538 | | | | | | | 32,660.00 | | 32,660.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 12 | 1997 | 22,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0539 | 22,500.00 | | | | | | | | |
| **Legal Costs** | | | | | | | | | | | 4,072.96 | | | | 297,064.24 | | 301,937.20 |
| 6411161 | Letter of Credit & Misc Expenses | 75900800 | MISC SERV & FEES | 11 | 1996 | 21,951.14 | WZI | CVXO 0161 | | | | | | | 21,951.14 | | 21,951.14 |
| 6411161 | Letter of Credit & Misc Expenses | 75900800 | MISC SERV & FEES | 11 | 1996 | 611.66 | WZI | CVXO 0167 | | | | | | | 611.66 | | 611.66 |
| UC11100 | Letter of Credit & Misc Expenses | 75900800 | MISC SERV & FEES | 1 | 1997 | 3,780.00 | CONSERVATION COMMITTEE OF CALOLAN | CVXO 0222 | | 3,780.00 | | | | | | | |
| **Letter of Credit & Misc Expenses** | | | | | | | | | | | | | | | 22,562.80 | | 22,562.80 |
| UC11132 | Office Services & Equipment | 71900400 | OSS STATM'LS/SUP | | 1997 | 87.95 | EXECUTIVE BUSINESS SERVICES | CVXO 0200 | | | 50.00 | | | | 37.95 | | 87.95 |
| UC11161 | Office Services & Equipment | 75900000 | OSS - ADMIN SERVICES | | 1997 | 11.28 | UNITED PARCEL SERVICE | CVXO 0224 | | | 6.00 | | | | 5.28 | | 11.28 |
| UC11100 | Computer Services & Equipment | 76150100 | CSE DISTR COMPUTING | 5 | 1997 | 4,111.82 | R&C COMPUTERS | CVXO 0904 | | 4,111.82 | | | | | | | |
| UC11100 | Employee Business Expense | 78990100 | MISHP D035 SUB & PUB | 4 | 1997 | 24.69 | KRATTBLT | CVXO 0289 | | | 14.00 | | | | 10.69 | | 24.69 |
| UC11100 | Other Equip, Servs, Rentals, & Costs | 72300100 | SPF EQUIPMENT RENTAL | 1 | 1997 | 254.18 | XEROX CORP | CVXO 0239 | | 254.18 | | | | | | | |
| UC11100 | Other Equip, Servs, Rentals, & Costs | 72300100 | SPF EQUIPMENT RENTAL | 2 | 1997 | 254.18 | XEROX CORP | CVXO 0270 | | 254.18 | | | | | | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | 38,300.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0288 | 38,300.00 | | | | | | | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | 38,300.00 | VENDOR N/A | | | 38,300.00 | | | | | | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | (38,300.00) | VENDOR N/A | | | (38,300.00) | | | | | | | |
| **Other** | | | | | | | | | | | 70.00 | | | | 53.92 | | 124 |
| **Total** | | | | | $ 1,411,042 | | | | $ 472,518 | $ 145,154 | $ 15,094 | $ 4 | $ - | $ - | $ 777,825 | $ 440 | $ 793,363 |

Prepared by Invotex

**Notes/Sources:**

1/ Sale transactions based on Plaintiff's Response to Defendant's RFP No. 6, April 22, 2011.
2/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 368-376, 26-28, 665-666, 494-516; with allocations from Declaration of Alan A. Burzlaff, December 6, 2013.
3/ Camerina zone has been deducted because it falls outside date range provided in May 8, 2013 Opinion.

Exhibit 5

# Chevron's Damages Claim Adjusted for Combination of Mr. Burzlaff's Allocations and Transaction Analysis

| Cost Type | Chevron's Corrected Damages Claim 1/ | Chevron's Adjusted Damages Claim 2/ | Reduction to Chevron's Corrected Damages Claim |
|---|---|---|---|
| Legal Costs - Stevens and Carneros | $  4,564,606 | $  4,407,884 | $  (156,722) |
| Legal Costs - FOIA and Sanctions | 995,110 | 995,110 | - |
| Company Payroll & Benefits | 7,986,729 | 3,845,683 | (4,141,046) |
| External Non-Legal Prof & Labor | 2,963,952 | 2,392,331 | (571,620) |
| CVX Internal Technical Consultants | 3,747,712 | 1,683,250 | (2,064,461) |
| Other | 2,272,599 | 791,603 | (1,480,996) |
| Miscellaneous Expenses | 57,859 | 55,034 | (2,825) |
| Total | $  22,588,567 | $  14,170,896 | $  (8,417,671) |

**Sources:**
1/  See Exhibit 2.
2/  See Exhibit 5.1.

Prepared by Invotex

Exhibit 5.1

**Chevron's Damages Claim Adjusted for Combination of Mr. Burzlaff's Allocations and Transaction Analysis - By Zone**

|  | Stevens Zone 1/ | Carneros Zone 2/ | Adjusted Claim 3/ |
|---|---|---|---|
| Legal Costs - Stevens and Carneros | $ 3,964,299 | $ 443,585 | $ 4,407,884 |
| Legal Costs - FOIA and Sanctions | - | - | 995,110 |
| Company Payroll & Benefits | 3,826,536 | 19,147 | 3,845,683 |
| External Non-Legal Prof & Labor | 2,356,978 | 35,353 | 2,392,331 |
| CVX Internal Technical Consultants | 1,683,250 | - | 1,683,250 |
| Other | 787,949 | 3,654 | 791,603 |
| Miscellaneous Expenses | 54,847 | 186 | 55,034 |
| Adjusted Damages | $ 12,673,861 | $ 501,925 | $ 14,170,896 |

**Sources:**
1/   See Exhibit 5.3.
2/   See Exhibit 5.4.
3/   See Exhibit 5.2.

Prepared by Invotex

**Chevron's Damages Claim Adjusted for Combination of Mr. Burzlaff's Allocations and Transaction Analysis**

| Cost Category | Chevron's Claim using Mr. Burzlaff's Adjustments 3/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization | Improper Inclusion of Costs Related to Sale | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| 1/ Legal Costs - Stevens and Cameros | $ 4,438,186 | $ 26,228 | $ - | $ - | $ 4,073 | $ 4,407,884 |
| 2/ Legal Costs - FOIA and Sanctions | 995,110 | - | - | - | - | 995,110 |
| 1/ Company Payroll & Benefits | 4,427,659 | - | - | 581,975 | - | 3,845,683 |
| 1/ External Non-Legal Prof & Labor | 2,617,049 | 213,767 | - | - | 10,951 | 2,392,331 |
| 1/ CVX Internal Technical Consultants | 2,958,261 | - | 1,275,010 | - | - | 1,683,250 |
| 1/ Other | 1,385,805 | 594,132 | - | - | 70 | 791,603 |
| 1/ Miscellaneous Expenses | 55,034 | - | - | - | - | 55,034 |
| **Total** | $ 16,877,103 | $ 834,127 | $ 1,275,010 | $ 581,975 | $ 15,094 | $ 14,170,896 |

**Sources:**

1/ Calculated as the sum of Exhibits 5.3 and 5.4.

2/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim - 18. FOIA and Sanctions are not included in zone-specific analysis.

3/ See Exhibit 2.

Prepared by Invotex

Exhibit 5.3

**Chevron's Damages Claim Adjusted for Combination of Mr. Burzlaff's Allocations and Transaction Analysis - Stevens Zone**

| Cost Category | Chevron's Claim using Mr. Burzlaff's Adjustments 1/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert 2/ | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants 3/ | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization 4/ | Improper Inclusion of Costs Related to Sale 5/ | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| Legal Costs | $ 3,994,601 | $ 26,228 | $ - | $ - | $ 4,073 | $ 3,964,299 |
| Company Payroll & Benefits | 4,403,820 | - | - | 577,284 | - | 3,826,536 |
| External Non-Legal Prof & Labor | 2,581,697 | 213,767 | - | - | 10,951 | 2,356,978 |
| CVX Internal Technical Consultants | 2,958,261 | - | 1,275,010 | - | - | 1,683,250 |
| Other | 1,379,455 | 591,436 | - | - | 70 | 787,949 |
| Miscellaneous Expenses | 54,847 | - | - | - | - | 54,847 |
| **Total** | $ 15,372,682 | $ 831,432 | $ 1,275,010 | $ 577,284 | $ 15,094 | $ 12,673,861 |

**Sources:**

1/  Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 18, 60, 354, 462, 488, 662 as corrected by Exhibit 22 to Deposition of Mr. Stone dated October 30, 2013 and adjusted by
    Declaration of Alan A. Burzlaff, dated December 6, 2013.
2/  See Exhibit 5.5.
3/  See Exhibit 5.6.
4/  See Exhibit 5.7.
5/  See Exhibit 5.8.

Prepared by Invotex

Chevron U.S.A Inc. v. The United States

Exhibit 5.4

**Chevron's Damages Claim Adjusted for Combination of Mr. Burzlaff's Allocations and Transaction Analysis - Carneros Zone**

| Cost Category | Chevron's Claim using Mr. Burzlaff's Adjustments 1/ | Unsupported Transactions Acknowledged by Chevron and Chevron's Damage Expert 2/ | Improper Inclusion of Fixed Costs Unrelated to Equity Finalization - CVX Internal Technical Consultants 3/ | Improper Inclusion of Accrued Benefit Costs Unrelated to Equity Finalization 4/ | Improper Inclusion of Costs Related to Sale 5/ | Adjusted Damage Claim |
|---|---|---|---|---|---|---|
| Legal Costs | $ 443,585 | $ - | $ - | $ - | $ - | $ 443,585 |
| Company Payroll & Benefits | 23,838 | - | - | 4,691 | - | 19,147 |
| External Non-Legal Prof & Labor | 35,352 | (1) | - | - | - | 35,353 |
| CVX Internal Technical Consultants | - | - | - | - | - | - |
| Other | 6,350 | 2,696 | - | - | - | 3,654 |
| Miscellaneous Expenses | 186 | - | - | - | - | 186 |
| **Total** | $ 509,312 | $ 2,695 | $ - | 4,691 | $ - | $ 501,925 |

**Sources:**

| | |
|---|---|
| 1/ | Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 18, 60, 354, 462, 488, 662 as corrected by Exhibit 22 to Deposition of Mr. Stone dated October 30, 2013 and adjusted by Declaration of Alan A. Burzlaff, dated December 6, 2013. |
| 2/ | See Exhibit 5.5. |
| 3/ | See Exhibit 5.6. |
| 4/ | See Exhibit 5.7. |
| 5/ | See Exhibit 5.8. |

Prepared by Invotex

Exhibit 5.5

Case 1:04-cv-01365-SGB  Document 399-2  Filed 12/06/13  Page 80 of 196
Chevron U.S.A. Inc. v. The United States

# Summary of Unsupported Transactions Identified by Chevron 1/

| | Stevens Zone | Adjustments for Carneros Zone | Total |
|---|---|---|---|
| **Legal Costs** | | | |
| Total 2/ | $ 3,994,601 | $ 443,585 | $ 4,438,186 |
| Supported 3/ | 3,968,372 | 443,585 | 4,411,957 |
| **Not Supported** | $ 26,228 | $ - | $ 26,228 |
| | | | |
| **External Non-Legal Prof & Labor** | | | |
| Total 2/ | $ 2,581,697 | $ 35,352 | $ 2,617,049 |
| Supported 3/ | 2,367,930 | 35,353 | 2,403,283 |
| **Not Supported** | $ 213,767 | $ (1) | $ 213,767 |
| | | | |
| **Other** | | | |
| Total 2/ | $ 1,116,792 | $ 3,337 | $ 1,120,130 |
| Supported 3/ | 525,356 | 641 | 525,997 |
| **Not Supported** | $ 591,436 | $ 2,696 | $ 594,132 |
| | | | |
| **Total** | | | |
| Total | $ 7,693,090 | $ 482,275 | $ 8,175,365 |
| Supported | 6,861,658 | 479,579 | 7,341,237 |
| **Not Supported** | $ 831,432 | $ 2,695 | $ 834,127 |

Prepared by Invotex

**Sources/Notes:**

1/ Adjustments reflect the date restrictions of the Stevens and Carneros zones based on the court's May 8, 2013 Opinion. For partial months, I have adopted Mr. Metcalfe's apportionment methodology.

2/ Exhibits 5.2 to 5.4. Other does not include Chevron's claim for Office Space.

3/ Source documents identified on Interim pages 26-28, 368-376 and 494-516; and Native 0003b.xls.

Exhibit 5.6

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 81 of 196
Chevron U.S.A. Inc. v. The United States

## Adjustment to Claimed Costs for CVX Internal Technical Consultants

|  | Stevens Zone | | Carneros Zone | |
|---|---|---|---|---|
| Total CVX Internal Technical Consultant Costs | 2,958,261 | 1/ | - | 1/ |
| Adjustment of Labor Rate for Removal of Resources Costs | 43.1% | 2/ | 43.1% | 2/ |
| **Adjustment to Claimed Costs** | $ 1,275,010 | | $ - | |

**Sources:**
1/  See Exhibit 5.2.
2/  Musika Declaration, paragraph 18.

Prepared by Invotex

**Adjustment to Chevron's Claimed Payroll Burden Costs**

| | 1996-2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inappropriate Burden Expense Elements** | | | | | | | | | | | | | |
| Stock Plan / Pension Plan / Pension & Annuity Plan | n/a | $ 27,540,050 1/ | $ 8,433,830 2/ | $ 63,363,501 3/ | $ 42,721,798 4/ | $ 46,761,415 5/ | $ 43,654,315 6/ | $ 39,784,406 7/ | $ 24,276,662 8/ | $ 109,528,831 9/ | $ 99,824,703 10/ | $ 23,294,337 11/ | $ 529,183,849 |
| Saving Plus Plan (ESIP) | n/a | 3,586,465 1/ | 15,537,606 2/ | 25,230,965 3/ | 25,515,347 4/ | 26,173,002 5/ | 31,240,824 6/ | 36,260,445 7/ | 44,166,677 8/ | 49,186,947 9/ | 49,503,025 10/ | 19,168,924 11/ | 325,548,227 |
| OPEB Cash | n/a | 15,611,088 1/ | 25,666,182 2/ | 34,625,326 3/ | 29,690,447 4/ | 29,933,222 5/ | 33,081,074 6/ | 31,289,264 7/ | 23,698,600 8/ | 23,030,416 9/ | 23,912,130 10/ | 9,705,492 11/ | 280,743,241 |
| OPEB Non-Cash | n/a | 6,175,543 1/ | 9,878,600 2/ | 5,636,681 3/ | 3,669,606 4/ | - | - | - | - | - | - | - 11/ | 25,360,430 |
| Total Inappropriate Burden Expense | n/a | 52,913,146 | 59,516,218 | 128,836,473 | 101,597,198 | 102,867,639 | 107,976,213 | 107,834,115 | 92,141,939 | 181,744,194 | 173,239,859 | 52,168,754 | 1,160,835,747 |
| | | | | | | | | | | | | | |
| Total Burden Expense | n/a | 84,907,399 1/ | 122,802,206 2/ | 188,616,575 3/ | 161,963,863 4/ | 161,925,897 5/ | 173,218,601 6/ | 177,871,059 7/ | 183,467,775 8/ | 281,448,305 9/ | 275,593,667 10/ | 87,326,499 11/ | 1,899,682,331 |
| Ratio of Inappropriate to Total Burden | n/a | 62.3% | 48.5% | 68.3% | 62.7% | 63.5% | 62.2% | 60.6% | 50.2% | 64.6% | 62.9% | 59.7% | 61.1% |
| | | | | | | | | | | | | | |
| **Adjustments for Stevens Zone** | | | | | | | | | | | | | |
| Payroll Burden - In Date Range 12/ | 1,041,509 | 49,639 | 91,879 | 159,812 | 120,540 | 126,862 | 120,068 | 115,387 | 102,024 | 153,784 | 76,433 | n/a | 2,158,836 |
| Allocation to Stevens Zone 13/ | 52.9% | 5.7% | 0.8% | 4.0% | 25.9% | 18.8% | 13.8% | 28.4% | 87.9% | 86.9% | 79.2% | n/a | |
| Stevens Zone Portion of Payroll Burden | 550,475 | 2,829 | 742 | 6,343 | 31,207 | 23,904 | 16,711 | 32,799 | 89,654 | 133,680 | 60,562 | n/a | 948,905 |
| | | | | | | | | | | | | | |
| Payroll Burden - Stevens Zone | 550,475 | 2,829 | 742 | 6,343 | 31,207 | 23,904 | 16,711 | 32,799 | 89,654 | 133,680 | 60,562 | n/a | 948,905 |
| Adjustment to Payroll Burden | 61.1% | 62.3% | 48.5% | 68.3% | 62.7% | 63.5% | 62.2% | 60.6% | 50.2% | 64.6% | 62.9% | n/a | |
| Accrued Cost Adjustment for Payroll Burden - Stevens Zone | $ 336,378 | $ 1,762 | $ 359 | $ 4,333 | $ 19,576 | $ 15,185 | $ 10,387 | $ 19,884 | $ 45,027 | $ 86,323 | $ 38,070 | n/a | $ 577,284 |
| | | | | | | | | | | | | | |
| **Adjustments for Cameros Zone** | | | | | | | | | | | | | |
| Payroll Burden - In Date Range 12/ | 918,503 | - | - | - | - | - | - | - | - | - | - | n/a | 918,503 |
| Allocation to Cameros Zone 13/ | 0.8% | - | - | - | - | - | - | - | - | - | - | n/a | |
| Cameros Zone Portion of Payroll Burden | 7,677 | - | - | - | - | - | - | - | - | - | - | n/a | 7,677 |
| | | | | | | | | | | | | | |
| Payroll Burden - Cameros Zone | 7,677 | - | - | - | - | - | - | - | - | - | - | n/a | 7,677 |
| Adjustment to Payroll Burden | 61.1% | - | - | - | - | - | - | - | - | - | - | n/a | |
| Accrued Cost Adjustment for Payroll Burden - Cameros Zone | $ 4,691 | - | - | - | - | - | - | - | - | - | - | n/a | $ 4,691 |

Sources:
1/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-33.
2/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-34.
3/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-35.
4/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-36.
5/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-37.
6/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-38.
7/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-39.
8/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-40.
9/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-41.
10/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-42.
11/ Mr. Metcalfe's Workpaper Binder "N" - General Accounting Information & Other Supporting Documents, p. N-43.
12/ Cost Element 660/0200 per Native0003b limited to the appropriate date range.
13/ Calculated as a percentage of total payroll allocated to Stevens or Cameros after Mr. Burtaff's adjustments.

Chevron NativeO010b 2/

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 83 of 196

**Adjustment for Costs Related to Sale**

| Cost Center | Cost Category | Cost Element | Cost element name | Period | Year | Amount | Vendor Description | Bates ID | Blue Ridge | Other | Dry Gas Zone | Camonce Zone | Stevens Zone | Shallow Oil Zone | Other | Net to Zero | Total Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Excluded by Mr. Metcalfe | | Abused by Mr. Burdett 2/ | | | | | | |

| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 1 | 1996 | 15,083 | FRED FRANK | CV02 0001 | | 15,083 | | | | | 48,789.63 | | 48,789.63 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 1 | 1996 | 3,246.48 | FRED FRANK | CV02 0074 | | 3,246.48 | | | | | 22,164.53 | | 22,164.53 |
| 6411161 | External Non-Legal Prof & Labor | 7000010 | CONTRACT LAB-SURFACE | 2 | 1996 | 28,636.92 | BARENTS GROUP L L C | CV02 0012 | | 28,636.92 | | | | | 914.00 | | 914.00 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 18,465.21 | CASSIDY & ASSOCIATES | CV02 0007 | | 18,465.21 | 43.00 | | | | 52.00 | | 52.00 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 8,742.74 | CASSIDY & ASSOCIATES | CV02 0008 | | 8,742.74 | | | | | 19,693.97 | | 19,693.97 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 672.77 | CASSIDY & ASSOCIATES | CV02 0017 | | 672.77 | | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 629.80 | CASSIDY & ASSOCIATES | CV02 0009 | | 629.80 | | | | | 6.00 | | 19.00 3/ |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 5,714.59 | CASSIDY & ASSOCIATES | CV02 0013 | | 5,714.59 | | | | | 12,381.76 | | 12,381.76 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 2 | 1996 | 17,947.59 | CASSIDY & ASSOCIATES | CV02 0024 | | 17,947.59 | | | | | 18,846.46 | | 18,846.46 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 3 | 1996 | 603.21 | CASSIDY & ASSOCIATES | CV02 0023 | | 603.21 | | | | | 580.00 | | 580.00 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 4 | 1996 | 3,160.16 | CASSIDY & ASSOCIATES | CV02 0025 | | 3,160.16 | | | | | 440.00 | 440.00 | |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 4 | 1996 | 173.76 | CASSIDY & ASSOCIATES | CV02 0028 | | 173.76 | | | | | 46,934.92 | | 46,934.92 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 4 | 1996 | 512.00 | FRED FRANK | CV02 0026 | | 512.00 | | | | | 30,328.75 | | 30,328.75 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 5 | 1996 | 16,422.25 | CARMEN GROUP INC | CV02 0031 | | 16,422.25 | | | | | 650.00 | | 650.00 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 5 | 1996 | 6,000.00 | CARMEN GROUP INC | CV02 0025 | | 6,000.00 | | | | | 35,697.50 | | 35,697.50 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 6 | 1996 | 1,326.63 | FRED FRANK | CV02 0033 | | 1,326.63 | | | | | 4,936.25 | | 4,936.25 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 6 | 1996 | 9,157.56 | CARMEN GROUP INC | CV02 0035 | | 9,157.56 | | | | | 37,553.75 | | 37,553.75 |
| | | | | | | 136,534.48 | | | | | | | | | | | |

| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 7 | 1996 | 48,789.63 | WZI | CV02 0038 | | | | | | | 22,496.25 | | 22,496.25 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 7 | 1996 | 22,164.53 | WZI | CV02 0074 | | | | | | | 8,422.50 | | 8,422.50 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1996 | 914.00 | BARENTS GROUP L L C | CV02 0085 | | | | | | | 2,500.00 | | 2,500.00 |
| 6411161 | External Non-Legal Prof & Labor | 7000010 | CONTRACT LAB-SURFACE | 8 | 1996 | 52.00 | ZALCO LABORATORIES INC | CV02 0074 | | | 43.00 | | | | 23,479.73 | | 23,479.73 |
| 6411132 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 9 | 1996 | 19,693.97 | WZI | CV02 0095 | | | | | | | 78.60 | | 78.60 |
| 6411132 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1996 | 218.96 | LH HEITZMAN | CV02 0008 | | 218.96 | | | | | 6,936.91 | | 6,936.91 |
| 6411132 | External Non-Legal Prof & Labor | 7000010 | CONTRACT LAB-SURFACE | 10 | 1996 | 6.00 | ZALCO LABORATORIES INC | CV02 0007 | | | 9.00 | | | | | | |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1996 | 12,381.76 | WZI | CV02 0152 | | | 4.00 | | | | 56,239.23 | | 56,239.23 |
| 6411161 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1996 | 18,846.46 | WZI | CV02 0133 | | | | | | | 12.71 | | 12.71 |
| UC13100 | External Non-Legal Prof & Labor | 7000010 | CONTRACT LAB-SURFACE | 1 | 1997 | 580.00 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV02 0227 | | | | 580.00 | | | | | |
| UC13100 | External Non-Legal Prof & Labor | 7000010 | CONTRACT LAB-SURFACE | 1 | 1997 | 440.00 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV02 0239 / CV02 0374 | | | | | | | | 440.00 | |
| UC13131 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 7 | 1997 | 46,934.92 | WZI | CV02 0318 | | | | 580.00 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 7 | 1997 | 30,328.75 | WZI | CV02 0227 | | | | 650.00 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 650.00 | WZI | CV02 0427 | | | | 4,936.25 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 35,697.50 | WZI | CV02 0038 | | | | 2,044.38 | | | | | |
| UC13131 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 4,936.25 | WZI | CV02 0427 | | | | 18.78 | | | | | |
| UC13131 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 2,044.38 | WZI | CV02 0434 | | | | | | | 21,297.50 | | 21,297.50 |
| UC13131 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 18.78 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV02 0387 | | | | | | | 8,779.47 | | 8,779.47 |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 21,297.50 | WZI | CV02 0383 | | | | | | | 78.60 | | 78.60 |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 8,779.47 | WZI | CV02 0391 | | | | | | | 6,936.91 | | 6,936.91 |
| UC13150 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 78.60 | CARMEN GROUP INC | CV02 0412 | | | | 78.60 | | | 78.57 | | 78.57 |
| UC13150 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 8 | 1997 | 6,936.91 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV02 0099 | | | | 78.57 | | | 12.71 | | 12.71 |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1997 | 12.71 | ONLINE CONNECTING POINT/PACIFIC ONLI | CV02 0475 | | | | 12.71 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1997 | 56,239.23 | WZI | CV02 0506 | | | | 4,936.25 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 10 | 1997 | 37,553.75 | WZI | CV02 0407 | | | | 2,044.38 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 11 | 1997 | 22,496.25 | WZI | CV02 0483 | | | | | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 11 | 1997 | 8,422.50 | WZI | CV02 0503 | | | | | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 11 | 1997 | 2,500.00 | LYNCH & ASSOCIATES | CV02 0022 | | | | 2,500.00 | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 12 | 1997 | 23,479.73 | WZI | CV02 0687 | | | | | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 12 | 1997 | 9,245.45 | WZI | CV02 0519 | | | | | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 12 | 1997 | 21,548.50 | WZI | CV02 0530 | | | | | | | | | |
| UC13101 | External Non-Legal Prof & Labor | 7559020 | OTHR PROF SERV & FEE | 12 | 1997 | 5,580.02 | WZI | CV02 0527 | | | | | | | | | |
| | | | | | | 447,343.63 | | | | | | 10,951.29 | | | | 440.00 | 446,793.12 |

| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 8 | 1996 | 16,472.99 | CARMEN GROUP INC | CV02 0069 | 85,191.25 | | | 3,742.21 | | | 16,472.99 | | 16,472.99 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 9 | 1996 | 12,660.42 | CARMEN GROUP INC | CV02 0088 | | | | 312.75 | | | 12,660.42 | | 12,660.42 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 10 | 1996 | 640.50 | KLEIN WEISS DEMATTAEI HALL | CV02 0087 | | | | | | | 640.50 | | 640.50 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 11 | 1996 | 315.39 | KLEIN WEISS DEMATTAEI HALL | CV02 0062 | 66,300.00 | | | | | | 315.39 | | 315.39 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 11 | 1996 | 4,987.21 | NOSSAMAN GUTHNER KNOX & | CV02 0061 | | | | | | | 1,247.00 | | 4,987.21 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 11 | 1996 | 443.75 | NOSSAMAN GUTHNER KNOX & | CV02 0271 | 45,000.00 | | | | | | 443.75 | | 443.75 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 11 | 1996 | 12,018.45 | CARMEN GROUP INC | CV02 0020 | | | | | | | 12,018.45 | | 12,018.45 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 11 | 1996 | 2,293.75 | CARMEN GROUP INC | CV02 0110 | 33,100.00 | | | | | | 2,293.75 | | 2,293.75 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 12 | 1996 | 66,300.00 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0240 | | | | | | | 19,553.88 | | 19,553.88 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 1 | 1997 | 85,191.25 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0343 | | | | | | | 11,767.76 | | 11,767.76 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 1 | 1997 | 25,147.07 | CARMEN GROUP INC | CV02 0165 | 28,200.00 | | | | | | 25,147.07 | | 25,147.07 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 2 | 1997 | 932.00 | BARENTS GROUP L L C | CV02 0266 | | | | | | | 369.75 | | 369.75 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 3 | 1997 | 9,813.70 | CARMEN GROUP INC | CV02 0304 | | | | | | | 9,813.70 | | 9,813.70 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 3 | 1997 | 16,031.26 | CARMEN GROUP INC | CV02 0165 | 25,827.00 | | | | | | 16,031.26 | | 16,031.26 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 4 | 1997 | 3,300.00 | KLEIN WEISS DEMATTAEI HALL | CV02 0312 | | | | | | | 3,300.00 | | 3,300.00 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 4 | 1997 | 6,304.79 | CARMEN GROUP INC | CV02 0271 | 42,500.00 | | | | | | 6,304.79 | | 6,304.79 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 5 | 1997 | 63.75 | KLEIN WEISS DEMATTAEI HALL | CV02 0217 | | | | | | | 63.75 | | 63.75 |
| 6411161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 5 | 1997 | 406.88 | CARMEN GROUP INC | CV02 0210 | | | | | | | 406.88 | | 406.88 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 7 | 1997 | 33,100.00 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0302 | | | | | | | 11,997.16 | | 11,997.16 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 7 | 1997 | 31,997.16 | CARMEN GROUP INC | CV02 0298 | | | | | | | 9,234.10 | | 9,234.10 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 7 | 1997 | 9,234.10 | CARMEN GROUP INC | CV02 0316 | | | | | | | | | |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 8 | 1997 | 28,200.00 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0013 | | | | | | | 7,960.23 | | 7,960.23 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 8 | 1997 | 7,960.23 | CARMEN GROUP INC | CV02 0334 | | | | | | | | | |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 8 | 1997 | 9,492.29 | CARMEN GROUP INC | CV02 0382 | | | | | | | 9,492.29 | | 9,492.29 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 8 | 1997 | 42,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0380 | | | | | | | | | |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 9 | 1997 | 6,157.88 | CARMEN GROUP INC | CV02 0474 | | | | | | | 6,157.88 | | 6,157.88 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 9 | 1997 | 35,350.00 | BLUE RIDGE DESIGN & TECHNICAL | CV02 0472 | | | | | | | 59.67 | | 59.67 |
| UC13161 | Legal Costs | 7547000 | LEGAL SERVICE & FEES | 9 | 1997 | 9,859.10 | CARMEN GROUP INC | | | | | | | | 9,859.10 | | 9,859.10 |

Prepared by Invotex

Case 1:04-cv-01365-SGB   Document 399-2   Filed 12/06/13   Page 84 of 196

Exhibit 5.8

| Cost Center | Cost Category | Cost Element | Cost element name | Period | Fiscal Year | Amount | Vendor-Description | Bates ID | Blue Ridge | Other | Screens Zone | Camena Zone | Dry Gas Zone | Shallow Oil Zone | Other | Net to Zero | Total Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **Excluded by Mr. Metcalfe** | | **Allocated by Mr. Burdaff 2/** | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 10 | 1997 | 26,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0502 | 26,500.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 10 | 1997 | 7,770.68 | CARMEN GROUP INC | CVXO 0494 | | | | | | | 7,770.68 | | 7,770.68 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 23,750.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0518 | 23,750.00 | | | | | | | | |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 22,040.00 | CARMEN GROUP INC | CVXO 0516 | | | | | | | 22,040.00 | | 22,040.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 11 | 1997 | 700.00 | LYNCH & ASSOCIATES | CVXO 0501 | | | | | | | 700.00 | | 700.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 12 | 1997 | 32,660.00 | CARMEN GROUP INC | CVXO 0538 | | | | | | | 32,660.00 | | 32,660.00 |
| UC11161 | Legal Costs | 75470100 | LEGAL SERVICE & FEES | 12 | 1997 | 22,500.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0539 | 22,500.00 | | | | | | | | |
| | **Legal Costs** | | | | | | | | | | | | | | 297,664.24 | - | **301,937.20** |
| 6411161 | Letter of Credit & Misc. Expenses | 75900800 | MISC SERV & FEES | 11 | 1996 | 21,951.14 | WZI | CVXO 0161 | | 21,951.14 | | | | | | - | 21,951.14 |
| 6411161 | Letter of Credit & Misc. Expenses | 75900800 | MISC SERV & FEES | 11 | 1996 | 611.66 | WZI | CVXO 0167 | | 611.66 | | | | | | | 611.66 |
| UC11100 | Letter of Credit & Misc. Expenses | 75900800 | MISC SERV & FEES | 1 | 1997 | 3,780.00 | CONSERVATION COMMITTEE OF CA OIL AN | CVXO 0222 | | | | | | | 3,780.00 | | |
| | **Letter of Credit & Misc Expenses** | | | | | | | | | | 4,072.96 | | | | | | **22,562.80** |
| UC11132 | Office Services & Equipment | 71900400 | OSE STAT/MTLS/SUP | 1 | 1997 | 87.95 | EXECUTIVE BUSINESS SERVICES | CVXO 0200 | | | 50 | | | | 38 | | 87.95 |
| UC11130 | Office Services & Equipment | 75900500 | OSE-ADMIN SERVICES | 1 | 1997 | 11.28 | UNITED PARCEL SERVICE | CVXO 0224 | | | 6 | | | | 5 | | 11.28 |
| UC11100 | Computer Services & Equipment | 76150100 | CSE DISTR COMPUTING | 5 | 1997 | 4,111.82 | R&C COMPUTERS | CVXO 0304 | | | | | | | 4,111.82 | | |
| UC11100 | Employee Business Expense | 78995100 | MISHP DUES SUB & PUB | 4 | 1997 | 24.69 | KNATBILT | CVXO 0389 | | | 14 | | | | 11 | | 24.69 |
| UC11100 | Other Equip, Servs, Rentals, & Costs | 72300100 | SPF EQUIPMENT RENTAL | 1 | 1997 | 254.18 | XEROX CORP | CVXO 0239 | | | | | | | 254.18 | | |
| UC11100 | Other Equip, Servs, Rentals, & Costs | 72300100 | SPF EQUIPMENT RENTAL | 2 | 1997 | 254.18 | XEROX CORP | CVXO 0270 | | | | | | | 254.18 | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | 38,300.00 | BLUE RIDGE DESIGN & TECHNICAL | CVXO 0288 | 38,300.00 | | | | | | 38,300.00 | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | 38,300.00 | VENDOR N/A | | | | | | | | 38,300.00 | | |
| UC11161 | Other Equip, Servs, Rentals, & Costs | 75100100 | LABY OR TESTING SERV | 3 | 1997 | (38,300.00) | VENDOR N/A | | | | | | | | (38,300.00) | | |
| | **Other** | | | | | | | | | | 70 | | | | 54 | - | **124** |
| | **Total** | | | | | $ 1,413,043 | | | $ 472,538 | $ 145,154 | $ 150,094 | $ - | $ 4 | $ - | $ 777,825 | $ 440 | $ 793,363 |

Notes/Sources:
1/ Safe transactions based on Plaintiff's Response to Defendant's RFP No. 6, April 22, 2011.
2/ Mr. Metcalfe's Chevron Interim Ruling - Damages Binder, Interim pages 368-376, 26-28, 465-466, 494-516, with allocations from Declaration of Alan A. Burdaff, December 6, 2013.
3/ Camena zone has been deducted because it falls outside date range provided in May 8, 2013 Opinion.

Prepared by Invotex

**INDEX TO APPENDIX TO THE DECLARATION
OF MICHELLE M. RILEY, CPA
CASE NO. 04-1365C
JUDGE SUSAN G. BRADEN**

**Tabs   Document**

1.    Excerpts from Chevron v. U.S. Trial Transcripts, dated May 31, 2011

2.    Excerpts from Chevron v. U.S. Trial Transcripts, dated June 1, 2011

3.    Excerpts from Chevron v. U.S. Trial Transcripts, dated June 3, 2011

4.    Excerpts from the Deposition of Kimberly A. Melton, dated May 12, 2011

5.    Excerpts from the Deposition of Norm Stone, dated May 11, 2011

6.    Excerpts from the Deposition of Norman Stone, dated October 30, 2013

7.    Excerpts from the Deposition of Ganesh Thakur, dated May 3, 2011

8.    Terry L Musika Declaration (JE1911), dated June 1, 2011

# APPENDIX

UNITED STATES
COURT OF FEDERAL CLAIMS

---

```
CHEVRON U.S.A., INC.,        )

            Plaintiff,       )

       vs.                   ) Docket No.

THE UNITED STATES,           ) 04-1365C
```

Pages:    1 through 334

Place:    Washington, D.C.

Date:     May 31, 2011

---

HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1

```
 1     IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3   CHEVRON U.S.A., INC., )

 4        Plaintiff      )

 5   vs.                 )  Case No. 04-1365C

 6   THE UNITED STATES,   )

 7        Defendant      )

 8

 9                  Courtroom 5

10                  National Courts Building

11                  717 Madison Place, N.W.

12                  Washington, D.C.

13

14                  Tuesday, May 31, 2011

15

16                  VOLUME 1

17

18          The parties met, pursuant to the notice of

19   the Judge, at 11:03 a.m.

20

21          BEFORE THE HONORABLE SUSAN G. BRADEN

22

23

24

25
```

THAKUR - DIRECT

1   to the entire Chevron organization worldwide.

2      Q.    Okay.  Turning to your binder, the

3   first document in there, tab one, is Joint

4   Exhibit 1708.

5           And I put the first page of that up on

6   the screen.  It's a PowerPoint presentation

7   that says "ET labor rates."

8           Dr. Thakur, are you familiar with this

9   document?

10     A.    I am very familiar with the ETC, which

11  is the Energy Technology Company, labor rates.

12     Q.    Okay.  And I want to turn to page 002

13  of this document.  Hold on one second.

14          Okay.  The numbers, I guess, are on

15  the left-hand side here, and I put this up on

16  the screen.

17          This describes the business model for

18  ETC.  Could you just briefly describe what this

19  slide is talking about?

20     A.    Yes.  ETC, or Energy Technology

21  Company, is an internal service provider for

22  Chevron.  ETC purposefully does not make any

23  profit.  Primary financial goal for ETC is to

24  recover its costs fully.

25          Management and employee compensation

THAKUR - DIRECT

 1   and everything is linked to achieving full cost

 2   recovery, and we consider full cost recovery to

 3   be within plus, minus 3 percent.

 4           THE COURT:  What type of services do

 5   you provide for Chevron?

 6           THE WITNESS:  We provide engineering

 7   and hard sciences, R & D and technical services

 8   of reservoir engineering and reservoir

 9   simulation to the Chevron worldwide operations.

10   It works like an internal consulting company

11   and --

12           THE COURT:  I was just going to ask

13   that, yeah.

14           THE WITNESS:  Yes.  And it provides --

15   it provides -- but it's a very specialized

16   skills of people.  Most people in this company

17   have advanced degrees --

18           THE COURT:  Okay.

19           THE WITNESS:  -- and many, many years

20   of experience.

21   BY MR. ROSENBERG:

22      Q.   If we turn two pages later to the --

23   the page that has 004 on it, this is a document

24   that talks about the business model and how

25   projects are designed.  And could you just

THAKUR - DIRECT

1   briefly describe sort of what this is getting

2   at here?

3       A.    Right.  As we see here in this chart,

4   that people resource costs, and those are

5   converted into the labor rate calculation.  And

6   basically what we do is we look at the total

7   cost and divide it by the labor rate that is

8   available for an individual, and from there, we

9   calculate that labor rate for those

10  individuals.

11          And those times are charged at their

12  labor rates, for the individuals working on the

13  project.  Also, if there is any external or

14  direct costs available, then those are also

15  charged at cost.  So, as you can see here from

16  this picture, it clearly illustrates that the

17  charges are just to recover costs; there is no

18  profit or no markup from the charges.

19      Q.    Now, Dr. Thakur, you mentioned your

20  positions within Chevron.  Are there any

21  positions outside of Chevron that you hold?

22      A.    Yes, I also hold the position what is

23  called the incoming president of the Society of

24  Petroleum Engineers, worldwide.  So it's a

25  three-year term.  This is the year where I'm

THAKUR - DIRECT

1    directly working for me in my division, and

2    those names I'm very familiar with it, and

3    their work also I'm very familiar with it.

4           And those are the individuals like we

5    talked about, Chul-Hee Chun, Bill Todd and

6    other individuals.

7    Q.    Okay.  And was it your understanding

8    that the work they were doing on these

9    spreadsheets was related to Elk Hills equity

10   finalization?

11   A.    Absolutely, yes.

12   Q.    Okay.  Let's now go to tab 8 of your

13   binder, Dr. Thakur.  And this is an overall

14   cost spreadsheet that we've talked about a

15   little bit in this case.  If you turn to -- if

16   you turn to the categories from -- let me turn

17   to the years from 1996 to 2001 on here.

18          Do you see on this spreadsheet the

19   category of -- excuse me.  CVX Internal

20   Technical Consultants, do you see that?

21   A.    Yes.

22   Q.    And if you look at the right-hand

23   side, the total amount on this sheet for that

24   is 5.296 million dollars.  Do you see that?

25   A.    Right.

THAKUR - DIRECT

1    Q.    Was it -- do you have an understanding

2    as to what this category, CVX Internal

3    Technical Consultants, refers to?

4    A.    Yes, this is exactly the work that was

5    performed by the CPTC, which is Chevron

6    Petroleum Technology Company, or ETC, the

7    Energy Technology Company, and what it shows

8    that year by year, everyone's time and other

9    charges accumulated and as shown here.  For

10   example, it shows, for the year 1996, the cost

11   was 1.267 million dollars, and for 1997, the

12   cost as shown here on this sheet, and when you

13   accumulate all of these things, then the total

14   cost shown here is 5.296327.  So this will be

15   close to 5.3 million dollars which are related,

16   as I mentioned earlier, to reservoir

17   simulation, petrophysics and siliceous shale

18   types of technical services which were

19   performed for the Elk Hills equity

20   redetermination.

21   Q.    Now, Dr. Thakur, you didn't prepare

22   this sheet, did you?

23   A.    No.

24   Q.    Is it your understanding or do you

25   have an understanding as to where the 5.3

UNITED STATES
COURT OF FEDERAL CLAIMS

---

CHEVRON U.S.A., INC.,          )

       Plaintiff,          )

   vs.                         ) Docket No. 04-1365C

THE UNITED STATES,             )

       Defendant.          )

Pages:    335 through 713

Place:    Washington, D.C.

Date:     June 1, 2011

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1      IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3   CHEVRON U.S.A., INC.,          )

4             Plaintiff,          )

5      vs.                        ) Docket No. 04-1365C

6   THE UNITED STATES,            )

7             Defendant.          )

8

9                     Courtroom 5

10                National Courts Building

11                 717 Madison Place NW

12                  Washington, D.C.

13

14                Wednesday, June 1, 2011

15                     Volume II

16

17

18

19    The parties met, pursuant to the notice of the

20    Judge, at 9:00 a.m.

21

22      BEFORE:  THE HONORABLE SUSAN G. BRADEN

23

24

25

MELTON - DIRECT

1       A.   I think I went into this before.   When

2   an employee is set up into the payroll system,

3   they're assigned a cost center, whatever group

4   that person is going to report.   So I would be

5   assigned to a finance cost center.   My payroll

6   automatically posts to my cost center each pay

7   period by way of that initial setup in the

8   payroll system.

9       Q.   And if you could go back to the detail

10   file, and when you've -- there's a reference

11   there to payroll burden.

12       A.   Oh, yes.

13       Q.   What does that mean?

14       A.   Payroll burden is just that.   It's

15   payroll burden.   It's above an employee's

16   salary.   It would include burdens such as

17   medical insurance, dental insurance, retirement,

18   Social Security, those types of benefits that

19   are in addition to just base salary.

20       Q.   And how is the amount that goes into

21   the accounting system calculated for those

22   benefits?

23       A.   It's actually calculated at a legal

24   entity level within the organization.   So, for

25   San Joaquin Valley Business Unit, we're part of

MELTON - DIRECT

1    Chevron U.S.A. or CUSA, and the actual costs for

2    those categories that I mentioned, dental,

3    retirement, savings -- those costs are -- the

4    actual costs are calculated, and a rate is

5    determined, a rate is calculated.  And that rate

6    is applied to payroll each time payroll is

7    posted.

8         Q.   So if a payroll entry was posted for

9    $10,000, how would they -- how would they apply

10   the rate, just give us an example?

11        A.   If the rate was 45 percent, they would

12   apply 45 percent to that $10,000 salary, and a

13   payroll burden would be posted for that for

14   $4500.

15        Q.   Okay.  And if you could go to tab 12

16   in the binder, which is Joint Exhibit 1791, what

17   is this document?

18        A.   This is a document that summarizes the

19   payroll burdens for one of the companies, CUSA,

20   Chevron U.S.A., from 2004 to current.

21        Q.   And if you go down to the second page

22   of this document, what does that chart on the

23   bottom show?

24        A.   This chart was included in an e-mail

25   that comes out periodically communicating that

MELTON - DIRECT

1    there's a change to the payroll burden.  So this

2    e-mail was March 2010, and it basically

3    describes the percent or components that make up

4    that 46 percent payroll burden.

5         Q.   And who is eligible -- what employees

6    are eligible for the benefits that are listed

7    there that go into the payroll burden

8    calculation?

9         A.   Well, all employees would be eligible

10   for medical, dental, pension plans, and ESIP

11   plans have a vesting period.  OPEB is other

12   post-employment benefits.  That's available to

13   all employees depending on their period of

14   service.  FICA and Social Security and

15   Medicare -- all employees are eligible for that

16   as are long-term disability and life insurance.

17        Q.   Okay.  And you mentioned -- you

18   mentioned vesting.  Do you have an understanding

19   as to whether the employees who are included on

20   your detail, if labor is included on your detail

21   file, do you have an understanding as to whether

22   they were vested during this period?

23             THE COURT:  Counsel?

24             MR. TODOR:  Objection, no foundation

25   for the periods for which the -- the time

 1    periods for which the employees being referred

 2    to are --

 3              THE COURT:  Okay.  You can correct

 4    that.

 5    BY MR. FISHER:

 6        Q.   Ms. Melton, I'm referring to the

 7    entire period covered by your native 3B

 8    spreadsheet, so 1996 to the present, the

 9    employees in there.  And the question has to do

10    with whether -- the extent to which those

11    employees were vested during that -- during that

12    period.

13        A.   All of the employees we were able to

14    confirm were vested for both pension and ESIP as

15    of January 1, 1996, except for one employee was

16    vested in March of 1996.

17        Q.   And do these benefits that go into the

18    payroll burden -- do they include things like

19    executive stock options that are only available

20    to some people in the company?

21        A.   Employee stock options are limited to

22    the employees based on their level within the

23    organization, and because they're not available

24    to all employees, they don't go into the payroll

25    burden calculation because that payroll burden

MELTON - DIRECT

1    amount is applied to everybody's salary every

2    pay period.  Stock option accruals and booking

3    entries are maintained at a higher corporate

4    level cost center.

5        Q.   And I think you mentioned that the

6    percentage, for example, the 46 percent that we

7    see on this exhibit, is calculated based on

8    costs for all the employees in the company code,

9    the Chevron U.S.A. company code; is that right?

10       A.   Yes, that's correct.

11       Q.   Do you have any reason to believe that

12   the average cost for that larger group of

13   employees is any different than the average cost

14   for the group of employees that are included on

15   your native spreadsheet?

16            MR. TODOR:  Objection, lack of

17   foundation.

18            THE COURT:  Straighten it up.

19   BY MR. FISHER:

20       Q.   First, just -- I'm not asking you what

21   your understanding is, but do you have an

22   understanding as to the relative -- what the

23   relative costs could be for the group of

24   employees in the spreadsheet as opposed to the

25   larger group of employees in the company?

MELTON - DIRECT

1      A.   I don't see why the employee --

2      Q.   I'm sorry, just to straighten up the

3   objection and lay the foundation, I'm first just

4   asking you, do you have an understanding as to

5   that?

6      A.   I'm sorry, you'll have to say it one

7   more time.

8      Q.   Sure.  Just -- the question I'm asking

9   you about the -- about this issue of comparing

10  the burden costs for the equity employees versus

11  the burden costs for the company as a whole, do

12  you have an understanding about how those two

13  groups compare?

14           THE COURT:  In what regard?

15           MR. FISHER:  With respect to -- the

16  payroll burden is calculated for the company as

17  a whole.

18           THE COURT:  I'm trying to get you to

19  finish the sentence for her.

20           MR. FISHER:  Right, okay.

21  BY MR. FISHER:

22      Q.   So, Ms. Melton, my original question

23  was -- and now all I'm asking you, is do you

24  have an understanding on this, is --

25           THE COURT:  I think that's a yes or

MELTON - DIRECT

1    no, is what he's looking for; is that right?

2              MR. FISHER:  Right.  Right.

3    BY MR. FISHER:

4         Q.   So do you have an understanding as to

5    whether there would be any difference between

6    the average burden costs for all the employees

7    in CUSA versus the average burden costs for the

8    employees in equity finalization?

9         A.   I would have no reason to believe why

10   they would be any different.

11        Q.   Okay.  If we could move on to the

12   internal technical consultants, which is on tab

13   10.

14             THE COURT:  You've had your witness

15   here for an hour and a half held hostage.  Would

16   you like to have a short break?

17             THE WITNESS:  I think we're almost

18   done.

19             MR. FISHER:  We are almost done.  It's

20   up you to.  We have --

21             THE COURT:  Okay.

22             MR. FISHER:  -- five, ten minutes.

23   BY MR. FISHER:

24        Q.   If you could turn back to tab 10, and

25   if could you pull that up on the screen, that

UNITED STATES
COURT OF FEDERAL CLAIMS

---

CHEVRON U.S.A., INC.,          )

        Plaintiff,          )

   vs.                         ) Docket No. 04-1365C

THE UNITED STATES,             )

        Defendant.          )

Pages:   1057 through 1250

Place:   Washington, D.C.

Date:    June 3, 2011

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    CHEVRON U.S.A., INC., )

4         Plaintiff        )

5    vs.                    )  Case No. 04-1365C

6    THE UNITED STATES,     )

7         Defendant         )

8

9                      Courtroom 5

10                    National Courts Building

11                    717 Madison Place, N.W.

12                       Washington, D.C.

13

14                    Friday, June 3, 2011

15                    TRIAL VOLUME IV

16

17

18

19          The parties met, pursuant to the notice of

20    the Judge, at 9:10 a.m.

21

22          BEFORE THE HONORABLE SUSAN G. BRADEN

23

24

25

MUSIKA - DIRECT

1   you want to identify what we're looking at

2   here.

3           MR. SCHUNK:  Thank you, Your Honor.

4   BY MR. SCHUNK:

5       Q.   I believe this is slide two of the

6   attachments to your declaration, Mr. Musika; is

7   that correct?

8       A.   Yes, it is.

9           THE COURT:  And the header says

10  Results of System Analysis.

11          MR. SCHUNK:  Thank you, Your Honor.

12  And it may be two slides.  It's

13  Roman numeral I, Result of System Analysis.

14          THE COURT:  Okay.

15  BY MR. SCHUNK:

16      Q.   Mr. Musika, can you, please, explain

17  for the Court what this slide portrays?

18      A.   Yes, this is a direct summary.

19  There's many related work papers and work that

20  went behind this, but this is a direct summary

21  of task number one, which is the systems

22  analysis.

23          And what I identified was, and as

24  Ms. Melton testified to here at great length,

25  is that the ordinary course of accounting data

MUSIKA - DIRECT

1    produced a number of $12,140,714.  There were

2    reclassifications of data, there was

3    adjustments of data, there was

4    recategorizations of data, and there were just

5    outright errors in the data, numerous errors.

6         THE COURT:  And that's not unusual.

7         THE WITNESS:  Errors are not unusual.

8    Some of the errors that I detected were

9    particularly troubling.

10         THE COURT:  Okay.  We'll talk about

11    those.

12         THE WITNESS:  And so this slide

13    summarizes those various issues and reconciles

14    numerically down to the ultimate damage claim

15    of $48,998,081.

16         And if I can say for purposes of the

17    Court's following is that that number does not

18    equal the 50.4 million that Chevron has

19    testified in court to during this proceeding,

20    and the difference being my amount was taken

21    from native file 3 that was produced prior to

22    my deposition and expert report.  Chevron has,

23    as they've indicated, continued to update their

24    number, and native file three -- I think native

25    file 3 is up to native file 3b, I think.

MUSIKA - DIRECT

1          THE COURT:  So if I understand this

2     correctly, what you're saying is you're

3     satisfied that 48.9 million dollars is -- you

4     can trace that much in -- of the overall claim

5     from the accounting data that you saw?

6          THE WITNESS:  Once it was adjusted,

7     reclassed and corrected for errors, yes, Your

8     Honor.

9          THE COURT:  But you could find that,

10    you were satisfied that that was in the back-up

11    appropriately allocated to Elk Hills?

12         THE WITNESS:  Not to Elk Hills.  I

13    could find that there were entries in the

14    system and in the overlay to the system that

15    Chevron had put together for purposes of

16    getting to the damage claim.

17         This is not what's in their accounting

18    system.  This is what ultimately was produced

19    from the accounting system once it was modified

20    to convert it to a litigation claim.  I'm not

21    saying there's anything wrong with that.

22         THE COURT:  I understand.  Because

23    obviously they didn't keep the books for this

24    purpose of this lawsuit.

25         THE WITNESS:  Exactly.

MUSIKA - DIRECT

1           THE COURT:  Right.  They kept them in
2     a way they feel is appropriate to keep them for
3     the corporation as a whole.  They set up the
4     system.  They didn't decide, I'm setting up a
5     special system for litigating 15 years from now
6     or whatever.
7           THE WITNESS:  That's absolutely a key
8     point.
9           THE COURT:  Yeah.
10          THE WITNESS:  And not that we're
11    saying that's a negative or pejoratively --
12          THE COURT:  It's just the way it is.
13          THE WITNESS:  Exactly.
14          THE COURT:  So you're satisfied that
15    there's 48.9 million that you can find in the
16    accounting system that was spent, you can
17    figure out what it is.  I was concerned about
18    whether you can link this to Elk Hills, and you
19    said not necessarily.
20          THE WITNESS:  That's correct.
21          THE COURT:  Explain to me what -- what
22    I'm missing here.
23          THE WITNESS:  Well, I'd like to do it
24    in two steps, so let's stop here first in the
25    systems analysis.

MUSIKA - DIRECT

```
 1          THE COURT:  Then we'll go to the next

 2   page.

 3          THE WITNESS:  Can I answer your

 4   question as it relates to the systems analysis?

 5          THE COURT:  Yeah.

 6          THE WITNESS:  I'm concerned in the

 7   systems analysis because, one, I don't want the

 8   Court to accept or believe based on my

 9   professional opinion that because Chevron is a

10   good corporate citizen and files its reports

11   with the SEC and complies with Sarbanes-Oxley

12   and has PriceWaterhouse Coopers as their

13   auditors that that somehow creates a glow that

14   transcends or carries over to the damage claim.

15          And the reason I say that is because

16   of the significance of the number of changes

17   that had to be made for the reasons Your Honor

18   identifies.  Their ordinary course accounting

19   system isn't maintained for litigation.

20          THE COURT:  Right.  So there may be

21   redundancies within the system that account for

22   the difference.  I'm assuming that's part of

23   it.

24          THE WITNESS:  Yes.  And I think the

25   key part is --
```

MUSIKA - DIRECT

1116

          1          THE COURT:  Because you're making a
          2   value judgment, you're going back in time and
          3   saying was that -- was there any, you know,
          4   part of Elk Hills could be attributed to that.
          5   And it's a judgment call as to whether it goes
          6   into one pile or another.
          7          THE WITNESS:  That's going to get to
          8   my second point.
          9          THE COURT:  Okay.
         10          THE WITNESS:  My first point is -- on
         11   the system is that the system is not maintained
         12   to provide us any guidance or assurance that an
         13   expense was incurred in connection with Elk
         14   Hills finalization process.
         15          PriceWaterhouse Coopers doesn't care.
         16   Generally accepted accounting principles
         17   doesn't care.
         18          THE COURT:  Right, right.
         19          THE WITNESS:  SEC doesn't care.  And
         20   secondly -- and then we'll move to the second
         21   slide --
         22          THE COURT:  Okay.
         23          THE WITNESS:  -- is that in doing my
         24   systems analysis --
         25          THE COURT:  Can we do that?  Let's

1    move.  Do you mind?

2         MR. SCHUNK:  Yes, Your Honor.

3         THE COURT:  I'm working with the

4    witness here a little bit.  I'm getting in your

5    way, but that's okay.

6         MR. SCHUNK:  At the Court's pleasure,

7    Your Honor.

8         THE WITNESS:  One number I didn't

9    cover on that prior slide, and the second

10   reason in the system is because I found entries

11   in my systems analysis which were a breach in

12   the authorization process that -- that Chevron

13   applied to its accounting system to create a

14   level of assurance.

15        I found that documents, transactions

16   that had been authorized, that had been through

17   the accounting system, that had been reviewed

18   by people who were involved in the

19   equity -- Elk Hills equity finalization process

20   had authorized the expense, were not

21   appropriate, and they were pulled by Chevron

22   and said they would withdraw approximately a

23   half million dollars of transactions, which I

24   immediately said, well, I need to know why

25   these transactions have been pulled.  What's

MUSIKA - DIRECT

 1  going on.  And I never got an answer.

 2          THE COURT:  Well, I understand.  And

 3  the reason for that basically is because it

 4  doesn't make any difference.  Once they're out,

 5  then I don't really care why.  You may have an

 6  interest academically in it, but it's --

 7          THE WITNESS:  Except that the same

 8  party that approved those transactions approved

 9  other transactions.

10          THE COURT:  All right.

11          THE WITNESS:  The companies that were

12  approved and pulled, he has other companies

13  that are still in the transaction.  There are

14  many other tentacles here that impact the

15  remaining transactions that I've made no

16  adjustment for, but I've gotten no answer.

17          THE COURT:  Okay.

18          MR. FISHER:  Your Honor, just for the

19  record, we discussed this on the phone the

20  Friday, I think, before trial, I think it was.

21          THE COURT:  Right.

22          MR. FISHER:  And as we explained at

23  the time, we did not say that these were

24  unsupported transactions or

25  anything -- anything like that.  They were

MUSIKA - DIRECT

1    trying to seek depositions over the weekend of

2    people about things that happened 15 years ago,

3    and that was the reason why, along with the

4    fact that this was not -- these invoices were

5    not at the absolute core of the equity

6    finalization work that was going on.

7            MR. SCHUNK:  To be clear, Your Honor,

8    the point here, I believe, isn't that these

9    specific transactions, but it indicates that

10   the system isn't reliable.  So although those

11   numbers have been taken out, that does

12   demonstrate --

13           THE COURT:  The system's reliable.

14   The issue is the value judgments, I think, that

15   were made in putting them in one pile or

16   another.

17           THE WITNESS:  I'll go with Your

18   Honor's characterization, yes.

19           THE COURT:  Yeah, I mean --

20           THE WITNESS:  That's kind of part of

21   the system, but you're right.

22           THE COURT:  The system is the system

23   but -- you know.

24   BY MR. SCHUNK:

25       Q.   Final question on this slide.  Does

MUSIKA - DIRECT

1120

1  Chevron's system provide stand-alone support

2  for its damages number of 48.9 million dollars,

3  Mr. Musika?

4     A.    Not stand alone.  It provides some

5  levels of support concerning the transaction

6  existed and it was paid, et cetera, but

7  not -- it's not a stand-alone basis to say that

8  absent any other further authorization or

9  support that we could push a button and accept

10  50.4 million dollars as a basis to award, so

11  not on that basis.

12     Q.    Okay.  And you prepared a slide to

13  show your transaction analysis as well, is that

14  true?

15     A.    Yes.

16     Q.    And is this that slide?

17     A.    In the interest -- there you are.

18  That's the slide.

19     Q.    I should let the record reflect --

20          THE COURT:  You begin with your 48

21  number --

22          THE WITNESS:  I do, Your Honor --

23          THE COURT:  -- as your starting point?

24          THE WITNESS:  Yes.

25  BY MR. SCHUNK:

MUSIKA - DIRECT

1121

```
 1      Q.    I'll let the record reflect this is
 2   slide number four attached to your declaration.
 3   The slide is entitled Accounting Adjustments to
 4   Chevron's Damage Claim Based on Deficiencies in
 5   Support.
 6          And, Mr. Musika, if you could, please,
 7   describe for the Court what this slide
 8   portrays.
 9      A.    Yes, this -- and I'll be brief.  If
10   the Court or you wanted to get into more
11   detail, we certainly will.
12          THE COURT:  No, this is very important
13   to the case.  I want you to talk through this
14   with me.
15          THE WITNESS:  So I do begin with the
16   same 48 million dollars, and I then look at
17   selected transactions to determine whether or
18   not there is transactional support for the
19   transactions that would permit this 48 million
20   dollar number to be awarded.  Of course there
21   are other legal concerns about that amount, but
22   that's not my area.
23          So the first deduction for $3,026,219
24   comes directly from Chevron and Mr. Metcalfe's
25   work papers.  Those were areas in which -- and
```

MUSIKA - DIRECT

1   I know the Court has heard about the

2   categorization of expenses.  These were -- I

3   only looked at the categories that would be

4   supported by third party type support, like

5   business expenses or external legal fees.

6          I didn't look at payroll in this area.

7   I accepted payroll.  I didn't look at internal

8   consultants.  I accepted those large numbers.

9          THE COURT:  Right.

10         THE WITNESS:  But if it was an area or

11  category that was going to be supported by an

12  invoice, I sampled those -- no, sorry, I looked

13  at those categories.  And for those categories,

14  Chevron's own fact witnesses and Mr. Metcalfe

15  had developed a schedule which said, here are

16  the amounts that are supported, here are the

17  amounts that are unsupported.

18         And I know I've been in court and

19  heard various characterizations, it's 83

20  percent, it's 95 percent, it's 96 percent.  I'm

21  not looking at the percent.  I just took those

22  categories for the amount that was unsupported

23  and I deducted for that, saying there's no

24  support.  That's number one.

25         Number two, deficiencies in Chevron's

MUSIKA - DIRECT

1    claim support, I made a deduction for 972,000.

2         THE COURT:  Describe for me what you

3    mean by deficiencies.

4         THE WITNESS:  What I meant by

5    deficiencies is I went in and I looked at these

6    transactions, and I considered a variety of

7    characteristics about the transaction, when it

8    occurred, how it was authorized, who authorized

9    it, how much judgment was inherent in the

10   person who was authorizing, did the document

11   itself state on its face from a third party

12   that it was related to Elk Hills equity

13   finalization.  And I made a professional

14   judgment and call in each of those cases, did

15   the invoice on itself in terms of the support

16   qualify it to a reasonable degree of certainty

17   or it didn't.

18        And out of those transactions, I came

19   up with $972,374 that I would submit to the

20   Court lacked sufficient support in the invoice

21   to warrant.

22        I didn't extend that.  I didn't

23   extrapolate that sample to anything else.  I

24   just stayed with those transactions.

25        THE COURT:  Okay.

1          THE WITNESS:  Third category, improper

2     inclusion of fixed costs unrelated to equity

3     finalization, CVX internal technical

4     consultants.

5          Well, now we're away from the third

6     party support, and I'm into the cost

7     allocations.  I looked at the internal charges,

8     not looking for a piece of paper, but looking

9     for how reasonable and systematic those

10    allocations were.

11         And in the case of the CVX technical

12    consultants, what Chevron and Chevron's damage

13    expert produced was a policy statement from a

14    subsidiary of Chevron called ETC that explained

15    the basis of the allocation of -- or the basis

16    of the rates that were being charged by

17    internal consultants of Chevron that worked on

18    the equity finalization process.

19         THE COURT:  I forget the name of the

20    gentleman that was here who testified about

21    that from Houston.

22         MR. ROSENBERG:  Dr. Thakur.

23         THE COURT:  Yeah, so we're talking

24    about his work now.

25         THE WITNESS:  Yes.  And I think over,

MUSIKA - DIRECT

1   again, the 15-year time period, it's

2   understandable that the names change, the rates

3   change, but I made an assumption based on the

4   one production that was made that the

5   philosophy and the procedures and the policy

6   inherent in the ETC rate structure for 2005

7   generally applied for all years for Chevron,

8   and I don't think they have an issue with that.

9           But what I looked at there was I saw

10  that the policy statement said we're going to

11  charge other divisions of Chevron, in this case

12  the Elk Hills equity finalization process, for

13  the salaries, for the benefits, and for every

14  other cost that this subsidiary incurs, travel,

15  computers, office space, the president's

16  salary.  It was the kitchen sink, basically,

17  everything from that subsidiary got put into

18  those rates, and those rates then --

19          THE COURT:  Rather than the rate of

20  the actual salary of the person that was being

21  sent out?

22          THE WITNESS:  Exactly.

23          THE COURT:  Okay.  Just like a

24  consulting firm, you're basically paying --

25  there's a portion of the rate that covers the

MUSIKA - DIRECT

1    overhead.  So you figured out what you thought

2    the amount of overhead was, took that out, and

3    then this is what that shows, okay.

4            THE WITNESS:  Exactly.  I don't need

5    to say it.  You just said it very well.

6            THE COURT:  I don't know if I said it

7    very well, but assume for a moment that

8    Mr. Rosenberg's billing rate is a hundred

9    dollars an hour, a portion of that basically

10   goes into the rent that Jones Day pays, lights,

11   you know, toilet paper for the bathroom, all

12   those types of things basically is overhead.

13   So maybe the rate for his personal services

14   really is something like $60 rather than a

15   hundred.

16           THE WITNESS:  Yes, Your Honor, that's

17   exactly right.  And I have two comments about

18   that.

19           THE COURT:  Big assumption that that's

20   your rate.

21           MR. ROSENBERG:  The $60 is about

22   right.  We do buy a lot of toilet paper.

23           THE COURT:  There's a follow-up line.

24           THE WITNESS:  I'm not touching that.

25           Two quick points about that.  That's

MUSIKA - DIRECT

1   exactly right.  And with cost allocations,

2   internal cost allocations, the problem becomes

3   it's based on a budget.  It's based on an

4   assumed number of hours.  So if the person

5   charges more hours then -- because we divide

6   the hours.

7          THE COURT:  I think I understand what

8   you did.  That's all I'm trying to do here.

9          THE WITNESS:  Okay.

10          THE COURT:  All right.  Now --

11          MR. ROSENBERG:  Just to follow that

12   up, since we all opened the door to it, my

13   rates include the toilet paper, the meager

14   amount I get, but also profit for the firm.

15   CPTC's rates don't.  That's what Dr. Thakur

16   testified to.

17          MR. SCHUNK:  Objection, Your Honor,

18   Mr. Rosenberg is now testifying.  We move to

19   strike the last portion.

20          THE COURT:  I consider it a momentary

21   break in the action.  I'm not going to go back

22   and do that on cross.

23          We're all trying to work here.  If we

24   can't keep this exercise at least in some level

25   of, you understand, lightness, then we're

MUSIKA - DIRECT

 1  doomed, you know.

 2          We're working collectively, really, to

 3  kind of get through this exercise, and

 4  that's -- you know.

 5          MR. SCHUNK:  I appreciate that, Your

 6  Honor.

 7          THE COURT:  Sure.

 8  BY MR. SCHUNK:

 9    Q.    What about the next row down,

10  Mr. Musika?

11    A.    The next row down is improper

12  inclusion of accrued benefit cost unrelated to

13  equity finalization.  And here, it's a similar

14  consideration and evaluation, but different in

15  the sense that what happened with the benefits,

16  as Ms. Melton testified to, and I think

17  Mr. Metcalfe spent some time with it too -- and

18  I don't disagree with the procedure and the

19  outcome, the numbers are what they are.

20          But what was done was, what the

21  company as a whole -- we have the direct salary

22  of the Elk Hills finalization people, haven't

23  touched that at all.  The benefits were not

24  their benefits.  What they did was they reached

25  into the company as a whole, which would be

1    like reaching into the courtroom here to try

2    and say, what's the average salaries of this

3    courtroom, and we calculate that amount, and

4    then we apply that amount to a statistical

5    subsample, the summer interns.  And we say the

6    summer interns, you're going to get benefits

7    and payroll equal to the average amount of the

8    salaries in this room.  Well, of course,

9    they're not.

10            And that's what happened.  What

11   happened was they used the rates for the

12   company as a whole, which one particular

13   category demonstrates how statistically

14   inaccurate it is.  It included a large amount

15   of stock options and stock plans that

16   Ms. Melton testified to, derived or are related

17   to executives in the corporation, and that rate

18   was pulled over and applied to everyone in the

19   Elk Hills equity finalization process.

20            And when we asked them during the

21   deposition if they were aware of what this

22   program was and three other programs, the two

23   fact witnesses didn't even know what the

24   programs were.

25            So, out of the something like

MUSIKA - DIRECT

1130

1   15 components of the benefit rate, I chose four

2   that were clearly, in my mind, not associated

3   with Elk Hills finalization process and removed

4   them.

5          I left in voluntary dental plans, I

6   left in FICA, I left in unemployment insurance,

7   I left in medical insurance.  I left all the

8   things that I would expect an employee, a

9   general employee to participate in, but as to

10  those esoteric high level components I took

11  those out.

12  Q.    I believe the next line --

13         THE COURT:  What I'm seeing, it's

14  really -- it's interesting because when

15  those -- Mr. Metcalfe may recall the nuclear

16  cases, that no one's done that analysis from

17  the government's side, have they, on the

18  salaries and stuff.

19         MR. METCALFE:  That's correct, Your

20  Honor.  It's a normal practice to do what

21  Chevron has done here.

22         THE COURT:  I was just thinking, no

23  one's even raised that as an issue in the

24  nuclear case.

25         MR. METCALFE:  That's correct, for

MUSIKA - DIRECT

 1    damages --

 2            THE COURT:  It's an interesting point

 3    but it just hasn't come up.  And I'm just

 4    trying to think back and forth about what the

 5    Circuit has allowed and not allowed.

 6            THE WITNESS:  I understand.

 7    BY MR. SCHUNK:

 8      Q.    The next item, Mr. Musika, is row

 9    number 6, I believe.  Do you see that?

10      A.    I do.

11      Q.    And what does that row represent?

12      A.    This is an amount that comes directly,

13    again, from Chevron.  Mr. Stone, in his

14    declaration, identified amounts that were

15    related to the sale and not to the finalization

16    process.  And in his declaration, he identified

17    in general an amount of 1.4 million dollars.

18    Subsequent to that, or perhaps contemporaneous

19    to that, I don't know when, but Chevron

20    produced a native file with detailed

21    transactions coming up to approximately that

22    1.4 million that Mr. Stone testified to.

23            I used that amount, but the reason I

24    have 900 -- only 938,524, because included in

25    that detail and support of Mr. Stone's

MUSIKA - DIRECT

1   1.4 million dollars were the transactions that

2   I identified that lacked support.  And so -- so

3   not to double count, I took those out of the

4   numbers, since Chevron had already removed

5   those, and that reduced the sale-related costs

6   down to $938,524.

7       Q.   And what's the purpose of this 324,000

8   figure on row number seven?

9       A.   Yes, that's -- because I have multiple

10  categories, I performed an analysis to make

11  sure, and I produced in connection with my

12  expert report and submitted to the Court a

13  master database worksheet which took every one

14  of these transactions and created column after

15  column after column to make sure that we had a

16  sort of provenance for each of the transactions

17  and to see what they were for and whether or

18  not they appeared in more than one category.

19          If they appeared in more than one

20  category, to include them would be a double

21  count, and so we identified those transactions

22  that appeared in more than one category and

23  pulled them out.  So I added that back to the

24  damage calculation.

25      Q.   Mr. Musika, there 's a 24 million

```
                                                      Page 1
  1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

  2

  3

  4   CHEVRON U.S.A. INC.,

  5        Plaintiff,

  6        vs.                        No. 1:04cv1365C

  7   UNITED STATES,

  8        Defendant.
      --------------------------------
  9

 10

 11

 12

 13                                  `

 14                    DEPOSITION OF

 15                KIMBERLY ANNE MELTON

 16

 17

 18              Thursday, May 12, 2011

 19                   9:00 a.m.

 20

 21              9525 Camino Media

 22              Bakersfield, California

 23

 24

 25        Michelle M. Purdy, CSR No. 12187
```

Kimberly Anne Melton                                          May 12, 2011
Bakersfield, CA

Page 213

1    evidence for support of payroll burdens of the

2    $39,775.91 that were included in the company payroll and

3    benefits category.

4           Did you have anything to do with that figure?

5    A.    The $39 --

6           MR. FISHER:  Objection.  Have anything to do in

7    what sense?  Did she pull that figure from the SAP file

8    and include it on the spreadsheet?  Did she calculate it

9    from a burden rate?  What?

10   BY MR. TODOR:

11   Q.    Okay.  You did not perform this calculation

12   that resulted in the $39,775.91, correct?

13   A.    I did not.

14   Q.    Did you approve the inclusion of that cost as

15   support for payroll burden?

16   A.    That is not my capacity to approve that payroll

17   burden to that payroll cost.

18   Q.    Or the representation as to the payroll burden

19   to the Department of Justice.  Did you have any -- was

20   this brought to you before production to say is this

21   figure correct?

22   A.    No.

23   Q.    Do you know if any components of payroll burden

24   are included in this document and of the calculation

25   below?

Page 214

1        A.    It looks like it is.  I don't know that.  It

2   looks like it's pulling the 46 percent payroll burden

3   shown in August of '04 and applying it to somebody's

4   salary potentially.  That's what it looks like to me.

5        Q.    And there are some categories there.  It looks

6   like pension plan, revised plan number.

7        A.    Savings plan.  Savings plus plan.

8        Q.    Life insurance, medical insurance --

9        A.    Yes.

10       Q.    Dental insurance, long-term disability, OPEB

11   cash.  What is that?

12       A.    I don't recall exactly what that acronym means.

13       Q.    Okay.  Do you have -- what is OPEB non-cash?

14       A.    I don't know.

15       Q.    Do you know what OPEB non-cash?

16       A.    I don't know what that is.

17       Q.    FICA?

18       A.    I know what FICA is.

19       Q.    Is there something called PEB cash as opposed

20   to OPBE cash?

21       A.    I have no clue.

22       Q.    Does Chevron calculate payroll burden for each

23   cost center or is it a company-wide calculation?

24       A.    It is actually done as a --I don't know if it's

25   done -- I don't know if it's done at our -- it' done at

Kimberly Anne Melton                                          May 12, 2011
Bakersfield, CA

Page 215

1    a company code level, which is a legal entity level.  So

2    CUSA, Chevron U.S.A. is our company and it's done at

3    that company code level.  I believe that's right.  It's

4    done at a higher level than our business unit but it is

5    not done at the highest level of Chevron Chevron.

6        Q.   Do you know what level was represented in the

7    calculation on this page?

8        A.   It was the rate that was applied -- that would

9    be applied to our people in our business unit that are

10   in that company code.

11       Q.   And is that a rate that is calculated at which

12   level?

13       A.   I don't know what you mean.

14       Q.   At the Chevron U.S.A. a level or a different

15   level?

16       A.   It's either -- it's somewhere in between --

17   it's at a company code 0064 -- I really don't recall.

18   It's either Chevron North America Exploration Production

19   Company level or it is -- I think it's done at Chevron

20   North America Exploration Production Company level,

21   which has several company codes within them but it is a

22   lower level than Chevron Corporation.

23       Q.   Is it fair to say that payroll burden was not

24   calculated for the specific employees who worked on the

25   Elk Hills Equity project?

Page 216

1      A.   Payroll burden automatically hits certain cost

2    elements related to payroll automatically through the

3    system and gets charged to that employees cost center.

4      Q.   It wasn't an individualized analysis?

5      A.   No.  No.  It's a much higher level than that.

6      Q.   If somebody had a dental checkup you weren't

7    adding all of those things up; is that correct?

8      A.   That is correct.

9      Q.   And you have no particular reason to know what

10   the actual amounts were for these specific employees; is

11   that correct?

12     A.   No.  That is correct.

13     Q.   There is a category for pension plan there.  Is

14   there a vesting period for the Chevron pension plan?

15     A.   Yes.

16     Q.   Do you know whether any of the employees were

17   on pension?

18     A.   I don't know that.

19     Q.   Do you know whether they were in their vesting

20   period or not?

21     A.   I would have no clue.

22     Q.   Similarly no particular knowledge of the detail

23   for the particular employees for these other categories?

24   Am I correct about that?

25     A.   Yes.

Kimberly Anne Melton                                          May 12, 2011
Bakersfield, CA

Page 217

1           (Whereupon, Melton Exhibit 17 was marked for

2           identification.)

3   BY MR. TODOR:

4       Q.   My Melton, you have been provided with a

5   document marked Melton Exhibit 17.  This is a document

6   that has been prepared by consultants retained by the

7   Department of Justice in this matter and this is an

8   attempt to compile the cost elements that are included

9   in the SAP accounting system for the relevant cost

10  centers that apply for Elk Hills.  And this was based

11  upon the presentation of the data to the Department of

12  Justice by Chevron but it is data that was not included

13  in the Chevron's reliance damage amount in the native

14  file three.

15          Did that make sense to you?

16      A.   No, it didn't.  I'm sorry.

17      Q.   So to rephrase these are cost elements for the

18  cost centers that were included -- that for the same

19  cost centers but cost elements that were not included in

20  native file three.  So native file three you have

21  presented and native file three came up with a total

22  cost calculation of roughly $49 million?

23      A.   Yes.

24      Q.   And that was based upon a compilation of cost

25  elements for cost centers attributable to equity

1

1     IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4   CHEVRON U.S.A. INC.,

5       Plaintiff,

6       vs.                          No. 1:04cv1365C

7   UNITED STATES,

8       Defendant.
    --------------------------------

9

10

11

12

13                                   `

14                    DEPOSITION OF

15                     NORM STONE

16

17

18              Wednesday, May 11, 2011

19                   10:00 a.m.

20

21              9525 Camino Media

22            Bakersfield, California

23

24

25        Michelle M. Purdy, CSR No. 12187

215

1     Q.   Okay.  So bonuses are based on behavior then?

2     A.   It's not a bonus.  I wouldn't categorize $250

3 as a bonus.  I would categorize or describe success

4 sharing as a bonus based on performance of your primary

5 duties and jobs.  I would look at something like this of

6 recognition and awards as something that may be again a

7 strong safety record.  Maybe if it was for me -- is that

8 who it was for?  Maybe I helped somebody out.  We

9 actually have a recognition and awards program that I

10 can nominate other people for awards and they can

11 receive awards based on kind of on-the-spot behaviors

12 that the company wants to reinforce.

13    Q.   Okay.  Showing you what we'll mark as Stone

14 Exhibit 29.

15         (Whereupon, Stone Exhibit 29 was marked for

16         identification.)

17 BY MR. VOHRA:

18    Q.   I'll represent to you this was a series of

19 Chevron documents that were presented to DOJ for payroll

20 burden costs.  It's $39,775.91 that were included in the

21 company payroll and benefits category.

22    A.   All right.

23    Q.   Would you have approved the inclusion of these

24 costs?

25    A.   No.

216

1      Q.    Can you explain the nature of these costs?

2      A.    No.   Other than very superficially.   Payroll

3   burden I believe would be things like the cost of health

4   insurance and that sort of thing that the company is

5   burdened for each and every employee in excess of their

6   salary.

7      Q.    Okay.   Did you generally review burden costs to

8   see if they were properly included in the company

9   payroll and benefits category?

10     A.    That is an automatic allocation I believe in

11  SAP.

12     Q.    Would you agree that the burden -- would you

13  agree that the burden costs reflected in this document

14  include charges for employee pension plan costs?

15     A.    I could neither agree or disagree.   I don't

16  know.

17     Q.    If you look at the top line, a really little

18  line, I apologize, on the far left the top line is

19  pension plan.

20     A.    Yes.   I see it.

21     Q.    Okay.   And then there is a savings plus plan.

22  Is that included?

23     A.    I see that.

24     Q.    And then you would agree that life insurance is

25  included.   It's identified right there.

217

1     A.   It appears that perhaps this entire list is

2   part of the payroll burden.

3     Q.   Right.

4     A.   I don't know that but that is kind of what it

5   appears.

6     Q.   Okay.  If you go down one, two, three, four,

7   five, six -- seven lines there is an entry for OPEB

8   CASH.

9          Do you see that?

10    A.   Yeah, I do.

11    Q.   Okay.  Do you know what OPEB CASH is?

12    A.   No, but I want some.  I like cash.

13    Q.   Do you know who would know what that is?

14    A.   Kim.

15    Q.   And right under OPEB CASH is NON CASH.

16         Do you know what that is?

17    A.   I don't know what that is.

18    Q.   If you look at August 2004 the column the

19   monster at the top of page.

20    A.   I got it.

21    Q.   And if you go all the way to the shaded column

22   in the middle of the page --

23    A.   Okay.

24    Q.   -- for burden rate.

25    A.   Where it says .46 or eight?

218

1      Q.   Right.  Am I correct that that 46 percent is

2   the burden rate?

3      A.   Well, if you look over to the far left the row

4   is labeled burden rate.

5      Q.   So that 46 percent that is developed on this

6   sheet is that 46 percent for employees that were charged

7   directly to the Elk Hills project or is that for a

8   larger group of Chevron employees?

9      A.   SAP account.  I don't see anything on this that

10   would suggest this is specific to Elk Hills.  I don't

11   see, for example, my charge code or any charge code that

12   I'm familiar with at Elk Hills.

13      Q.   So that 46 percent would be for a larger group

14   of Chevron?

15      A.   I don't know that but that's my guess.

16      Q.   Okay.  Do you know if employees that were

17   charged specifically to the Elk Hills project incurred

18   an expense or pension costs?

19      A.   Yes.  I would answer that yes.  There might be

20   a lag in terms -- there used to be.  I'm not sure if

21   there is any lag, a year lag or something.  You might

22   have to work two years before you become a member but

23   if -- and I don't know that perhaps they may have to

24   make an election.  I don't know.  I would be amazed if

25   anybody failed to become a member if that were a

Norman Stone                                                    October 30, 2013
Bakersfield, CA

Page 1

 1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2                            _____

 3

 4   CHEVRON U.S.A., INC.,       )
                                 )
 5              Plaintiff,       )
                                 )
 6        v.                     )   Docket No.
                                 )
 7   THE UNITED STATES,          )   04-1365C
                                 )
 8              Defendant.       )
     _____)

 9

10

11

12

13                  DEPOSITION OF NORMAN STONE

14

15                  Wednesday, October 30, 2013

16

17                  Bakersfield, California

18

19

20

21

22

23

24

25   Reported by:  Patricia Kerchner, CSR No. 12017

Page 20

 1   all the invoices of -- invoices that weren't related to

 2   the technical issues.

 3        Q.   Uh-huh.

 4        A.   But some of them -- for instance, I might have

 5   had at the time a consulting firm working.  And instead

 6   of being in a sequential stage of where we were going,

 7   say, from Dry Gas Zone to Stevens to whatever and

 8   working sequentially, we may have been working in

 9   parallel.

10        Q.   Uh-huh.

11        A.   And we may have had a consultant working on the

12   Stevens and perhaps the SOZ as well.

13        Q.   At the same time.

14        A.   Exactly.  And the invoices would not reflect

15   nor does our accounting system reflect the task that was

16   put to us by Judge Braden.

17        Q.   Uh-huh.

18        A.   Judge Braden asked us to divvy the charges up

19   by zonal bin, if you will.

20        Q.   Right.

21        A.   And we did not do that.  We did not anticipate,

22   of course, back in 1996 that this would be required.

23   And so those invoices were not identified in such a way

24   that the provider themselves actually said:  You know,

25   we worked 10 percent on Stevens this months, 20 percent

Norman Stone                                              October 30, 2013
Bakersfield, CA

Page 21

1    on SOZ, and 80 percent on OHA or something.  That was

2    not the case.  So based upon our recollection, we made

3    the most reasonable estimate that we could.

4        Q.   Okay.  Could you describe the documents that

5    you reviewed in order to make these allocations.  I

6    mean, I know you're not going to be able to give me --

7             MR. ROSENBERG:  You mean categories of

8    documents?

9    BY MR. SNYDER:

10       Q.   Yeah, as you recall them.  I mean, for example,

11   there's a chronology, which let's mark this.

12       A.   Could I have a copy of the chronology.

13       Q.   Yeah.  I'm going to put it in -- we'll start

14   with this.  It seems like the logical first exhibit.

15            (Defendant's Exhibit Number 1

16            marked for identification.)

17   BY MR. SNYDER:

18       Q.   So, Norm, I've just handed you what's been

19   marked as -- it's called Stone Exhibit 1.  And I know

20   you've seen this before, but I'll let you explain what

21   this document is.

22       A.   This is a document that we have used throughout

23   this trial.  In fact, I'm very grateful Mr. Burzlaff put

24   this together working for the DOE and kept a record of

25   the events and time and major events and the times that

Norman Stone                                               October 30, 2013
Bakersfield, CA

Page 22

1    they occurred over the years of -- of -- of various

2    actions and decisions and whatnot in the equity process.

3         Q.   Okay.

4         A.   And I see this one, and I thank you for it.  He

5    put it together in different ways, but it -- we have one

6    timeline that includes all the zones, and then you have

7    included today, which is a little bit better for this

8    because we've been asked to divvy things up in terms of

9    zone, a timeline for each zone, the Dry Gas, the

10   Stevens.  I assume that they're all four here.  Shallow

11   Oil.  I don't see Carneros just thumbing through it, but

12   I assume it's here somewhere.  Yes.

13        Q.   Yeah.  So the first six pages of this document,

14   I'll just represent, were a joint exhibit at the trial,

15   JE17.  As you've noted, there's these zone by zone

16   categorizations after that.  So we'll just refer to this

17   as the chronology --

18        A.   Good.

19        Q.   -- for reference.  The first six pages of this

20   document, did you look at that with Mr. Holtzclaw as you

21   did your allocations at times?

22        A.   Yes.

23        Q.   How often did -- was it something you used for

24   most of the invoices? some of the invoices?

25        A.   Some of the invoices would be my answer.

Page 23

1      Q.   Uh-huh.

2      A.   If -- you know, again, I would imagine the

3   majority -- I mean, my recollection is the majority, we

4   pretty much understood.  Some of -- not all but some of

5   the -- for example, the consultants only worked on one

6   zone perhaps.  And so we knew that that would be

7   Stevens.

8      Q.   Okay.  And we'll get to the consultants soon

9   enough, and we can talk about that.

10     A.   But we did use it -- we used it repeatedly.

11   We've used it -- in fact, we've taken it to the point

12   we've -- as we walk through this on a monthly basis,

13   we'll look, for example, what occurred the month before,

14   the month after, and of course what was occurring at the

15   time of the invoice.

16     Q.   Uh-huh.

17     A.   And the other thing -- the other thing -- well,

18   it's something that -- I guess another little

19   complicating factor, but some of the invoices may have

20   come in 60 days after the work was done.

21     Q.   Uh-huh.

22     A.   And perhaps, according to this timeline, they

23   may appear to be SOZ when really they occurred --

24     Q.   Uh-huh.

25     A.   -- or the work occurred 60, 90 days before we

Page 61

1    the meeting you had with Mr. --

2         A.   With Holtzclaw and, you know, the meetings over

3    the years.

4         Q.   Oh, okay.

5         A.   And Mark and I would have had a discussion, we

6    would have looked at the time frame, we would have

7    looked at Exhibit 1 to review what was going on at the

8    time.

9         Q.   The chronology.

10        A.   The chronology.  We would have looked at, you

11   know, whatever we could glean from this --

12        Q.   Uh-huh.

13        A.   -- to come up with that allocation, yes.

14        Q.   Okay.  And when you say "would have," is that

15   what you did to make this allocation, those things that

16   you just -- you did those things to make this

17   allocation?

18             MR. ROSENBERG:  Object to the form.  He

19   testified he didn't remember this specific invoice, but

20   that that was the procedure he used.

21             THE WITNESS:  Yeah.

22             MR. SNYDER:  Okay.

23             THE WITNESS:  And looking at it in a cursory

24   fashion again here today, based upon what I know of the

25   time frame, what I know of what Cobb was doing for us

Page 62

1    and so forth, my cursory analysis here today is that it

2    should be 100 percent Stevens.

3    BY MR. SNYDER:

4        Q.   Okay.

5        A.   But that is not to represent -- because I

6    simply do not remember doing this.  It's not familiar to

7    me at all, at least in this form.  And that's why I was

8    asking whether those other pages attached were --

9        Q.   Fair enough.

10       A.   I don't know.  I mean, my memory is not bad but

11   it's --

12       Q.   Yeah.

13       A.   -- faded a little bit here.

14            MR. ROSENBERG:  And, Mike, this was what I was

15   sort of alluding to at the beginning of the deposition.

16   He looked at thousands and thousands of invoices in the

17   process of doing this, and I doubt he's going to

18   remember most of them specifically.

19            MR. SNYDER:  Yeah.  And, I mean, I think --

20   this is the first one.

21            MR. ROSENBERG:  Sure.

22            MR. SNYDER:  We're going to get into a flow

23   here.  I think there will be a few where we'll maybe

24   need to have more protracted.  But most of them I think

25   we're going to start moving.  And I'm just -- I have a

Norman Stone                                                    October 30, 2013
Bakersfield, CA

Page 63

1   sampling of invoices.  So I think we'll start making

2   some headway here.

3           MR. ROSENBERG:  And the other thing I would

4   note, Mike --

5           MR. SNYDER:  Yeah.

6           MR. ROSENBERG:  -- is that based on -- you

7   know, I understand that for the vendors, you basically

8   just identified the vendor.

9           MR. SNYDER:  Yes.

10          MR. ROSENBERG:  You know, I can tell you that

11  during the time frames -- and if you look at the

12  chronology -- you know, I'm sure you did this with

13  Mr. Burzlaff -- there are time when the only major thing

14  going on in the chronology is Stevens.

15          MR. SNYDER:  Right.

16          MR. ROSENBERG:  And, again, I don't know what

17  Mr. Burzlaff was working on --

18          MR. SNYDER:  Yeah.

19          MR. ROSENBERG:  -- but Chevron was not

20  multitasking during most of the periods where there were

21  intensive, you know, work, for example, on Stevens.

22          MR. SNYDER:  Okay.

23          MR. ROSENBERG:  So, I mean, Chevron wasn't

24  spending 30 percent of its time on SOZ --

25          MR. SNYDER:  Uh-huh.

Norman Stone                                                    October 30, 2013

Bakersfield, CA

Page 86

1    doing this purposely.  That's not what we're doing.  But

2    we are representing the fisc of the country here.  And

3    just as you guys are --

4        A.   I understand.

5        Q.   -- giving us invoices, some of which are less

6    than 500 bucks, and claiming that those are damages, we

7    are trying to do our due diligence.

8             So I have a great team that has found a few of

9    these, and we have to do our due diligence.  So if you

10   look at this document and you do the math for the other

11   costs and you use a calculator, which I can provide to

12   you, you'll find that they total 37 percent.

13           MR. ROSENBERG:  Mike, Mike, I understand this

14   is your deposition.  Mike, the document has one category

15   that's all Stevens.  The other category talks about

16   proof reserves, including for Stevens.  So you can't

17   characterize this document as having one charge that's

18   Stevens and one charge that's other.

19           And I think when you're describing a document

20   that is contrary to the face of the document, that is

21   inappropriate.  So I think that question is

22   inappropriate.  And Mr. Stone can give you whatever

23   answer he can give you, but I don't think the way you

24   characterized this makes any sense.

25           MR. SNYDER:  Fair enough, Larry.

Page 87

1    BY MR. SNYDER:

2        Q.   So let me ask the question:  This second cost,

3    the $1,950 cost, is that the other percentage, the

4    percentage that was allocated to other?  Is that the

5    other percentage that you -- that -- when you allocated

6    this, was that what you allocated to other was this

7    second cost?

8            MR. ROSENBERG:  Object to form.

9            You can answer if you can answer.

10           THE WITNESS:  Again, as with the others, this

11   doesn't jump out at me as one that I recall doing.  So I

12   don't have the benefit of knowing exactly what we did

13   and why we did it at the time that we did it.

14           However, just a quick cursory review of this --

15   let me check the date.  What did we allocate, 75 and 25

16   was the other?

17           MR. ROSENBERG:  Yes.

18           THE WITNESS:  75 Stevens?

19           MR. ROSENBERG:  Yes.

20           THE WITNESS:  Again, certainly the first part

21   of it reads Stevens --

22   BY MR. SNYDER:

23       Q.   Uh-huh.

24       A.   -- conversion factor.

25           The second part, I suspect, is what you're

Norman Stone                                                    October 30, 2013

Bakersfield, CA

1  saying is where the other comes in, but it's not fully

2  other.  It's got some other part of it.  And just

3  looking at the cost, 75/25 appears reasonable.

4      Q.   One last question on this.  The first category

5  of costs, the converting gas to oil equivalent, that

6  issue was at play with respect to the SOZ as well;

7  correct?

8      A.   No.

9      Q.   No?

10     A.   My answer would be no with a bit of an

11 explanation.

12     Q.   Uh-huh.

13     A.   It was intended that -- I believe it would have

14 affected the SOZ eventually, but the OHA case, the ILA,

15 and all the review that was done on the conversion

16 factor was done in Stevens.  In fact, it was never

17 finished.  But I believe there was a bit of an

18 understanding that if it were completed and there was a

19 finalization to the equity conversion issue, that it

20 would -- we'd probably go back and apply it in SOZ.  But

21 there was no, to my recollection, guarantee that we

22 would do that.  We thought it would, but there was no

23 guarantee.

24          MR. ROSENBERG:  Mike, I had the privilege of

25 briefing and arguing two conversion factor appeals to

Page 126

1     A.   -- under a different name.  And he's also the

2   same -- he would be the same person under Articulated

3   Digital Motion or something like that.

4     Q.   Uh-huh.

5     A.   I forget his other name.  It's something like

6   that.  Articulated Motion -- I don't know.

7     Q.   Okay.  I don't know what that is either.

8     A.   It's something like that.

9     Q.   Okay.

10    A.   That's all the same person.  And he had a

11  consulting firm.  And his expertise were with our -- was

12  with our system, meaning our -- he's kind of an IT type

13  of guy I guess is what I would say.

14    Q.   Okay.

15    A.   He had a lot of expertise working with

16  Mark Holtzclaw and keeping our system up and running.

17  He was a very good programmer, for example.  And our

18  entire computer system was homegrown.  We did a lot of

19  our own programming, if you will.  Our system was

20  homegrown.  And then he was also very good at CAD design

21  and working on displays and that sort of thing.

22    Q.   Okay.  Let's move on to Arrow Engineering,

23  another vendor.  And before I hand this to you, what did

24  Arrow Engineering specifically -- the more specific you

25  can be and brief you can be at the same time without

Page 127

1  leaving things out that you think are material, what did

2  Arrow Engineering do?

3      A.   If you want me to be brief, please don't ask

4  the question.

5           Arrow Engineering was a firm out of Lancaster,

6  I believe, Lancaster, California, a ways from here.  And

7  their expertise was in capturing digitally analog maps

8  and various documents and capturing that data in a

9  digital sense so that we could move those data into our

10  system.

11           (Defendant's Exhibit Number 21

12           marked for identification.)

13  BY MR. SNYDER:

14      Q.   Okay.  I'm going to hand you a document marked

15  as Exhibit 21.  It's an Arrow Engineering invoice with

16  Bates Number H1-169.  It's for $8,582.  It was allocated

17  100 percent to Stevens.

18      A.   Finally I got one I recognize.

19           MR. ROSENBERG:  This is one of the ones on our

20  sheet.  And I -- do you want to mark this?  I'd mark the

21  sheet now as an exhibit.

22           MR. SNYDER:  Okay.  Let me find it.  Just for

23  the record, I'm marking it as an exhibit.  I don't know

24  what the foundation is for any of this, and I'm not

25  stipulating to anything about it yet, but let's put it

Page 128

 1   on the record.

 2           MR. ROSENBERG:  Fine.

 3           MR. SNYDER:  It's --

 4           MR. ROSENBERG:  This will be Exhibit 22.

 5           MR. SNYDER:  22.

 6           (Defendant's Exhibit Number 22

 7           marked for identification.)

 8           THE WITNESS:  I've got 21.

 9           MR. ROSENBERG:  This is going to be 22.

10           MR. SNYDER:  I'm going to hand you -- actually,

11   Larry, can you hand him a copy and put this on it.

12           MR. ROSENBERG:  Yeah.  Here is a copy.  This

13   will be 22.

14           MR. SNYDER:  22.

15   BY MR. SNYDER:

16     Q.   And so this is a document prepared by Chevron.

17   Chevron kindly provided this to us today.  And this

18   invoice that we just looked at for 8,500-and-some

19   dollars is --

20           MR. ROSENBERG:  Right.  This was allocated --

21           MR. SNYDER:  I see it.

22           MR. ROSENBERG:  -- at 100 percent Stevens.  And

23   after looking at it again, it's a Dry Gas invoice.

24           MR. SNYDER:  Okay.

25           MR. ROSENBERG:  Mr. Stone can explain that if

Page 129

1   you want him to.

2          MR. SNYDER:  Sure.  Go ahead.  Yeah.

3          THE WITNESS:  Actually this will be fairly

4   quick.

5          MR. SNYDER:  Good.  That's why I was thinking

6   about it.

7          THE WITNESS:  Arrow was a company that we used,

8   as I said, to capture displays digitally so we could

9   bring them into our system.  And we took literally

10  barrels of maps and books up to them to have them

11  capture them.  And Mark and I both, when we were back

12  looking at this four months ago, only remembered ever

13  doing Stevens.  That's all we ever did with them.

14  BY MR. SNYDER:

15     Q.   Okay.

16     A.   And my recollection is we did not have the

17  detail on these.  And what we did with this particular

18  vendor was -- our recollection was only just Stevens,

19  both of us, and so we assigned every one of them 100

20  percent Stevens.

21          As it turns out, there was one invoice that was

22  not.  And we got the detail on it, actually, as a result

23  of receiving your letter.  We got some more detail, we

24  looked at it, and saw that we digitized a bunch of Dry

25  Gas maps and had no recollection of it.

Norman Stone                                                    October 30, 2013
Bakersfield, CA

Page 130

```
 1    Q.   Okay.  Thank you.

 2         (Defendant's Exhibit Number 23

 3         marked for identification.)

 4   BY MR. SNYDER:

 5    Q.   I'm going to hand you another Arrow invoice

 6   marked Exhibit 23.  And this is Bates Number H1-191.

 7   This is another Arrow invoice for $5,575.  And it was

 8   allocated 100 percent Stevens.

 9         The invoice on its face references the Stevens

10   Zone in the text and then there's a notation on the

11   bottom written in handwriting that says Dry Gas Zone.

12    A.   Yeah.  I do have recollection of this one as

13   well.  We recently looked at it, meaning in the last

14   three days.

15    Q.   Uh-huh.

16    A.   And Mark and I went over it.  And Mark is the

17   one that approved this particular invoice.  And we have

18   no recollection where Dry Gas Zone came from written

19   here.  And as I said before, both our recollections was

20   for this particular vendor everything was Stevens.  And

21   on the face of the document, after reviewing it again

22   this weekend -- or this week, we saw that it was work

23   performed on the Stevens Zone.  We don't know who added

24   the Dry Gas Zone notation.  And we let it remain at 100

25   percent Stevens.
```

Page 144

1   "Vendor N/A."  Vendor not available I guess is what

2   "N/A" means.  And there is no source document identified

3   in Native 3B for this line item or in the Interim binder

4   either.  And our question is:  What is the basis for

5   this allocation?

6       A.   My answer is I don't know.

7       Q.   Okay.

8            MR. ROSENBERG:  I mean, this I think was a

9   Kenrich allocation based on the time frame, December

10  '96.  Virtually all the work that was being done at that

11  point was Stevens.  Certainly there was no SOZ work.

12  The Carneros and Dry Gas technical work had all been

13  finished.  It had to have been Stevens.

14           MR. SNYDER:  Okay.

15           MR. ROSENBERG:  And I think we all went over

16  this with Norm and Mark at the time, but that -- you

17  know, that's sort of what it was based on.

18  BY MR. SNYDER:

19      Q.   Okay.  Let's move on -- we're getting close to

20  the end of this section.  We're still on Native 3B.  And

21  we're looking at Interim binder Page 369.  And Native

22  3B -- I don't know the page number.  I apologize for the

23  delay.  Here we go.

24           Okay.  On Native 3B, Page 4, towards the --

25  I'll show you my highlights.  I'm looking at these two

Page 145

1    entries here (indicating).

2        A.   5,710.05?

3        Q.   Yeah.  There's two in a row.

4        A.   Of the same thing.

5             MR. ROSENBERG:  This is on Page 4?

6             MR. SNYDER:  Yes.

7             THE WITNESS:  Page 4.

8             MR. SNYDER:  I'm looking at two line items on

9    Page --

10            MR. ROSENBERG:  Yeah, I see it.

11            MR. SNYDER:  -- 4 of Native 3B.  Both of them

12   are for $5,710.05.  The "Vendor Description" is "Vendor

13   N/A."  Both of these line items refer to a

14   Bates-numbered document, and those documents are CVXD

15   3955 and CVXD 3956.

16            MR. ROSENBERG:  Right.

17            MR. SNYDER:  I'm going to hand you those right

18   now.  They are attached together as Exhibit 25.

19            (Defendant's Exhibit Number 25

20            marked for identification.)

21   BY MR. SNYDER:

22       Q.   So this is CVXD 3955 and 56, Exhibit 25.  And

23   the first question is:  If you know, what are these

24   charges for, please tell us.

25       A.   Well, again, I don't recognize this in terms of

Norman Stone                                                  October 30, 2013

Bakersfield, CA

1    memory of why we allocated the way we did.

2        Q.   Uh-huh.

3        A.   Secondly, I -- where is the date on these

4    things?

5        Q.   I'm just -- the only reason I'm providing them

6    to you is because they're referred to in Native 3B as

7    the Bates ID source documents.

8        A.   I mean, there's -- I mean, there's -- I see

9    "conversion" and that sort of thing.  I assume they were

10   allocated 100 percent Chevron -- Stevens.

11           MR. ROSENBERG:  Yeah.

12           THE WITNESS:  So I'm looking at this, and I see

13   something that reminds me of material balance and

14   conversion.  I can tell you those are Stevens issues.  I

15   see "3/31/97" on both of them and they're both the same

16   number.  That makes me scratch my head.

17           MR. ROSENBERG:  Yeah.  If I could add

18   something.

19           MR. SNYDER:  Sure.

20           MR. ROSENBERG:  There is an offset for one of

21   these.  So this was a double --

22           MR. SNYDER:  Uh-huh.

23           MR. ROSENBERG:  -- and there's an offset that

24   subtracts one of these out.

25           MR. SNYDER:  I was going to ask that question

Page 147

1    next.  I have --

2              MR. ROSENBERG:  But, again, Norm didn't do

3    that.  This was Kenrich.

4              MR. SNYDER:  Right.

5              MR. ROSENBERG:  They found this, they allocated

6    it based on what Norm is saying and the time frame, and

7    they subtracted out the double.

8              MR. SNYDER:  Okay.

9              THE WITNESS:  Yeah.  So, I mean, if it's

10   material balance -- I don't know what "MTD" is.  You

11   know, I'm not sure that's material balance, but I see

12   the words "balance" and "conversion" --

13   BY MR. SNYDER:

14        Q.  Uh-huh.

15        A.  -- and the time frame, I would say Stevens.

16   But I don't see the vendor.

17        Q.  Yeah.

18        A.  And, I mean, that's all I can say.

19        Q.  Do you have any idea how this document was

20   generated or where it came from?

21        A.  No.

22        Q.  Okay.

23        A.  That's not me.

24        Q.  Okay.

25        A.  Thank goodness.

Page 148

```
 1          MR. SNYDER:  And, Mr. Rosenberg, I understand

 2    your point that one of these two was netted out.

 3          MR. ROSENBERG:  Yeah.

 4          MR. SNYDER:  So there's only one charge for

 5    this amount of $5,710.05.

 6          MR. ROSENBERG:  Yeah.

 7          MR. SNYDER:  We're getting closer to the end of

 8    this category.  Back to Native 3B, we're going to look

 9    at Pages 3 and 4 in the time frame December 1996.  And I

10    think the best way to do this is to show you the line

11    items that we are interested in here.

12          This is Page 3.  I've highlight -- I'm showing

13    Mr. Stone line items on Page 3 and 4 of Exhibit 17.

14    BY MR. SNYDER:

15       Q.   The line items that we're looking at are for

16    the following amounts:  $14,641 --

17       A.   Uh-huh.

18       Q.   -- $8,568 --

19          MR. ROSENBERG:  Where is the 8,000?

20          MR. SNYDER:  I think that's probably on the

21    next page, on Page 4.

22          THE WITNESS:  It is.  Second from the top.

23    BY MR. SNYDER:

24       Q.   Okay.  And then the remaining amounts are

25    $3,024, $1,118.
```

Page 149

1          MR. ROSENBERG:  Hold on.  Hold on.  The

2    1,117.60 is on Page 3.

3          MR. SNYDER:  Okay.  And there's two more:

4    $1,034 and $752.

5          MR. ROSENBERG:  Hold on.  I have 752.  Where is

6    the 1,034?  Oh, that's on the bottom of 3.

7    BY MR. SNYDER:

8      Q.   Okay.  So these line items together, if you

9    look you'll see that there are no vendors provided for

10   these line items or source documents.  And we are asking

11   you what these charges are for and why were they

12   allocated to the Stevens Zone.

13         MR. ROSENBERG:  Again, I'm pretty sure these

14   are all Kenrich allocations.  You know, if you look, the

15   1,034, the name talks about other geophysical services.

16   You know, December of '96, again, what was being done

17   with Stevens; the technical work on Carneros and Dry Gas

18   was pretty much complete; there wasn't any SOZ yet.  And

19   so I think Kenrich allocated these -- and I think there

20   was some discussions of some of these but --

21         THE WITNESS:  Yeah.  Well, there's two that are

22   over 5,000.  Two of the five are over 5,000.  So I

23   imagine we must have had something that we looked at.

24         MR. ROSENBERG:  Yeah.  Yeah.  And so the way

25   this worked is for these ones without invoices, just so

Norman Stone                                               October 30, 2013
Bakersfield, CA

Page 150

1   you're clear, there was a discussion between Kenrich

2   folks and Norman and Mark where Kenrich said, "Well,

3   this looks like we don't have an invoice."  And Norm and

4   Mark would say something to the effect of "Okay.  Well,

5   let's look at the time frame.  It's 12/96.  It's got to

6   be Stevens."  And so they allocated it based on that.

7   BY MR. SNYDER:

8       Q.   So, Norm, for the two that are over 5,000 --

9       A.   Uh-huh.

10      Q.   -- you don't know which vendor performed the

11  work for those two charges?

12      A.   Sitting here today and having this information

13  put in front of me, no, I don't know.

14      Q.   And you don't know why they're allocated to the

15  Stevens Zone and --

16      A.   No.  I thought -- you know, I mean, it's the

17  same thing.  Our responsibility was to allocate

18  everything we could and to be reasonable in our

19  allocation.

20      Q.   Yeah.

21      A.   It would be unreasonable to allocate this,

22  really -- I mean, the allocation -- the only thing that

23  strikes you with 12/96 is Stevens.

24      Q.   So the time frame.

25      A.   Yeah.

Norman Stone                                                              October 30, 2013
Bakersfield, CA

 1      Q.   Okay.

 2      A.   I mean, if this is all there is.  I don't know.

 3   I mean, again, I don't remember these numbers and having

 4   allocated them, and I don't know if there was more.  I

 5   just don't know.

 6      Q.   Okay.

 7      A.   But based on that, assuming, you know, these

 8   costs were gathered and the costs need -- something

 9   needs to be done with them, and it's our job to do the

10   most reasonable thing.  And Stevens is the most

11   reasonable allocation on there.

12      Q.   Okay.  A couple more line items on Native 3B

13   and we can break.

14      A.   Okay.

15      Q.   We're looking at Page 4 of Native 3B.

16      A.   Just give me the amount.

17      Q.   Yeah.  Sure.

18      A.   It's fairly easy to find.

19      Q.   It should be $4,342.  It's May of '97.

20      A.   Got it.

21      Q.   Okay.  So the question simply is:  There's no

22   source documents identified.  It's 100 percent

23   allocation to Stevens.  You know, I just want to get it

24   on the record.

25      A.   Again, it's everything we've been talking

Norman Stone                                                                October 30, 2013
Bakersfield, CA

1    about.  I have no recollection, and I cannot identify it

2    by so little information represented here.  And it looks

3    like there's one right up above it.  It looks like a

4    repeat.  That was probably one that was taken out.  I

5    mean, it looks like that other $5,000 one we looked at.

6        Q.   Uh-huh.

7        A.   So based on time frame of 5/97, I honestly

8    don't think it can be anything but Stevens.

9        Q.   Uh-huh.  And moving on -- I understand your

10   answer -- on Page 4 of this same document, in June of

11   '97 there's a line item for $3,913.

12       A.   Right.

13       Q.   It's the same -- same --

14       A.   It's the same thing.  You know, again, I can't

15   identify or have any recollection of why we did what we

16   did, but based on the time frame and -- and if that's

17   all that's available --

18       Q.   Sure.

19       A.   -- it could have been reasonably allocated as

20   Stevens.

21       Q.   And the last set of line items and we can

22   break.  Page 5 at the top there's -- and let me just

23   give you the amounts of the line items I want you to

24   look at.

25       A.   Hang on a second.

Page 153

1    Q.   Sure.

2    A.   Got it.

3    Q.   It's at the top.  This is all in the July of

4  1997 time frame.  There's a line item of 13,467, $2,030,

5  $1,407.

6         MR. ROSENBERG:  Which page is this again?

7         THE WITNESS:  5.  They're all together.

8         And I assume the last one is 1,270.

9  BY MR. SNYDER:

10   Q.   And actually there's two more after that.

11  1,270 --

12   A.   Oh, yeah.

13   Q.   -- $305 and $131.

14   A.   Yeah.

15   Q.   So those line items all have a "Vendor N/A,"

16  not available vendor description, and no Bates IDs are

17  provided in Exhibit 17, Page 5.

18   A.   Again, I cannot recognize those or have any

19  recollection of allocating those.  The only one I would

20  note that out of the -- one, two, three, four, five --

21  six of them --

22   Q.   Uh-huh.

23   A.   -- that probably would have allocated was the

24  13,467 because it's greater than 5,000 and the others

25  are sharply less than 5,000.

Norman Stone                                                          October 30, 2013
Bakersfield, CA

 1      Q.   That allocation for the 13,467, what's the

 2   basis of the allocation to the Stevens Zone?

 3      A.   Well, on the face, again, it would be --

 4   without knowing that we had more information, on the

 5   face it would be time frame.

 6           MR. SNYDER:  Okay.  Give me one second.  Okay.

 7   I think we can break for lunch.

 8           MR. ROSENBERG:  Yeah.  Just --

 9           MR. SNYDER:  Go ahead, Larry.

10           MR. ROSENBERG:  And, you know, if you look at

11   the chronology, the SOZ kick-off meeting is November of

12   '97.  And we're not saying there was absolutely nothing

13   done on SOZ before but it was very, very little.  And so

14   when you're talking about these invoices from the heart

15   of '97, you know, the only thing it could probably be is

16   Stevens.

17           MR. SNYDER:  Okay.  Thank you.

18           (Luncheon recess taken.)

19           MR. SNYDER:  All right.  Let's go back on the

20   record.

21   BY MR. SNYDER:

22      Q.   So, Mr. Stone, let's resume.  We're done with

23   the external non-legal category.  We're going to move on

24   to what is called the CVX internal technical consultants

25   category.

Norman Stone                                          October 30, 2013
Bakersfield, CA

 1        A.    Okay.

 2        Q.    That's the label that's been, you know, applied

 3   to this category of damages and in the Interim binder.

 4   If you could start with just explaining your

 5   understanding of this category of damages.

 6        A.    All right.  My understanding of the internal

 7   technical consultants that we put together for the

 8   damages trial was we included all those companies within

 9   Chevron Corporation.  So understand the umbrella of

10   Chevron Corporation --

11        Q.    Uh-huh.

12        A.    -- there are many different companies.  And

13   some of those companies are technical companies.

14        Q.    Okay.

15        A.    And they're very similar to the outside

16   external consultants, only they're Chevron employees.

17   And they provide assistance with petroleum engineering

18   issues.  And one of their -- their main -- one -- one of

19   the main things that they provide are things like

20   support in reservoir engineering -- reservoir

21   simulation.

22        Q.    Okay.  And reservoir simulation was performed

23   here for this field.  Which zones was that performed

24   upon?

25        A.    Correct.  We did reservoir simulations

Page 181

1    testified about.  And we were simply going through

2    whatever was helpful.

3              MR. SNYDER:  Okay.

4              MR. ROSENBERG:  Which one of these -- you know,

5    because Mr. Stone's testimony is as good as you're going

6    to get as to which exact ones we looked at and when --

7              MR. SNYDER:  That's fine.

8              MR. ROSENBERG:  -- but they were definitely

9    part of the process.

10   BY MR. SNYDER:

11      Q.   This is the only specific question I have.

12      A.   Okay.

13      Q.   For the spreadsheet that covers 1999, which is

14   Native 15, I think it's 27 -- marked as 27.

15             MR. ROSENBERG:  Exhibit 27.  Yeah.  Uh-huh.

16             THE WITNESS:  I got it.

17   BY MR. SNYDER:

18      Q.   Exhibit 27 for 1999, we, in preparing for this

19   deposition -- in the Excel format, we filtered the title

20   column for this spreadsheet.

21      A.   Which is which column?

22      Q.   It's the second-to-the-last one on the right

23   side.  And we filtered the title column, and we found

24   that 99 percent of the line items under that column

25   referred to the SOZ on this spreadsheet for 1999.  And

1   the total amount of those line items that referenced the

2   SOZ was $836,247, which is -- the total amount for the

3   whole spreadsheet is only roughly $10,000 more than

4   that.

5          And this spreadsheet -- or the amounts in this

6   spreadsheet were allocated 75 percent to SOZ.  And my

7   question is if you know why they weren't allocated as 99

8   or 100 percent to SOZ given that when you do this

9   filter, 99 percent of the line items refer to the SOZ.

10     A.   Based on this information in front of me, I

11  don't know why and I have no recollection of going

12  through each and every one of these allocations.  I'm

13  sorry.

14     Q.   That's fine.

15          MR. ROSENBERG:  I can give you some help with

16  this if you want it.

17          MR. SNYDER:  I think we talked about this at

18  one of the meetings.  And I'd rather not right now, but

19  I know --

20          MR. ROSENBERG:  Okay.

21          MR. SNYDER:  You know, I remember discussing

22  this with Mr. Metcalfe.

23          MR. ROSENBERG:  We had a lengthy discussion

24  about this --

25          MR. SNYDER:  Yeah.

Norman Stone                                                    October 30, 2013
Bakersfield, CA

Page 183

1           MR. ROSENBERG:  -- that once these guys started

2    any work on the SOZ, they changed the project name to

3    SOZ Equity Study.  But my recollection is that they were

4    still -- there were specific individuals who were still

5    finishing Stevens Zone work.  But it had this code

6    because once they started on the SOZ, they just changed

7    the name of the project.

8           MR. SNYDER:  Okay.  I mean, I have to do this.

9    Let the record reflect that, you know, Mr. Stone did not

10   appreciate the statement that Mr. Rosenberg just added

11   when I asked him the question initially.

12          MR. ROSENBERG:  Yeah.  I mean, Mike, you

13   didn't -- you didn't ask him the question:  Do you know

14   of any reason why this was -- during this time period

15   stuff was allocated to Stevens?  You said:  Based on

16   looking at this particular sheet, why was it allocated

17   to Stevens?

18          So if you want to ask him the broader

19   questions, that's fine.

20          MR. SNYDER:  Uh-huh.

21          MR. ROSENBERG:  But, again, you know, when we

22   agreed to do this as a deposition, it was on the

23   understanding this wasn't going to be some kind of

24   gotcha game.  And, you know, this document doesn't say

25   that, but there are other documents and other

Page 259

1            MR. ROSENBERG:   40.

2    BY MR. SNYDER:

3        Q.   Okay.  Give me one second.

4            All right.  Okay.  These documents that I just

5    gave to you marked Exhibits 37, 38, 39, and 40 are all

6    documents that indicate you went to meetings relating to

7    the Dry Gas and Carneros zones; is that right?

8        A.   Right.

9        Q.   And you don't dispute attending those meetings?

10       A.   No, I don't.

11       Q.   Okay.  You're aware that you allocated 100

12   percent of your salary to the Stevens Zone for the

13   equity allocations; correct?

14       A.   Correct.

15       Q.   Okay.  So why did you make that allocation when

16   it's obvious that you were involved in other jobs

17   besides the Stevens Zone?

18           MR. ROSENBERG:  Object to the form.

19           You can answer.

20           THE WITNESS:  Pardon me?

21           MR. ROSENBERG:  Answer.

22           THE WITNESS:  He's never said that.

23           Well, Counsel, we had several discussions of

24   how to allocate my particular time for equity

25   finalization.  And it turned out, as we went through the

Norman Stone                                                                  October 30, 2013
Bakersfield, CA

1    effort, our conclusion, which I certainly agree with and

2    would support as well as Mark Holtzclaw's time for the

3    same time period -- we, as you know, have allocated

4    Mark Holtzclaw 100 percent Stevens as well.

5    BY MR. SNYDER:

6        Q.   Uh-huh.

7        A.   We've done that from the aspect that it's very

8    difficult to envision, in fact, impossible to envision

9    that equity for the Stevens could have been done or

10   completed over the years without the two of us dedicated

11   to the Stevens work for the time period that we're

12   looking at or the life of equity finalization.

13            Simply put, there were two people, myself and

14   Mark Holtzclaw, that were absolutely necessary to the

15   Stevens from beginning to end at 100 percent dedicated

16   time value to get that work done.

17            Now, if you want to argue that we worked on

18   other zones, you're certainly welcome to.  At the time

19   we were putting in 80 to 100 hours a week.  And I

20   guarantee that we both worked 40 hours a week plus on

21   the Stevens, plus we did, in addition to that, other

22   zones.  And that's the way equity always was.

23            And simply put, most and many of the things

24   like -- and we talked about this before with Techbase.

25   The administrative process and the work that needed --

Page 261

1    there were certain things that had to be applied to the

2    Stevens to ensure that that work would be completed and

3    ensure that it would continue.  And we felt that 100

4    percent dedication of my time for those types of reasons

5    were important.

6            (Defendant's Exhibit Number 41

7            marked for identification.)

8    BY MR. SNYDER:

9        Q.   Okay.  I'm going to hand you -- this is a set

10   of documents having to do with SOZ meetings.

11       A.   All right.

12       Q.   And we'll mark this as Exhibit 41.  And there

13   are 10 meetings reflected -- I don't think there are any

14   disputes about this.  10 meetings reflected in this

15   Exhibit 41.

16           The first meeting on the first page is

17   November 6, 1997, which is, as you say, the kick-off

18   meeting.  And your name is listed there, and so is

19   Mark Holtzclaw's.

20       A.   Hang on, Counselor.  May I --

21       Q.   You may.

22       A.   Let me just look through this.

23       Q.   Take your time.

24       A.   And maybe I'll just stipulate -- I believe what

25   you're looking for --

Norman Stone                                                    October 30, 2013
Bakersfield, CA

Page 264

1          MR. ROSENBERG:  Object to the form.

2          MR. SNYDER:  Fair enough.

3          MR. ROSENBERG:  Object to the way you're

4   phrasing this question.

5          MR. SNYDER:  Okay.

6          MR. ROSENBERG:  If you can answer something

7   usefully, do it; otherwise, he can ask a different

8   question.

9          THE WITNESS:  My allocations in the -- for the

10  purpose of Judge Braden's directive, collectively we

11  came to -- collectively, it means both visually, we came

12  to the conclusion that Elk Hills equity finalization,

13  specifically the Stevens allocations -- or the Stevens

14  Zone, could not have been completed or even done if my

15  job and Mark Holtzclaw's jobs were not dedicated to its

16  success in its entirety.

17         If you remove one of us, then there is no

18  finalization for the Stevens.  That is not true of any

19  other person.  Any other person you could withdraw from

20  our list and replace them and it would go forward.  You

21  cannot do that, I don't believe, with Mark or I for the

22  Stevens.

23         And, therefore, we dedicated our time 100

24  percent, in the spirit of Judge Braden's directive, to

25  the Stevens solely.

Page 265

1          And when I think about it -- I was thinking

2     about this last night because I was sure you'd ask me

3     this question but --

4     BY MR. SNYDER:

5          Q.   Sure.  Yeah.

6          A.   -- one thing that occurred to me was that proof

7     of the pudding is -- is when equity went on the rocks in

8     2006 and, really, even before then, how many people were

9     left in equity for Chevron.  Well, there were two.  And

10    those two were Mark Holtzclaw and I.

11         Q.   When was that?

12         A.   Well, that was January 1st -- well, it was

13    December 31st, 2005.  But in 2006, we were the only two

14    left.  And in 2006, when we were the only two left, how

15    much work was being done on any other zone, really,

16    except Stevens?  There were still some things and

17    issues.

18         But then we went into litigation mode and all

19    these other things.  Who were the two who were left?  It

20    was Mark Holtzclaw and myself.  And so you can withdraw

21    all the other people, but from Chevron's point of view

22    and my point of view, we were essential to the Stevens

23    to have it completed.  And our time should be assigned

24    100 percent to the Stevens.

25         And, you know, I mean, you know as well as I

Page 266

1   do, you're welcome to challenge that.

2       Q.   Yeah.

3       A.   But I think -- I think it's a fair allocation.

4   I truly do.

5       Q.   Okay.  As the equity team leader, would

6   finalization of the other zones -- SOZ, Dry Gas Zone,

7   Carneros -- have been possible without you being

8   involved?

9            MR. ROSENBERG:  Object to the form.

10           You can answer.

11           THE WITNESS:  Yeah.  What we're looking to do

12   is -- is how are we going to dedicate our time to the

13   Stevens Zone.  The over-arcing of -- the over-arcing

14   concern for me is that Stevens is roughly 75 percent of

15   equity finalization.  The Dry Gas Zone was never

16   completed.  And so if you take me out of the equation or

17   Mark out of the equation --

18           MR. ROSENBERG:  You mean the SOZ.

19           THE WITNESS:  The SOZ was never completed.  If

20   you take Mark or I out of the equation for the SOZ, the

21   other, quote, 25 percent, would it have been completed?

22   Well, no, but it wasn't completed anyway.

23   BY MR. SNYDER:

24       Q.   Okay.

25       A.   So -- so -- and the Dry Gas Zone and the

1

1          UNITED STATES COURT OF FEDERAL CLAIMS

2

    CHEVRON USA, INC.      *
3                          *
    VS.                    * NO. 04-1365-C
4                          *
    UNITED STATES OF       *
5   AMERICA               *

6

7   ****************************************************
                    ORAL DEPOSITION OF
8                    MR. GANESH THAKUR
                     MAY 3RD, 2011
9   ****************************************************

10

11  ORAL DEPOSITION of MR. GANESH THAKUR, produced as

12  a witness at the instance of the Defendant, and

13  duly sworn, was taken in the above-styled and

14  numbered cause on the 3RD of MAY, 2011, from 11:04

15  a.m. to 5:15 p.m., before Samantha Downing, CSR,

16  RPR, CLR, in and for the State of Texas, reported

17  by machine shorthand, at the offices of CHEVRON

18  USA, INC., 1400 SMITH STREET, HOUSTON, TEXAS 7700,

19  pursuant to the Federal Rules of Civil Procedure

20  and the provisions stated on the record or

21  attached hereto.

22

23

24

25

13

```
 1    bachelor's in petroleum engineering from India

 2    School of Mines in 1970 about 41 years ago and

 3    received my master's in petroleum engineering and

 4    Ph.D. in petroleum engineering and MA in

 5    mathematics from Penn State, Pennsylvania State

 6    University.

 7        Q.  Okay.  And actually -- and I will try to

 8    make this as efficient as possible.

 9             I understand -- so were those all

10    previous degrees from India School of Mines?

11        A.  Only --

12        Q.  Only the BS?

13        A.  -- the BS.

14        Q.  Okay.

15        A.  And everything was from Penn State --

16        Q.  Okay.

17        A.  -- University, all of those.

18             And then I received my MBA from

19    Houston Baptist University in --

20        Q.  Okay.

21        A.  -- Houston.

22        Q.  And what about your work experience?  Can

23    you -- it's not necessary to go through

24    everything, but starting in maybe 1990 or so?

25        A.  1990 or so, okay.  Very good.
```

14

1              I have a total number of work

2    experience of 38 years.  Starting in 1990, I was

3    working in Midland, Texas as the

4    manager supervisor of reservoir engineering.  And

5    then in 1992, I moved to La Habra, California as

6    the division manager of the Reservoir Simulation

7    Division and -- and the product and service line

8    manager for E P Services.

9        Q.  And what about after that?

10       A.  After that, in '99, I became the senior

11   principle technical advisor for Chevron.  In 2005,

12   I became the global advisor for Chevron for

13   Reservoir Management for Worldwide Operations.

14              In 2008, I became the vice president

15   of Chevron Energy Technology Company and also the

16   global advisor and also one of the Chevron

17   fellows, and that's the current position I am

18   holding at this point in time.

19       Q.  Mr. Burzlaff tells me in 2012 you're going

20   to take a new position  is that right?

21       A.  Yes.  In 2012, I will become the president

22   of the Society of Petroleum Engineers worldwide.

23   And actually, that term starts in 2011 October,

24   the end of October.

25       Q.  Okay.  Hopefully this trial will be over

34

1   rentals, and cost --

2       A.  Right.

3       Q.  -- and communications?

4       A.  Right.

5       Q.  You said you are familiar with that

6   middle -- or around the middle, CV  internal --

7   and you can -- CV  internal technical consultants

8   is that right?

9       A.  Right.

10      Q.  And how are you familiar with that

11   category?

12      A.  Because I work in the organization that

13   provides technical consultation.

14      Q.  What organization is that?

15      A.  It's called Energy Technology Company.  At

16   that point in time in '92, in that period of time,

17   it was called Chevron Petroleum Technology

18   Company, also called CPTC.

19      Q.  When was it first called CPTC?

20      A.  In '92 --

21      Q.  '92.

22      A.  -- approximately.

23      Q.  And that same entity is now called the

24   Energy Technology Company?

25      A.  It has gone through a few reorganizations.

59

1              So CPTC charges an amount, and then

2    at some point the accountants move money from one

3    column to another column inside Chevron's books

4    is that right?

5        A.  I believe so.  I am not an accountant

6    myself so I cannot answer that  uestion, but

7    that's -- that's what I believe.

8        Q.  Okay.  Are you familiar, sir, that within

9    Elk Hills there were four different zones?

10       A.  Yes, sir.

11       Q.  Okay.  Would it have been possible for

12   CPTC employees to log their time based upon which

13   zone they were working?

14       A.  It would be -- the  uestion is would it be

15   possible for them which zone they are working?

16       Q.  Yes.

17       A.  Yes.

18       Q.  Was that done for Elk Hills?

19       A.  I believe so.

20       Q.  You believe it was done?

21       A.  Yes.

22       Q.  So for each time entry, we can tell on

23   which zone that employee was working  is that

24   right?

25       A.  Yes, because there will be a different

60

 1    O-113 prepared.

 2      Q.  Would these people have received -- these

 3  people who log time at Elk Hills, would they have

 4  received paychecks had Chevron used an outside

 5  entity to do CPTC's work?

 6      A.  Could you explain that  uestion, please?

 7      Q.  Certainly.

 8              Some of these employees worked for

 9  CPTC on Elk Hills?

10      A.  Right.

11      Q.  Had Chevron elected to use a different

12  entity to do the same work, would Chevron have had

13  to fire these employees?

14      A.  We provide services, technical services to

15  worldwide operations.  We do not fire or hire

16  employees on a -- just on a one-project basis.

17              Basically what happens is that those

18  individuals, they will be working on another

19  project.  We generally have a backlog of projects

20  to work on.

21      Q.  Okay.  So Chevron's costs for hiring these

22  employees didn't increase at all as a result of

23  Elk Hills  is that true?

24              MR. ROSENBER :  I will object as

25  calls for speculation.

61

1       Q.  (BY MR. SCHUNK)  You can answer.

2       A.  Could you repeat the  uestion?

3       Q.  I understand, Mr. Thakur, that you've

4    indicated today that these employees had more work

5    to do, that you wouldn't have had to fire them had

6    Elk Hills not happened  is that right?

7       A.  It -- it depends on a given point in time

8    how much work is in the  ue, how much work do we

9    need to do, what various operating companies.

10              So if your  uestion is very specific,

11   I'll be glad to answer that  uestion.

12      Q.  Okay.  Well, I believe -- and we can have

13   the court reporter go back.  But I believe you

14   said there was a backlog of work for the CPTC

15   employees to do  is that right?

16      A.   enerally, there is a backlog of work.  I

17   cannot say at every point in time there's a

18   backlog of work.

19      Q.  Was there a backlog in 1996?

20      A.  It's very difficult for me to remember

21   that.

22      Q.  Is there a backlog now?

23      A.  Yes.

24      Q.  What about five years ago  was there a

25   backlog then?

62

```
 1        A.  I don't remember.

 2              But I can tell you with confidence

 3     there is a backlog now, because I am very familiar

 4     with that at this point in time.

 5        Q.  Okay.  Well, tell me this:  So had Chevron

 6     elected to use an outside entity other than CPTC,

 7     would Chevron have had to fire the employees who

 8     worked on Elk Hills for CPTC?

 9              MR. ROSENBER :  I am going to object

10     as calling for speculation.

11              You can answer.

12        A.  I don't believe so.

13        Q.  (BY MR. SCHUNK)  Thank you.

14              Mr. Thakur, before we get into

15     specifics for each year and job, I want to look

16     back at generally that piece of paper in front of

17     you.

18        A.  Uh-huh.

19        Q.  Not at the specific numbers, but just

20     generally speaking can you tell me why it is that

21     Chevron used CPTC at Elk Hills?

22        A.  The  uestion is why Chevron used ETC or

23     CPTC at Elk Hills --

24        Q.  Yes.

25        A.  -- or on these kind of projects?
```

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON U.S.A. INC.,

      Plaintiff,

    v.

UNITED STATES.

      Defendant.

No. 1:04cv1365C
Judge Susan G. Braden

### Declaration of Terry L. Musika, CPA

1. I am currently a Managing Director of Invotex Group as well as a CPA with over 37 years of business experience. I am a former audit and consulting partner for the international accounting firm of Coopers & Lybrand, former Managing Director for Navigant Consulting, Inc. and have previously formed, owned and operated a proprietary database company, a national financial and economic consulting firm, and a merger and acquisition company. Additionally, I have frequently served the Federal Court system as a Court Appointed Chapter 11 Operating Trustee, Liquidating Chapter 7 Trustee, Operating Chapter 7 Trustee, Examiner, and Paying Agent.

2. My business address is 1637 Thames Street, Baltimore, Maryland 21231.

3. During the past 37 years I have provided expert testimony in over 200 separate proceedings before 47 different Federal District Courts throughout the U.S., nine separate state courts, numerous proceedings before the U.S. Court of Federal Claims, four separate U.S. Bankruptcy Courts, numerous arbitration matters and the United States International Trade

1



EXHIBIT

JE1911

Commission. I was accepted as a designated expert in all cases.

4. I was retained by the Commercial Litigation Branch of the Department of Justice on behalf of the United States to review and comment on the damages claimed by Chevron U.S.A. Inc., ("Chevron") as originally disclosed in the Declaration of Kimberly Anne Melton dated October 14, 2010 and as amended by Chevron in their response to Plaintiff's Objections and Responses to Defendant's First Request for Production of Documents Related to Damages – Document Request No. 2 dated April 22, 2011. I have also been asked to review and consider the Expert Reports of Kenneth P. Metcalfe.

5. I understand that Chevron's current claim for damages is $48,998,081. This amount is the total damage of $49,470,599 claimed by Chevron as stated in the Declaration of Kimberly Anne Melton dated October 14, 2010 Exhibit A and updated by Chevron in Native 0003.xlsx minus $472,518 of costs relating to Blue Ridge Design & Technical Services that were withdrawn by Chevron. I understand that both Chevron and Chevron's damage expert have continued to supplement, amend and change Chevron's damage claim. I have continued my focus on the $49,470,599 Chevron claim as expressed by Chevron in Native 0003.xlsx and not attempted to engage in a perpetual amendment of reports, schedules and work papers. I am prepared to discuss the numerous Chevron amendments and supplements should the court allow one or more of Chevron's changes. The objective of my analysis was to evaluate the existence, relevance and accuracy of the support provided by Chevron for the costs allegedly incurred in connection with the Elk Hills Equity Finalization Process.

6. I have assumed that Chevron's claim for damages is comprised of all Chevron expenses and costs, including legal and consulting fees incurred in connection with Chevron's participation in the Elk Hills Equity Finalization Process.

7. My approach to this matter involved two overlapping and related analyses. **Exhibit 1** illustrates that I performed a systems analysis to formulate an opinion regarding the extent to which Chevron's ordinary course accounting system and controls directly produced a reliable litigation damage claim to a reasonable degree of certainty without further complex manipulations of data. Secondly, based on the results of my system analysis and focusing specifically on areas of the damages that were more susceptible to errors, I performed a specific transaction analysis to formulate an opinion regarding the extent to which Chevron's supporting documentation for individual transactions demonstrated that such costs were incremental and causally connected to the Elk Hills Equity Finalization Process to a reasonable degree of certainty.

8. My system analysis involved two general steps. Step one involved a numerical reconciliation and investigation of any differences in the amount of the ordinary course accounting system and Chevron's damage claim. The purpose of the reconciliation was to determine the extent to which the damage claim amount was taken directly from the ordinary course system without exception, adjustment, reclassification or correction of errors.

9. Based on the results of my system analysis step one, I determined that the total cost of Chevron's ordinary course accounting data relating to Chevron's Finalization Process was $12,140,714 and did not equal nor provide stand alone support for Chevron's final damage claim of $48,998,081. **Exhibit 2** provides a reconciliation of the errors, reclassifications, and adjustments that were required to transpose the ordinary course systems data into a damage claim. A brief explanation of the reconciling items is as follows.

- Chevron originally identified ten different cost centers with thirteen different names that reportedly contained cost data relating to the Elk Hills Equity Finalization

Process. Chevron subsequently removed three of the cost centers that did not relate to the Elk Hills Equity Finalization Process although they incorrectly included certain transactions relating to the Elk Hills Equity Finalization Process.

- Chevron added back two letter of credit transactions, five legal expense transactions and eighty six company payroll & benefits, employee business expense, computer services & equipment, and communications transactions that were incorrectly included in the three cost centers that were not related to the Elk Hills Equity Finalization Process.

- Chevron removed negative $4,699,538 of transactions that were recorded in the ordinary course to reclassify transactions relating to the Elk Hills Equity Finalization Process out of an Elk Hills Equity Finalization Process cost center to another cost center.

- Chevron removed negative $3,868,884 of transactions that were recorded in the ordinary course as adjustments to remove certain costs that had been double booked as a consequence of reporting the expenses on two systems.

- Chevron removed $472,518 of transactions relating to a contract with Blue Ridge Design & Technical Services that could not be adequately explained or supported and was determined to be a company formed and operated by the wife of Program Director, Michael Stay.

10. Step two of my system analysis was to determine the degree to which the representations inherent in Chevron's damage claim were covered by the Chevron's ordinary course accounting system and controls. Based on my review and comparison of Chevron's ordinary course accounting system and controls with Chevron's damage claim, I determined that

Chevron's ordinary course system and controls did not address the fundamental representation of Chevron's damage claim. The fundamental representation of Chevron's damage claim is that the costs listed in their damage claim were incurred in connection with the Elk Hills Equity Finalization Process. Even assuming the damage claim amounts were derived directly from the ordinary course accounting system, for the following reasons one cannot conclude that the ordinary course accounting system provides any proof or even comfort that the claimed costs were incurred in connection with the Elk Hills Equity Finalization Process.

- Chevron has categorized its damage claim into eleven different damage categories (e.g., Legal Costs, Company Payroll & Benefits, etc.). The ordinary course accounting system does not include these categories. Accordingly, there are no Chevron ordinary system controls over this categorization. Further, I found numerous errors in Chevron's categorization. Chevron indicated during the deposition of Kimberly Anne Melton on May 12, 2011, that it had corrected the errors in categorization. However, based on my follow up review and analysis of Chevron's cost categorization there are still errors.

- Chevron's cost center and cost element designations are not part of or stated in accordance with generally accepted accounting principles (GAAP) and are therefore not the subject of Chevron's annual audit. The ordinary course accounting data is maintained and audited to provide a specific level of assurance regarding Chevron's compliance with generally accepted accounting principles for external reporting purposes. Chevron's independent auditor opinion states that "A company's internal control over financial reporting is a process designed to provide reasonable assurance

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

- Chevron's cost center and cost element classifications are not used in the preparation of or the reporting of Chevron's annual financial statements and annual filings with the SEC.

11. Due to the complexity of the differences between Chevron's ordinary course system data and Chevron's damage claim, the number and significance of the errors found during my system analysis and the fact that the ordinary course system controls do not apply to the damage claimed categorization, I concluded that Chevron's ordinary course system and controls did not provide a reliable approach or standalone basis to conclude that Chevron's damage claim costs were incurred in connection with the Elk Hills Equity Finalization Process.

12. Finally, it is important to emphasize that my conclusion does not question the occurrence of a Chevron expense. I would agree that the ordinary course accounting system and controls would provide a level of comfort concerning whether Chevron had incurred an expense. The key issue involving Chevron's damage claim is whether the Chevron expense was incurred in connection with the Elk Hills Equity Finalization Process. As indicated above, Chevron's ordinary course accounting system and controls do not provide stand alone support that the Chevron claim costs were incurred in connection with the Elk Hills Equity Finalization Process.

13. As a consequence of my systems analysis I proceeded to further investigate and analyze Chevron's damage claim on a detailed transaction basis. Based on my professional training and experience as a CPA and former audit partner for one of the largest accounting firms in

the world, I proceeded to further investigate certain specific Chevron transactions based on specific transaction characteristics that would cause the transaction to represent a greater risk of misstatement (size, timing, related party nature, frequency of occurrence, degree of estimation inherent in the amount, and degree of management judgment inherent in assigning this cost to the Elk Hills Equity Finalization Process). Based on my transaction investigation and analysis and as illustrated on **Exhibit 3**, I concluded that there were $8,219,202 of transactions with insufficient support to demonstrate that the claimed transaction was incurred in connection with the Elk Hills Equity Finalization Process.

14. I have provided a detailed identification of each category of adjustment that makes up the total adjustment of $8,219,202 on **Exhibit 4**. I provide the following explanation regarding each category of adjustment. However, it is once again important to emphasize that the objective of my transaction test is not whether an expense was incurred by Chevron. The objective of my test is to determine the extent to which Chevron has provided support that the expense that was incurred by Chevron was incurred in connection with the Elk Hills Equity Finalization Process. Simple name recognition of a vendor by an Elk Hills Equity Finalization employee was not sufficient support. I understand that there was at all times significant activity in and around the Elk Hills Equity Finalization Process that involved Chevron, or the San Joaquin Business Unit or some other activity within Elk Hills other than the Equity Finalization Process. Further, I understand based on testimony of Chevron employees connected to the Elk Hills Finalization Process that vendors that performed work for the Elk Hills Equity Finalization Process also performed other services for Chevron not associated with the Elk Hills Equity Finalization Process. Further, as the Chevron witnesses have indicated on numerous occasions it is not unusual that they cannot recall certain details

concerning an activity that occurred over a fifteen year time period. Accordingly, the basis of my test and the following adjustments is the extent to which Chevron has provided support that the expense that was incurred by Chevron was incurred in connection with the Elk Hills Equity Finalization Process.

15. The first adjustment on **Exhibit 4** is for unsupported transactions acknowledged by Chevron and Chevron's damage expert for $3,026,219. Both Chevron and Chevron's damage expert produced a detailed listing of transactions in support of the total damage claim. The detailed transaction listing contained various fields of information for each transaction including identified cost center, cost element, and cost category. The detailed transaction listing also contained a field labeled "amount supported." Accordingly, when the transaction had support the amount of the transaction was listed in the support column or field. When the transaction had no support the "amount supported" filed was left blank. In fact Chevron's damage expert produced a work paper titled "Summary Percent Of Total Claimed Incurred Costs Supported" in which he calculated and reported that the "Percent Of Total Claimed Incurred Costs Supported" was 82% of the total claimed costs. The total claimed costs on Chevron's damage experts work paper at the time was $49,466,819. Total incurred costs supported were $40,704,751. Accordingly, the total unsupported costs per Chevron were $8,762,068. My amount of $3,026,219 is considerably smaller and more conservative. I developed my number by looking only at cost categories that I would expect to have third party supporting documentation such as an invoice or business expense receipt. Accordingly, my adjustment of $3,026,219 is based on the amounts identified by Chevron as unsupported for only the cost categories that would be supported by third party supporting documentation. I did not include those cost categories such as Company Payroll & Benefits that would be supported by

internal documentation. It would not be inappropriate to consider Chevron's total $8,762,068 amount as unsupported as acknowledged by Chevron and Chevron's damage expert. In fact one way to consider the overall reasonableness of my total adjustments of $8,219,202 is to compare it to just what Chevron and Chevron's damage expert agree is unsupported.

16. I next proceeded to test those transactions that were identified as supported by Chevron to determine the extent to which Chevron has provided support that the expense that was incurred by Chevron was incurred in connection with the Elk Hills Equity Finalization Process. My approach in this test was to examine the produced support to determine the extent to which the support for the expense that was incurred by Chevron was incurred in connection with the Elk Hills Equity Finalization Process. My examination considered the earlier results of my systems test and the representations of Chevron employees. However, as explained above the simple name recognition of a vendor by an Elk Hills Equity Finalization employee was not sufficient support. Based on my original test and as disclosed in Exhibit 8 to my original expert report, I identified $1,096,025, $972,374 after the removal of transactions with Blue Ridge Design and Technical Services, of transactions without sufficient support that the expense that was incurred was incurred in connection with the Elk Hills Equity Finalization Process. The deficient transactions were represented by both large and small transactions. However, a series of large transactions involving one vendor, Blue Ridge Design & Technical Services, were particularly troubling and raised significant questions concerning the reliability of Chevron's process used to associate incurred expenses with the Elk Hills Equity Finalization Process. One example of the troublesome invoices was invoice bates stamped CVXD 0154. The invoice was for $85,191.25 from Blue Ridge Design & Technical Services mailed to Mr. Michael Stay to 33 Culpeper Street, Warrenton, VA. The

invoice did not identify or reference Elk Hills Equity Finalization in any way. Further, the invoice did not identify the nature of services or the individuals that provided the "Professional/Consulting Services, Support Services, and Clerical Services." There was no business address for Blue Ridge Design & Technical Services only a P.O. Box in Warrenton, VA, the same location of Michael Stay. Finally, Michael Stay was the person that authorized payment of this invoice. I reviewed the various Chevron deposition transcripts for an explanation of the services provided by Blue Ridge Design & Technical Services and could find none. Based on further investigation of Chevron's claim I determined that Blue Ridge Design & Technical Services had charged Chevron over $470,000 for unspecified services that Chevron had identified as expense relating to the Elk Hills Equity Finalization Process. Because of the peculiar nature of this invoice and related charges, I performed additional investigation of the public record and found that Blue Ridge Design & Technical Services was formed and operated by Cynthia Stay. The business address for the company was 13063 Country View Ln, Viewtown, VA. Finally, I determined that 13063 Country View Ln, Viewtown, VA was the personal residence of Michael and Cynthia Stay. The significance of these facts concerning the payment of an expense either directly to Michael Stay or to a directly related party of Michael Stay representing themselves to be a separate company, draws into question the credibility of all charges relating to Blue Ridge Design & Technical Services, all charges incurred as a result of, or authorized by, Michael Stay and the entire process employed by Chevron to authorize and pay expenses that Chevron has now identified as expenses relating to the Elk Hills Equity Finalization Process. I understand that Chevron has now withdrawn all invoices related to Blue Ridge Design & Technical Services and that a deposition of Michael Stay will occur sometime in the future. I have reserved further

comment or conclusion on the impact of this issue pending the outcome of the deposition of Michael Stay.

17. I next began my investigation and analysis of Chevron cost categories that were not supported by outside invoices. This group of cost categories (CVX Internal Technical Consultants and Company Payroll & Benefits) and the expenses therein are based on Chevron internal charges that largely represent the allocation of Chevron corporate costs to internal Chevron projects or programs. My investigation in this area focused specifically on the basis of Chevron's management decision regarding the allocation of corporate costs to Elk Hills Equity Finalization Process.

18. I began my investigation and analysis of Chevron's corporate cost allocation by reviewing the rates charged by CVX Internal Technical Consultants to internal Chevron projects. I determined that Chevron had produced a description of the procedures and policy for the Energy Technology Company (ETC) for only one year, 2005. Accordingly, I assumed that Chevron followed the same policy and procedures with respect to the development and charging of costs related to CVX Internal Technical Consultants. Based on the 2005 ETC Labor Rates document I determined that the goal of the ETC rates was to capture a full cost recovery of the costs of ETC. The key cost components include in the standard rates developed by ETC to be charged to other Chevron programs included payroll costs, office rent, computers and software, telecommunications and network connectivity, material and supplies, general travel costs, the president, planning, human resources, finance and HES. Accordingly, the costs included in this full cost recovery model included fixed costs that would have occurred even if the Elk Hills Equity Finalization Process did not occur. Further, the rates were standard fixed rates that were based on dividing the total ETC anticipated costs

for the year by the total number of ETC employees times 1,560 hours. Accordingly, if an ETC employee worked more than 1,560 hours in a year ETC would recoup even more than their total costs. I next compared the highest rate of an ETC employee charging time to the Elk Hills Equity Finalization Process to the inherent rate charged by Norman Stone, the most senior employee assigned directly to the Elk Hills Equity Finalization Process. I then compared Mr. Stone's inherent rate with the ETC employee and found that Mr. Stone's rate of $91 represented 56.9% of the ETC rate (**Exhibit 9**). Accordingly, I concluded that the inverse of this percentage, 43.1% represented the allocation of ETC costs over and above their salary and benefit costs and represented the fixed costs of ETC that would have existed even without the Elk Hills Equity Finalization Process. I multiplied the 43.1% times the total charged costs of the CVX Internal Technical Consultants on **Exhibit 10** to produce an adjustment of $2,114,214. Importantly, this analysis assumes that the ETC employees would have used every hour that they charged to the Elk Hills Equity Finalization Process on an alternative project. Accordingly, I do conservatively allow the full cost of the employees and their benefits.

19. Next, I reviewed the costs included in the Company Payroll & Benefits cost category. Based on my analysis of the costs included in this category, I determined that Chevron has included the salary costs for specific individuals that Chevron claims worked specifically on the Elk Hills Equity Finalization Process. Chevron also included a computer based charge for employee benefits. The benefits charge is based on a percentage of direct salaries that is intended to represent the costs associated with employee benefits. The percent that was applied to the employees charged to the Elk Hills Equity Finalization Process however is based on the cost ratio of employee benefits to direct salaries for a larger segment of Chevron

such as the San Joaquin Business Unit. I made no further investigation or adjustment of Chevron's direct salary costs associated with the individuals Chevron represents worked on the Elk Hills Equity Finalization Process. However, I did further investigate the employee benefits charge as discussed below.

20. Based on my further investigation of the costs included in the employee benefit rate used to calculate Chevron's damages relating to the Elk Hills Equity Finalization Process, I determined that the rate included certain accrued and unpaid costs that did not relate to the employees involved with the Elk Hills Equity Finalization Process. Certain of the benefits such as FICA and medical insurance would generally apply to all employees. However, four specific benefits: stock plan, savings plus plan, OPEB Cash, OPEB non-cash are employee benefit charges that are not universally included for all employees. Further, neither Norman D. Stone nor Kimberly Anne Melton could explain these four benefits. Based on the fact that Chevron has not provided any evidence to show that the claimed employees participated in these specific employee benefit programs and given that the Chevron witnesses did not know what these benefits were, I have made an adjustment of $1,492,556 to the damages as illustrated on **Exhibit 8** to remove the charge for these benefits based on the percentage that these unknown and unsupported benefits were to total benefits.

21. I have made a final adjustment for $938,524 for costs that Chevron has agreed were related to the sale of Elk Hill properties and not the Final Equity Process. Norman D. Stone stated in his declaration that Chevron's current damage claim includes approximately $1.4 million of transactions unrelated to Elk Hills Equity Finalization Process. He indicated that a portion of the invoices appear to be related, at least in part, to sale issues other than equity finalization. I understand that Chevron represents that a document with the Bates range of CVXD 4808 to

4810 contains that the total of the actual transactions referred to by Norman D. Stone in his Declaration. Included in this document is $427,518 of transactions relating to Blue Ridge Design & Technical Services that I have removed resulting in a final deduction of $938,524.

22. Next I performed an analysis to ensure that a transaction was not deducted more than once for different reasons. Accordingly, I reviewed all of the adjustments mentioned above and identified the transactions that appeared in more than one adjustment. **Exhibit 7** illustrates the basis of the amount that I have added back to Chevron's claim based on the fact that a transaction was included in more than one adjustment. For transactions that appeared in two adjustments I added back the amount of the transaction. For transactions that appeared in three adjustments I added back the amount of the transaction times two. Based on this approach the adjustment amounts presented on **Exhibit 4** can be considered on an individual gross basis. However, if more than one adjustment is considered **Exhibit 7** can be used to calculate the overlap of a transaction that may have been included in more than one adjustment.

23. Finally, I was asked by counsel to consider the extent to which Chevron would have incurred costs relating to the Elk Hills Equity Finalization Process even assuming no breach by the government. Based on a review of Chevron's actual costs and Chevron's actual projected costs prior to and without influence from any breach, I determined that Chevron's actual projected costs of accomplishing an Elk Hills Equity Finalization based on the testimony of Norman Stone was $24,000,000.

June 1, 2011

Terry L. Musika, CPA